1   PETER HSIAO (CA SBN 119881)
    PHsiao@mofo.com
2   MORRISON & FOERSTER LLP
    555 West Fifth Street
3   Los Angeles, California  90013-1024
    Telephone: 213.892.5200
4   Facsimile: 213.892.5454

5   ROBIN S. STAFFORD (CA SBN 200950)
    RStafford@mofo.com
6   MARK POE (CA SBN 223714)
    MPoe@mofo.com
7   MORRISON & FOERSTER LLP
    425 Market Street
8   San Francisco, California  94105-2482
    Telephone: 415.268.7000
9   Facsimile: 415.268.7522

10  Attorneys for Plaintiff
    THE NEWARK GROUP, INC.

11

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

15  THE NEWARK GROUP, INC.            Case No. 2:08-CV-02623-GEB-DAD

16              Plaintiff,            **PLAINTIFF'S MEMORANDUM
                                      OF POINTS AND AUTHORITIES
17      v.                            IN SUPPORT OF ITS MOTION
                                      FOR PARTIAL SUMMARY
18  DOPACO, INC.,                     JUDGMENT AS TO
                                      DEFENDANT'S LIABILITY
19              Defendant.            UNDER THE RESOURCE
                                      CONSERVATION AND
20                                    RECOVERY ACT ("RCRA")**

21                                    Date:      January 25, 2010
                                      Time:      9:00 a.m.
22                                    Courtroom: 10
                                      Judge:     Garland E. Burrell, Jr.
23

24

25

26

27

28

MPA ISO PARTIAL SUMMARY JUDGMENT
CASE NO. 2:08-CV-02623-GEB-DAD
sf-2747376

1

# TABLE OF CONTENTS

2

Page

3   TABLE OF AUTHORITIES ...................................................................................................... iii

I.       INTRODUCTION ....................................................................................................... 1

II.      STATEMENT OF FACT ............................................................................................ 3

         A.       The Property .................................................................................................... 3

         B.       Dopaco's Operations at the Property .............................................................. 4

                  1.       Dopaco's Use of Toluene ..................................................................... 4

                  2.       Storage of Toluene in Underground Storage Tanks ............................. 5

                  3.       Notice of Violation Issued  by the Regional Water Quality Control
                           Board ..................................................................................................... 6

                  4.       The Removal of Dopaco's Underground Storage Tanks ...................... 6

                  5.       Leaks from Dopaco's Underground Storage Tanks .............................. 6

                  6.       Dopaco's Spills at the Property ............................................................ 7

                  7.       Dopaco's Sumps ................................................................................... 8

                  8.       The Inadequate Testing Done at the Time of the UST Removal .......... 9

         C.       Newark's Discovery of Toluene Contamination at the Property ................... 10

         D.       Dopaco's Response to Newark's Inquiry ...................................................... 11

         E.       Toluene Poses Risks to Human Health and the Environment ....................... 11

III.     LEGAL STANDARD ............................................................................................... 13

         A.       Summary Judgment ....................................................................................... 13

         B.       Partial Summary Judgment ........................................................................... 14

         C.       The Resource Conservation and Recovery Act ............................................ 15

                  1.       The plaintiff's burden under RCRA's citizen suit provision ............. 15

                  2.       The RCRA citizen suit standard is to be liberally construed in favor
                           of protecting the environment ............................................................ 15

                  3.       Joint and Several Liability .................................................................. 16

IV.      ARGUMENT ............................................................................................................ 17

         A.       The Conditions at the Property Present an Imminent and Substantial
                  Endangerment to the Environment ................................................................ 17

         B.       The Endangerment Stems from Handling, Storage, and Disposal of
                  Hazardous Waste at the Property .................................................................. 19

         C.       Dopaco generated RCRA hazardous waste and contributed to its storage,
                  handling and disposal at the Property ........................................................... 20

                  1.       Dopaco created RCRA hazardous waste by discarding toluene into
                           the waste tanks .................................................................................... 20

                  2.       Dopaco's spills were "disposals" of hazardous waste ....................... 20

                  3.       Dopaco's leaking toluene tank was also a "disposal." ....................... 21

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3    4.    Dopaco also "disposed" of toluene that leaked from the floor and
         floor sumps in the basement.................................................................... 22

4    D.    Dopaco Cannot Escape Liability by Theorizing About the Conduct of
         Others ............................................................................................................ 22

5    E.    Equitable Principles Require a Finding of Liability Against Dopaco.................. 23

6  V.    CONCLUSION ....................................................................................................... 26

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 14

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
    69 F.3d 337 (9th Cir. 1995) .................................................................................... 14

*ASEA, Inc. v. S. Pac. Transp. Co.*,
    669 F.2d 1242 (9th Cir. 1981) ................................................................................ 25

*Aurora Nat'l Bank v. Tri Star Mktg.*,
    990 F. Supp. 1020 (N.D. Ill. 1998) ................................................................ 16, 22

*British Airways Bd. v. Boeing Co.*,
    585 F.2d 946 (9th Cir. 1978) .................................................................................. 13

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
    505 F.3d 1013 (10th Cir. 2007) ................................................................ 15, 16, 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 13

*City of Bangor v. Citizens Commc'ns Co.*,
    437 F. Supp. 2d 180 (D. Me. 2006) ................................................ 16, 17, 22, 23

*City of Bangor v. Citizens Commc'ns Co.*,
    532 F.3d 70 (1st Cir. 2008) .................................................................................... 22

*Cox v. City of Dallas*,
    256 F.3d 281 (5th Cir. 2001) .................................................................................. 16

*Craig Lyle Ltd. P'ship v. Land O' Lakes, Inc.*,
    877 F. Supp. 476 (D. Minn. 1995) ........................................................................ 21

*Dague v. City of Burlington*,
    935 F.2d 1343 (2nd Cir. 1991) ........................................................................ 14, 17

*Dydio v. Hesston Corp.*,
    887 F. Supp. 1037 (N.D. Ill. 1995) ...................................................................... 21

*Eisenberg v. Ins. Co. of N. Am.*,
    815 F.2d 1285 (9th Cir. 1987) ................................................................................ 13

*Henry v. Champlain Enters., Inc.*,
    212 F.R.D. 73 (N.D.N.Y. 2003) ............................................................................ 25

iii

*In re Placid Oil*,
    932 F.2d 394 (5th Cir. 1991) ........................................................................ 14

*Jackson v. Bank of Haw.*,
    902 F.2d 1385 (9th Cir. 1990) ...................................................................... 14

*Lincoln Props. v. Higgins*,
    No. S-91-760 DFL/GGH,
    1993 U.S. Dist. LEXIS 1251 (E.D. Cal. Jan. 18, 1993) ..................... 15, 16, 17, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................................... 14

*Me. People's Alliance v. Mallinckrodt, Inc.*,
    471 F.3d 277 (1st Cir. 2006) ............................................................. 16, 17, 22

*Paper Recycling, Inc. v. Amoco Oil Co.*,
    856 F. Supp. 671 (N.D. Ga. 1993) ................................................................ 21

*Parsons v. Jefferson-Pilot Corp.*,
    789 F. Supp. 697 (M.D.N.C. 1992) ............................................................... 14

*United States v. Conservation Chem. Co.*,
    619 F. Supp. 162 (W.D. Mo. 1985) ..................................................... 15, 17, 18

*Vas-Cath, Inc. v. Mahurkar*,
    745 F. Supp. 517 (N.D. Ill. 1990) ................................................................ 14

*W. Fed. Savings & Loan Ass'n v. Heflin Corp.*,
    797 F. Supp. 790 (N.D. Cal. 1992) ............................................................... 14

*Waste, Inc. Cost Recovery Group v. Allis Chalmers Corp.*,
    51 F. Supp. 2d 936 (N.D. Ind. 1999) ............................................................ 16

*Zands v. Nelson*,
    779 F. Supp. 1254 (S.D. Cal. 1991) .............................................................. 21

*Zands v. Nelson*,
    797 F. Supp. 805 (S.D. Cal. 1992) ("*Zands II*") ........................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATUTES & CODES**

42 U.S.C.

§ 6903(3) ............................................................................................................ 22
§ 6903(5) ............................................................................................................ 21
§ 6972(a) ............................................................................................................ 15
§ 6972(a) (1)(B) ................................................................................................. 15

Resource Conservation and Recovery Act, 42 U.S.C.

§ 6902 ("RCRA") ......................................................................................... *passim*

**RULES & REGULATIONS**

40 C.F.R.

§ 141.61(a)(16) ................................................................................................. 12
§ 261.2(b)(1) ..................................................................................................... 20
§ 261.2(b)(2) ..................................................................................................... 20
§ 261.31(a) ........................................................................................................ 19
§ 261.33 ............................................................................................................. 21
§ 261.33(a) ........................................................................................................ 19
§ 261.33 (f) ........................................................................................................ 19

Fed. R. Civ. P.

30(b)(6) ............................................................................................... 4, 20, 24, 25
36(a)(4) ............................................................................................................. 25
56(a) .................................................................................................................. 13
56(c) .................................................................................................................. 13
56(d) .................................................................................................................. 14

William Schwarzer, *Summary Judgment Under the Federal Rules:  Defining Genuine Issues Of Fact*, 99 F.R.D 465 (1984) ................................................................... 14

## I.     INTRODUCTION

Plaintiff The Newark Group ("Newark") brought this action in November 2008 to compel the defendant Dopaco, Inc. ("Dopaco") to accept responsibility for remediating toluene contamination that it caused at Newark's property located at 800 West Church Street in Stockton, California (the "Property").  Now that fact discovery has concluded in this case, it is clear that Newark is entitled as a matter of law to summary adjudication of its claims under the Resource Conservation and Recovery Act, 42 U.S.C. § 6902 ("RCRA").

Section 6902, RCRA's citizen suit provision, imposes joint and several liability on companies that cause or contribute to the storage, handling, or disposal of hazardous waste that may present an imminent and substantial endangerment to human health or the environment. This provision provides the Court with broad authority to fashion an equitable remedy to address any risks posed by such hazardous waste.  Dopaco has either admitted or otherwise cannot dispute facts that lead inexorably to its liability under this standard and justify the injunctive relief sought by Newark in this action.  Indisputable evidence proves that Dopaco—a tenant of the Property's former owner from 1981 to 1988—stored, handled, and disposed of toluene at the Property.  That toluene became a RCRA hazardous waste when it was released to the environment through three pathways associated with Dopaco's printing operation:  (1) Leakage from a 4,000 gallon underground storage tank ("UST") in which Dopaco stored toluene, and/or its associated piping, (2) leakage and surface spills of toluene associated with two waste USTs into which Dopaco disposed of toluene-containing waste ink, and (3) leakage of toluene and toluene-containing waste inks through the floor of Dopaco's basement operation.

Dopaco's contributions to these sources of toluene contamination are well-documented with evidence from disinterested third parties that Dopaco cannot dispute:  First, the environmental consultant that excavated the 4,000-gallon USTs near the end of Dopaco's tenancy reported that soils excavated from the pit smelled like solvent.

Second, Dopaco's surface spills were documented by the Regional Water Quality Control Board for the Central Valley Region ("Regional Board"), which expressly cited Dopaco's poor practices in a Notice of Violation issued in 1985. Among other things, The Regional Board called

1   out Dopaco's "obvious spills" around the waste tanks, and ordered Dopaco to cease emptying

2   drums of waste ink into the waste tanks by hand.  Dopaco has admitted that the waste inks it

3   generated at the Property contained toluene.

4          Third, Dopaco's landlord, the former owner of the Property, described having to clean up

5   30 barrels full of accumulated toluene-containing waste-ink residue that was left behind in pits in

6   the floor when Dopaco vacated the Property.  The pits were located directly under Dopaco's

7   rotogravure printing press.

8          Finally, two separate environmental consultants have confirmed that the groundwater and

9   soil immediately adjacent to Dopaco's operation is contaminated with toluene at levels thousands

10  of times higher than action standards established by the U.S. Environmental Protection Agency

11  ("EPA") and the California Environmental Protection Agency ("CalEPA").  The highest

12  concentrations of toluene – along with high concentrations of another chemical associated with

13  rotogravure inks – were discovered in close proximity to the UST in which Dopaco stored

14  toluene, the basement where Dopaco piped in and dispensed the toluene, and the floor pit in

15  which toluene-containing waste ink had accumulated for years.  There is no plausible source for

16  the contamination other than the rotogravure printing operation that Dopaco ran during its

17  tenancy at the Property.

18         Dopaco's spills and leaks have contributed to conditions that constitute an imminent and

19  substantial endangerment to the environment.  The EPA has found toluene to be harmful to

20  microorganisms in the environment and lethal to aquatic life at concentrations as low as 9.5 parts

21  per million ("ppm").  The samples taken in 2005 and 2006 in the vicinity of Dopaco's toluene

22  UST showed toluene in concentrations as high as **6,800 ppm** in groundwater and **13,000 ppm** in

23  soils.

24         RCRA empowers this Court to grant Newark summary judgment and fashion a remedy

25  necessary to eliminate any risks posed by this contamination.

26

27

28

II.     STATEMENT OF FACT

A.     The Property

Between 1917 and 2003, the Property was the site of a paper mill that principally made paperboard, the non-corrugated "cardboard" used to make cereal boxes, fast food containers, and a variety of other consumer and industrial paper products.  (Declaration of Robin Stafford ("Stafford Decl.") Ex. 1.)  In addition to the paper-making facility, the Property included a "carton plant" and printing operations, where the paperboard was printed with ink, cut, and converted into packaging.  (*Id.*)  Those printing operations consisted of two departments—a lithography department and a rotogravure department.  (*Id.* at NEW 1837-38.)  In lithography printing, which had taken place on the Property since the 1930s, sheets of paperboard are stamped with ink-covered plates.  (*Id.* at NEW 1837.)  In rotogravure printing, which began at the Property in the 1950s, a continuous sheet of paper is run through a series of ink-covered rollers, each of which applies a different color. (*Id.* at NEW 1838.)

The Property became part of Fiberboard Products, Inc. in 1927.  (*Id.* at NEW 1836.) Fiberboard owned the facility until November 1977, when it sold the Property to a new company called Pacific Paperboard Products, Inc.  (*Id.* at NEW 1839.)  That company dissolved shortly thereafter, and the Property was sold to the Gold Bond Division of National Gypsum Company ("Gold Bond") on July 1, 1981.  (*Id.*)

Gold Bond was only interested in the papermaking operation, so it shut down the printing operations by mid-September of 1981.  (*Id.*)  Gold Bond sold the lithography equipment to San Joaquin Packaging Company, which became a tenant in the upper level of the printing building, and it sold the rotogravure printing presses to Dopaco, which leased the basement level of the printing building.  (*Id.* at NEW 1840.)

Dopaco ran the rotogravure printing operation from the beginning of its lease on December 1, 1981 until an uncertain date in 1988, when it took its presses and moved to a new location in Stockton.  (Plaintiff's Statement of Undisputed Facts ("SUF") ¶¶ 2, 18.)  Newark purchased the Property the following year.  (SUF ¶ 1.)  Like Gold Bond, Newark operated only the paper plant, not the printing operations.  After San Joaquin Packaging departed in 1991, no

1    commercial printing took place at the Property, and Newark did not use toluene in its operations.

2    (SUF ¶ 19.)  In March 2003 Newark closed the paper plant, and except for a small paper

3    recycling business, the Property has been dormant.  (*See* Stafford Decl. Ex. 2, (Deposition of

4    Robert Mullen (Sept. 17, 2009) (hereafter "Mullen Dep.") 29:12-30:10).)

5              **B.      Dopaco's Operations at the Property**

6              Dopaco operated two rotogravure printing presses at the Property from December 1981

7    until it left the Property in 1988.  (SUF ¶ 2.)  For the first several years of its tenancy, Dopaco

8    used "solvent-based inks"—inks that were made using various chemical solvents, such as normal

9    propyl acetate, isopropyl acetate, and toluene. (Stafford Decl. Ex. 3 (Deposition of Robert

10   Sheehan, (Sept. 23, 2009) (hereafter "Sheehan Dep.") 26:7-21).)[1]  Those solvents were used both

11   to dilute the ink, and to clean the presses between printing runs.  (Declaration of Roger Avery ¶

12   4.)

13              **1.      Dopaco's Use of Toluene**

14             Among the solvents that Dopaco used throughout its tenancy at the Property was toluene,

15   a colorless solvent with an "aromatic hydrocarbon" odor.  (SUF ¶ 4.)  In its responses to Requests

16   for Admissions, Dopaco has admitted to using toluene as a diluent for the inks used in its printing

17   operations, a fact that is consistent with contemporaneous documents.  (SUF ¶ 4; Stafford Decl.

18   Ex. 4.)  Dopaco's Rule 30(b)(6) witness Robert Sheehan—a former "Gravure Superintendent" at

19   the Property—testified that Dopaco actually used toluene only in the "top lacquer" that it applied

20   to cartons after the pigmented inks had been applied.  (Sheehan Dep. at 29:2-17.)  Mr. Sheehan

21   noted, however, that Dopaco used the generic term "ink" broadly enough to include the toluene-

22   based top lacquer.  (*Id.* at 158:17-21.)  In either case, two facts are undisputed:  (1) Dopaco used

23

24

25   [1] For ease of reference, the deposition transcripts of Mr. Mullen (Newark's 30(b)(6) witness) and
     Mr. Sheehan (Dopaco's 30(b)(6) witness) are referred to hereafter simply as "Mullen Dep." and
26   "Sheehan Dep." without repeating the reference to Exhibits 2 and 3 of the Stafford Declaration.

27

28

1   and stored toluene as part of its operations, and (2) the waste ink produced by those operations

2   contained toluene.

3   **2.      Storage of Toluene in Underground Storage Tanks**

4          The chemicals that were used in the printing operations at the Property were stored in a

5   series of six USTs referred to as the "product tanks," which were buried in the ground

6   immediately outside the entrance to Dopaco's basement premises.  (Avery Decl. ¶ 5, Ex. 2.)

7   Dopaco used five of those product tanks, and San Joaquin Packaging used one.  (*Id.* ¶ 6, Ex. 3.)

8   Among Dopaco's tanks was the 4,000 gallon toluene tank.  (*Id.*)  An electric pump sat inside each

9   tank so that the solvent could be dispensed to the inside of the building.  (SUF ¶ 6.)  The pump

10  forced the solvents, under pressure, through piping made of an unknown material, to a nozzle in

11  the interior of the building.  (*Id.*; Sheehan Dep. 86:13-16.)  Neither the piping nor the toluene tank

12  was ever tested for leaks (SUF ¶ 20), and Mr. Sheehan agreed that a minor leak would likely have

13  gone unnoticed by Dopaco:  "Yeah, I don't know if we would have caught on to anything like

14  that . . . a pin hole, I don't know."  (Sheehan Dep. 201:17-203:3.)

15         In addition to the toluene product tank, Dopaco also used two 2-3,000 gallon USTs

16  referred to as "waste tanks."  (SUF ¶ 7.)  Dopaco disposed of "waste ink and solvents" from its

17  printing operation into those waste tanks by two methods:  (1) pumping the waste from the

18  building through underground pipelines leading 200'-300' to the tanks, and (2) by pouring drums

19  of waste directly into the tops of the tanks, which emerged above ground level.  (Stafford Decl.

20  Ex. 5 at DOPACO 257); Sheehan Dep. at 78:5-25.)  Aside from one occasion where Gold Bond

21  disposed of unknown materials into the waste tanks, Dopaco was the exclusive user of those tanks

22  during its tenancy.  (Sheehan Dep. 65:1-16, 106:20-107:5.)  Like the product tanks and their

23  piping, Dopaco took no steps to ascertain whether the waste tanks and their associated piping

24  leaked.  (SUF ¶ 20.)  A series of hazardous waste manifests that Dopaco produced in this

25  litigation shows that the waste tanks typically contained between 10% and 20% toluene.

26  (Stafford Decl. Ex. 6.)

27

28

1

2

**3.      Notice of Violation Issued  by the Regional Water Quality Control Board**

3      In response to a complaint of "red dye" in a slough adjacent to the Property, inspectors

4   from the San Joaquin County Environmental Health Department and the California Regional

5   Water Quality Control Board inspected the Property on May 17 and September 23, 1985.

6   (Stafford Decl. Ex. 5.)  Following the inspections, the Regional Board issued a Notice of

7   Violation ("NOV") to Gold Bond, as the owner of the Property, requiring it to abate a handful of

8   violations.  (*Id.*)  In a separate section entitled "Dopaco," the inspection report that accompanied

9   the NOV identified several improper practices by Dopaco, including (1) dumping of red ink into a

10  sump that drained directly to the slough, (2) improper storage of solvent-containing drums, and

11  (3) "considerable spillage around the [waste] tanks."  (*Id.* at DOPACO 257.)  To address the

12  surface spillage, the report stated that "the practice of dumping waste drums into the tank by hand

13  needs to be upgraded to prevent spills."  (*Id.*)  In contrast to Dopaco's practices, the Regional

14  Board observed "no apparent problems" with regard to San Joaquin Packaging's operation. (*Id.*)

15      **4.      The Removal of Dopaco's Underground Storage Tanks**

16      On January 7, 1986, a meeting was held to discuss the NOV among representatives from

17  Gold Bond, Dopaco, San Joaquin Packaging, an environmental consultant, the Regional Water

18  Board, the state Toxic Substances Control Division, and the county Health Department.  (Stafford

19  Decl. Ex. 7.)  To address the problems with Dopaco's USTs, Roger Avery, the then-plant

20  manager for Dopaco, agreed that Dopaco would remove the two waste tanks and its five product

21  tanks.  (*Id.* at NEW 297.)  Gold Bond and Dopaco obtained quotes for the excavation project, and

22  eventually American Environmental Management Corporation ("AEMC") was selected to do the

23  removal.  (Stafford Decl. Ex. 8.)  The tanks were removed on September 30 and October 2, 1986,

24  after which they were scrapped for disposal. (SUF ¶ 10.)

25      **5.      Leaks from Dopaco's Underground Storage Tanks**

26      An inspector from the Environmental Health Department was present on the dates the

27  tanks were excavated.  With respect to the waste tanks, the inspector's handwritten notes state

28  that they "showed signs of leakage; ink could be seen around tanks and soil."  (SUF ¶ 10, Stafford

1  Decl. Ex. 9.)  The "Excavation Report" prepared by AEMC also noted the "visible ink stains"

2  "along the sides and bottom of the excavation," and noted that "odors were detected in the

3  excavation but not the excavated soils."  (SUF ¶ 10, Stafford Decl. Ex. 10 at NEW 948-949).)

4      As for the product tank excavation, AEMC noted that "a slight odor was detected in the

5  pit," and AEMC segregated the "soils containing the strongest odors."  (*Id.*)  AEMC noted that

6  there was no visible staining in the product tank excavation, but Mr. Sheehan agreed that because

7  toluene and other solvents are clear, he would not expect them to leave visible stains.  (*Id.* at

8  NEW 947; Sheehan Dep. 116:15-117:11.)  When asked where the odor in the product tank

9  excavation could have come from, Mr. Sheehan conceded:  "One would assume, I guess, from the

10  tanks that were there."  (*Id.* at 115:23-116:9.)

11      **6.    Dopaco's Spills at the Property**

12      Aside from the evidence of leakage from the USTs, there are numerous contemporaneous

13  accounts of spillage on the ground surface outside of Dopaco's operation.  As noted, the NOV

14  observed "considerable spillage around the tanks."  (Stafford Decl. Ex. 5 at DOPACO 257.)  A

15  later memorandum authored by the Regional Board noted "the obvious spills surrounding the

16  tanks."  (Stafford Decl. Ex. 11 at NEW 83.)  A more thorough description is found in one of the

17  quotes prepared by a contractor in preparation for removing the USTs:

18      [M]y assessment of the plant tour identified [the waste USTs] as
       probably the most significant environmental problem faced by the
19      facility.  **Ground spillage of  solvent waste was very apparent
       and presents a potential threat to the local ground water
20      quality**.  We strongly recommend that your tenant, Dopaco, be
       requested to discontinue use of these tanks and improve their
21      current waste handling practices as soon as it is practical. . . .
       Although the standard procedure for testing of discontinued and
22      excavated tanks is to sample every 200 square feet of underlying
       soils, it is our opinion that **current site conditions will hamper the
23      ability to distinguish soil contamination from surface spillage or
       a tank leak**. . . .  **It was apparent that soil contamination exists
24      in the immediate area and soil boring at this time would only be
       useful to begin an assessment of the extent** of such
25      contamination.

26  (Declaration of Donald Rothenbaum, Ex. 1 (NEW 995-1002 at 996) (emphasis added).)

27      Mr. Sheehan admitted that there was no evidence to dispute this description of the extent

28  of the surface spillage, and nothing indicating that the description was exaggerated.  (Sheehan

1  Dep. at 101:19-103:19.)  Mr. Sheehan further admitted that aside from ceasing its use of the tanks

2  in preparation for their removal, Dopaco took no steps to remediate the surface spillage.

3  (Sheehan Dep. at 108:9-109:8.)  And when asked whether there was "any affirmative reason to

4  believe that the waste ink would not have contained toluene," he responded, "You can make that

5  assumption that there might have been toluene in the waste ink."  (Sheehan Dep. 160:1-13.)

6         **7.**    **Dopaco's Sumps**

7       Dopaco's 6-color rotogravure printing press was situated atop a sump that captured waste

8  ink from the press during its operation.  (SUF ¶ 9.)  In December 1988, after Dopaco left the

9  Property, Gold Bond discovered that the sump was filled with ink residue.  (*Id.*)  Gold Bond hired

10  a contractor to remove 30 barrels of ink residue and haul it offsite for disposal.  (*Id.*)  Although

11  Gold Bond described the ink residue as "completely contained in the concrete sump in the floor,"

12  this conclusion was unsupported by data, since there is no indication that Gold Bond conducted

13  any soil or groundwater tests to determine whether the sump leaked.  (*Id.* (NEW 87-93, 89).)  The

14  groundwater samples that set this litigation in motion indicate that waste inks from these sumps

15  did in fact leak into soil and groundwater—in addition to toluene, the samples taken immediately

16  adjacent to Dopaco's basement premises contained elevated levels of methyl isobutyl ketone

17  ("MIBK"), a chemical constituent of the inks used in the rotogravure printing process.  (RJN Ex.

18  G, H.)

19       Another potential route for the contamination is an area of Dopaco's basement operation

20  known as the "solvent wash up room."  The solvent wash up room is located approximately ten to

21  twelve feet from the location of the highest toluene levels found at the Property.  (Stafford Decl.

22  Ex. 12 at DOPACO 2054.)  This area contained dispensers that were connected to the product

23  tanks by individual pipelines.  (Avery Decl. ¶ 7.)  As with the sump under the press, any cracks or

24  leaks in the floor of the solvent wash up room would create preferential pathways for toluene

25  spilled during handling to enter the subsurface through joints or cracks in the concrete or through

26  associated piping.

27

28

### 8.        The Inadequate Testing Done at the Time of the UST Removal

AEMC, the contractor hired to perform the UST excavation, submitted a removal plan to the regulatory agencies in May 1986.  (Stafford Decl. Ex. 13.)  A memo between personnel of the Regional Board described the shortcomings of AEMC's removal plan, noting that "[n]either Gold Bond nor American Environmental have committed to fully investigate the potential soil and ground water problems on the site."  (Stafford Decl. Ex. 11 at NEW 83.)  The Board recommended that AEMC should submit a revised plan that "should include soil borings to ground water around the tank and borings to ground water below the tank," and noted the possibility that some of the contents of the tanks would "float on the phreatic [i.e., underground] water surface."  (*Id.* at NEW 83-84.)  AEMC submitted a revised proposal on July 22, 1986, that proposed three "tentative monitoring well locations."  (Stafford Decl. Ex. 14 at DOPACO 374, 381.)

In September and October when the USTs were eventually removed, however, no groundwater was actually tested.  The testing that AEMC actually did was limited to two samples of soil taken from "approximately two feet below the bottom" of each excavated tank, or roughly ten feet below the ground surface.  (SUF ¶ 11.)  Although low levels of toluene were detected in several of the soil samples, they were below regulatory thresholds.  (*Id.* (NEW 957-968).)  In November, six additional soil samples were taken at the request of the County Environmental Health District, and then the product tank excavation was backfilled with the excavated soil. (Stafford Decl. Ex. 15 at NEW 815.)  After more discussion with the County, the waste tank excavation was also backfilled with excavated soil (minus the visibly stained portions) in December 1986.  (Stafford Decl. Ex. 16.)  For unknown reasons, no groundwater sampling was ever performed, and there is no evidence that the monitoring wells were ever installed.  Ironically, AEMC's excavation report disavowed the need for more testing, even while anticipating the very contamination that is currently at issue:  "Considering the depth and location of the samples, the only possible environmental and/or health threat of contamination is to groundwater."  (Stafford Decl. Ex. 10 at NEW 950.)

1  The failure to sample groundwater evidently went unnoticed until 1997, when the new

2  owner, Newark, learned that the excavation had never been formally "closed" by the regulatory

3  agencies.  Newark requested a "closure letter," but the Regional Board declined to issue one

4  unless additional testing was done.  (Stafford Decl. Ex. 17.)  The Board further noted that "during

5  the excavation of the tanks in 1985 [sic, 1986] groundwater occurred at approximately 20 ft bgs

6  [*i.e.*, below ground surface]."  (*Id.*)  Acting on the recommendation of a former Gold Bond

7  employee, Newark did not undertake the testing the Regional Board had suggested, and thus a

8  formal closure letter was never issued for the UST removal. (Stafford Decl. Ex. 18.)

9  **C.      Newark's Discovery of Toluene Contamination at the Property**

10  The severity of the toluene contamination was discovered in 2005, after the paper plant

11  closed and Newark was preparing to sell the Property.  A prospective buyer, Atlas Properties,

12  Inc., had entered an option to purchase the property for $5 million, but prior to consummating the

13  deal it retained an environmental consultant called Advanced GeoEnvironmental, Inc. ("AGE") to

14  conduct a series of onsite soil borings.  (SUF ¶ 12; Stafford Decl. Ex. 19 at NEW 2520, 2529.)

15  The boring in the area of Dopaco's product tanks revealed that the soil 15 feet below ground was

16  contaminated with 13,000 parts per million (ppm) of toluene, and the groundwater sample from

17  the same boring showed 6,800 ppm of toluene. (SUF ¶ 12.)  Within days of receiving those

18  results, Atlas terminated its offer, but expressed willingness to renegotiate the purchase "at a

19  drastically reduced price."  (Stafford Decl. Ex. 20.)

20  Atlas shared the AGE test results with Newark, and Newark retained its own consulting

21  expert to confirm the results.  (SUF ¶ 13.) That company, MACTEC, took additional borings in

22  the area, and confirmed the presence of toluene in adjacent groundwater.  (*Id.*)  Based on the five

23  borings that had been made in that area, MACTEC's analyst concluded that the toluene

24  contamination extended to an "an approximately 50 foot by 50 foot area surrounding [boring] B-

25  1."  (*Id.*, Stafford Decl. Ex. 21 at NEW 303.)

26  In the intervening years, several other prospective buyers have approached Newark with

27  an interest in buying the property, but all of them have either abandoned their bid, or drastically

28  reduced it, upon learning of the toluene contamination.  (Mullen Dep. at 129:20-131:25); *see also,*

1   *e.g.*, Stafford Decl. Exs. 22-28 (NEW 2476-77 (offering); 4299 (withdrawing offer); 3292-3298

2   (offering); 4224 (withdrawing offer); 5886-91 (offering); 5203 (withdrawing offer); 6288-6290

3   (offering $1.5 million "as-is").)

4   **D.      Dopaco's Response to Newark's Inquiry**

5          Upon reviewing the history of the Property and the available contemporaneous

6   documents, Newark concluded that Dopaco was responsible for the toluene contamination.

7   Newark thus contacted Dopaco to discuss how the costs of remediation might be shared, and

8   provided Dopaco with several of the documents that demonstrate its responsibility.  (Stafford

9   Decl. Ex. 29 (Letter from Phoebe Robb to David Ascher (June 5, 2006) (Ex. 23 to Sheehan

10  Dep.).)  Dopaco flatly refused, contending that "it has not been shown, and in Dopaco's view

11  cannot be shown, that any toluene present on the property is attributable to Dopaco."  (*Id.*)

12  Dopaco further described interviews "with several employees" that purportedly supported its

13  conclusion that "Dopaco never stored waste ink in underground storage tanks at the property."

14  (*Id.*)  Dopaco has since admitted that this statement is not true.  (SUF ¶ 7 (Dopaco's Resp. to RFA

15  6).)  At another point in its response, Dopaco recognized that the October 2, 1986 Inspection

16  Report described "a leaking underground storage tank containing waste ink," but insisted that the

17  tank "was not used or operated by Dopaco."  (Stafford Decl. Ex. 29 (Robb Letter).)  Dopaco has

18  also admitted that this statement is not true.  (SUF ¶ 7 (Dopaco's Resp. to RFA 6); Sheehan Dep.

19  194:8-198:2.)  It now admits that it used the waste tanks during its entire tenancy until March of

20  1986, but still maintains the conclusion that it did not contribute to the toluene contamination.

21  (Sheehan Dep. 199:13-201:2; 172:17-179:5.)

22  **E.      Toluene Poses Risks to Human Health and the Environment.**

23          According to a summary of various toluene toxicity studies compiled by the U.S.

24  Environmental Protection Agency:

25              Humans exposed to intermediate to high levels of toluene for short
               periods of time experience adverse central nervous system effects
26              ranging from headaches to intoxication, convulsions, narcosis, and
               death. . . . Exposure to 600 ppm for 8 hours resulted in the same and
27              more serious symptoms including euphoria, dilated pupils,
               convulsions, and nausea (U.S. EPA 1994).  Exposure to 10,000-
28              30,000 ppm has been reported to cause narcosis and death (U.S. Air

1
2
3
4

> Force 1989). . . . Exposures to high levels of toluene can result in adverse effects in the developing human fetus. . . . Variable growth, microcephaly, CNS dysfunction, attentional deficits, minor craniofacial and limb abnormalities, and developmental delay were seen in three children exposed to toluene in utero as a result of maternal solvent abuse before and during pregnancy (U.S. EPA 1994)."

5   (Plaintiff's Request for Judicial Notice ("RJN"), Ex. E.)  As noted, AGE's boring sample showed

6   levels at 13,000 ppm in soil (well within the range that can cause death) and 6,800 ppm in

7   groundwater.  (SUF ¶ 12.)

8          These levels far exceed applicable state and federal cleanup standards.  The Regional

9   Board considers all groundwater in the Central Valley Region to be potential sources of

10   municipal or domestic water supply.  (RJN, Ex. A.)  To protect these beneficial uses, the Regional

11   Board has established a "taste and odor objective" for toluene of 0.042 ppm, to meet the goal that

12   "groundwater shall not contain taste- or odor-producing substances in concentrations that cause

13   nuisance or adversely affect beneficial uses."  (*Id.*, Ex. B.)  The California Environmental

14   Protection Agency's Office of Environmental Health Hazard Assessment has adopted a public

15   health goal for toluene in drinking water of 150 parts per billion, or 0.15 ppm.  (*Id.*, Ex. C.)  The

16   U.S. EPA has set the most permissive standard, allowing a Maximum Contaminant Level for

17   toluene of 1 ppm, 40 C.F.R. § 141.61(a)(16), based on its assessment of "the best available

18   science to prevent potential health problems."[2]

19          EPA Region 9 has established soil "screening" levels as tools to assist risk assessors in

20   determining "whether levels of contamination found at the site may warrant further investigation

21   or site cleanup."[3]  These tools are to be used in assessing risks to human health.  The highest soil

22   screening level for toluene is 60 ppm.  (RJN, Ex. D.)  EPA Region 9 has also set a Primary

23   Remediation Goal for toluene in soils of 520 ppm.  (*Id.*)

24          Toluene is also toxic to the natural environment.  The same EPA summary quoted above

25   reports that the LC50 value (*i.e.*, the concentration necessary to kill 50% of fish in a 4-day test) is

26   _____

[2] http://www.epa.gov/ogwdw000/contaminants/dw_contamfs/toluene.html.

27   [3] http://www.epa.gov/reg3hwmd/risk/human/rb-concentration_table/usersguide.htm.

28

1     12-72 ppm for minnows, 13-24 ppm for bluegill, and 28-59 ppm for guppies.  (RJN, Ex. E)

2     Toluene is also toxic to invertebrates at levels between 9.5 and 25 ppm.  (*Id.*)  Indeed,

3     contamination that exceeds toluene's soil and groundwater saturation level of 526 ppm can be

4     toxic to the microorganisms that might otherwise remediate the contamination naturally.  (RJN,

5     Ex. F.)  The groundwater concentrations outside the printing shop are thousands of times these

6     levels.

7     **III.**     **LEGAL STANDARD**

8         **A.**     **Summary Judgment**

9         Federal Rule of Civil Procedure 56(a) allows any party claiming relief to move for

10     summary judgment "on all or part of the claim."  Fed. R. Civ. P. 56(a).  Rule 56(c) requires a

11     court to grant summary judgment when "the pleadings, depositions, answers to interrogatories,

12     and admissions on file, together with affidavits, if any, show that there is no genuine issue as to

13     any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

14     Civ. P. 56(c).  Summary judgment is not to be viewed as a "disfavored procedural shortcut, but

15     rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just,

16     speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317,

17     327 (1986).

18         The moving party has the initial burden of demonstrating for the court that there is no

19     genuine issue of material fact.  *Celotex*, 477 U.S. at 322-23.  However, the moving party need not

20     produce evidence negating the existence of an element for which the opposing party bears the

21     burden of proof.  *Id.* at 322.

22         After the moving party makes a properly supported motion, the burden shifts to the

23     responding party, who must present specific facts showing that contradiction is possible.  *British*

24     *Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950-52 (9th Cir. 1978).  It is not enough for the

25     responding party to point to the mere allegations or denials in the pleadings.  Rather, the party

26     must set forth, by admissible evidence, specific facts demonstrating the existence of an actual

27     issue for trial.  Such facts must be more than merely "colorable."  *Eisenberg v. Ins. Co. of N. Am.*,

28     815 F.2d 1285, 1288 (9th Cir. 1987).  Rather than a mere "scintilla" of support, the responding

1  party must show that the trier of fact could reasonably find in its favor. *Anderson v. Liberty*

2  *Lobby, Inc.*, 477 U.S. 242, 252 (1986).  To make that determination, the Court would consider

3  whether Dopaco's evidence is of sufficient "caliber or quantity" to persuade a rational finder of

4  fact. *Id.* at 254; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

5  (1986) (not enough to show some metaphysical doubt as to material facts); *Anheuser-Busch, Inc.*

6  *v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (speculative testimony

7  insufficient to defeat summary judgment); *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th

8  Cir. 1990) (implausible claims do not create triable issues).

9       Newark's RCRA claims will be decided by the Court under the broad authority provided

10  under the statute "to grant affirmative equitable relief to the extent necessary to eliminate *any risk*

11  posed by toxic wastes." *Dague v. City of Burlington,* 935 F.2d 1343, 1355 (2d Cir. 1991)

12  (emphasis in original). Therefore, the Court on summary judgment may draw inferences from

13  undisputed facts and has greater discretion to consider what weight to give the evidence. *See In*

14  *re Placid Oil*, 932 F.2d 394, 397-98 (5th Cir. 1991); *accord, Parsons v. Jefferson-Pilot Corp.*,

15  789 F. Supp. 697, 702-03 (M.D.N.C. 1992) (following *Placid Oil*); William Schwarzer, *Summary*

16  *Judgment Under the Federal Rules:  Defining Genuine Issues Of Fact*, 99 F.R.D. 465, 476-480

17  (1984) (discussing "What is a Fact Issue in Court Cases").

18       **B.    Partial Summary Judgment**

19       While Newark's motion would not dispose of the entire case if granted, it would

20  significantly simplify further proceedings.  "Rule 56(d) of the Federal Rules of Civil Procedure

21  provides that on a motion for partial summary judgment of the issues, the court is to, if

22  practicable, 'ascertain what material facts exist without substantial controversy and what material

23  facts are actually and in good faith controverted.'" *W. Fed. Savings & Loan Ass'n v. Heflin*

24  *Corp.*, 797 F. Supp. 790, 792 (N.D. Cal. 1992); *Vas-Cath, Inc. v. Mahurkar*, 745 F. Supp. 517,

25  520 (N.D. Ill. 1990) ("judges [should] pare off issues that may be resolved as a matter of law"),

26  *rev'd on other grounds*, 935 F.2d 1555 (Fed. Cir. 1991).

27

28

**C.     The Resource Conservation and Recovery Act**

      **1.     The plaintiff's burden under RCRA's citizen suit provision**

RCRA creates broad discretion in the trial court to order any person that contributed to an imminent and substantial endangerment to take whatever action is necessary to abate the endangerment.  42 U.S.C. § 6972(a). Specifically, RCRA's citizen suit provision allows any person to seek relief:

> against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).  Newark may therefore prevail on its RCRA claims under section 6972(a) by establishing the following:

    (1)    That conditions at the Property may present an imminent and substantial endangerment to human health or the environment;

    2)    That the endangerment stems from the handling, storage, treatment, transportation or disposal of any solid or hazardous waste; and

    3)    That Dopaco has contributed or is contributing to such handling, storage, treatment, transportation or disposal.

*Lincoln Props. v. Higgins*, No. S-91-760 DFL/GGH, 1993 U.S. Dist. LEXIS 1251, at *41-42 (E.D. Cal. Jan. 18, 1993); *United States v. Conservation Chem. Co.*, 619 F. Supp. 162, 199-200 (W.D. Mo. 1985); *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007).

      **2.     The RCRA citizen suit standard is to be liberally construed in favor of protecting the environment.**

RCRA's citizen suit provision authorizes injunctive relief where the presence of hazardous waste *may present* an imminent and substantial endangerment to health or the environment.  42 U.S.C. § 6902.  "In other words, injunctive relief is authorized when there *may* be a risk of harm. This gives effect to Congress' intent 'to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic

1 wastes.'"  *Burlington N.*, 505 F.3d at 1020.  Thus, RCRA does not require the existence of an

2 emergency, but rather provides the court with expansive authority to fashion a remedy upon

3 evidence that the contamination in question poses any risk to the environment:

> [I]t is significant that the word "may" precedes the standard of
> liability: "this is 'expansive language,' which is intended to confer
> upon the courts the authority to grant affirmative equitable relief to
> the extent necessary to eliminate *any risk* posed by toxic wastes."

7 *Lincoln Props.*, 1993 U.S. Dist. LEXIS 1251, at *42 (quoting *Dague v. City of Burlington,* 935

8 F.2d 1343, 1355 (2nd Cir. 1991) (emphasis in *Dague*) and *United States v. Price,* 688 F.2d 204,

9 213-14 (3rd Cir. 1982)), *rev'd in part on other grounds,* 505 U.S. 557 (1992)).

10      Thus, RCRA's citizen suit standard is to be liberally construed, with doubts resolved in

11 favor of protecting the environment.  *Burlington N.*, 505 F.3d at 1021 ("As such, given RCRA's

12 language and purpose, 'if an error is to be made in applying the endangerment standard, the error

13 must be made in favor of protecting public health, welfare and the environment.'") (quoting

14 *Interfaith Comty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005)).

15 <center>**3.     Joint and Several Liability.**</center>

16      Liability under RCRA's citizen suit provision is joint and several.  *Cox v. City of Dallas*,

17 256 F.3d 281, 301 n.37 (5th Cir. 2001); *Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d

18 277, 298 (1st Cir. 2006); *Lincoln Props.*, 1993 U.S. Dist. LEXIS 1251, at *54; *Waste, Inc. Cost*

19 *Recovery Group v. Allis Chalmers Corp.*, 51 F. Supp. 2d 936, 941 (N.D. Ind. 1999); *Aurora Nat'l*

20 *Bank v. Tri Star Mktg.*, 990 F. Supp. 1020, 1034 (N.D. Ill. 1998).  Therefore, it is not necessary to

21 have all potentially liable parties in an action in order to grant relief.  Stated another way,

22 evidence that a party other than the defendant also contributed to the contamination is insufficient

23 to avoid RCRA liability:

> At any rate, RCRA liability, generally speaking, is joint and
> several. The joint and several nature of environmental liability
> makes it fitting to hold a single polluter responsible for the totality
> of the damage where, as here, the harm is indivisible.

27 *Me. People's Alliance*, 471 F.3d at 298; *see also Aurora Nat'l Bank*, 990 F. Supp. at 1034; *City of*

28 *Bangor v. Citizens Commc'ns Co.*, 437 F. Supp. 2d 180, 214 (D. Me. 2006).  For this reason,

1   Dopaco may not escape summary judgment on Newark's RCRA claim by pointing to another

2   party as having contributed to the contamination on Newark's property. *See, e.g., Me. People's*

3   *Alliance*, 471 F.3d at 298 (granting summary judgment to plaintiff over defendant's objections

4   that it was not the only contributor to the hazardous waste in question).

5   **IV.    ARGUMENT**

6       **A.    The Conditions at the Property Present an Imminent and Substantial**
        **Endangerment to the Environment.**

7

8           RCRA's citizen suit provision applies to hazardous waste that may present an imminent

9   and substantial endangerment.  While this standard sounds dire, RCRA is intended to be liberally

10  construed in favor of environmental remediation.  *Burlington N.*, 505 F.3d at 1021.  Thus, the

11  threshold for injunctive relief is actually quite low.  *City of Bangor*, 437 F. Supp. 2d at 217.  In

12  *Lincoln Props.*, for example, another RCRA citizen suit brought in this Court, Judge Levi applied

13  this standard to grant summary judgment to a property owner against a group of drycleaners that

14  formerly occupied the property, despite the existence of a dispute of fact concerning the degree of

15  risk contaminated groundwater presented to humans.  *Lincoln Props.*, 1993 U.S. Dist. LEXIS

16  1251, at *43-44.

17          First, the word "endangerment" under the RCRA citizen suit provision does not require

18  proof of actual harm, but rather refers to a threatened or potential harm:

19                  the meaning of "endanger" is not disputed. Case law and dictionary
                    definition agree that endanger means something less than actual
20                  harm. When one is endangered, harm is *threatened;* no actual injury
                    need ever occur.
21
    *Dague,* 935 F.2d at 1356; *Lincoln Props.*, 1993 U.S. Dist. LEXIS 1251, at *43 (quoting *Ethyl*
22
    *Corp. v. EPA,* 541 F.2d 1, 13 (D.C. Cir. 1976), *cert. denied,* 426 U.S. 941 (1976)).
23
            Second, a finding of "imminence" does not require a showing that the threatened harm
24
    will occur immediately so long as the *risk* of threatened harm is present. *Dague,* 935 F.2d at
25
    1356; *see also Conservation Chem.,* 619 F. Supp. at 193 ("An endangerment need not be
26
    immediate to be 'imminent,' and thus warrant relief"). In fact, an endangerment is "imminent" for
27

28

1  purposes of RCRA's citizen suit provision if the factors giving rise to it are present, even though

2  the harm may not be realized for years.  *Conservation Chem.,* 619 F. Supp. at 193-94.

3        Finally, proof of "substantial" risk does not require a RCRA citizen suit plaintiff to

4  quantify the risks posed by the defendant's hazardous waste:

5          [T]he word "substantial" does not require quantification of the
        endangerment (e.g., proof that a certain number of persons will be

6          exposed, that 'excess deaths' will occur, or that a water supply will
        be contaminated to a specific degree). Instead, the decisional

7          precedent demonstrates that an endangerment is substantial if there
        is some reasonable cause for concern that someone or something

8          may be exposed to a risk of harm by a release or a threatened
        release of a hazardous substance if remedial action is not taken.

9

10  *Lincoln Props.*, 1993 U.S. Dist. LEXIS 1251, at *44 (quoting *Conservation Chem.*, 619 F. Supp.

11  at 194).  This standard is satisfied as long as the risks are not "remote in time, completely

12  speculative in nature, or *de minimis* in degree."  *Id.* at *45.

13        Toluene is present in soil at the Property at a concentration of 13,000 ppm.  Groundwater

14  at the Property contains toluene at a concentration of 6,800 ppm.  (SUF ¶ 12.)   U.S. EPA has

15  determined that toluene poses ecological risks, causing 50 percent mortality to aquatic life at

16  levels that are orders of magnitude below these – ranging from 9.5 ppm to 72 ppm.  (RJN Ex. E.)

17  And the cleanup standards set by EPA  – 1 ppm for drinking water and 520 ppm for soils – are

18  also orders of magnitude below these concentrations.  (RJN Ex. D.)

19        Toluene at these levels also grossly exceeds groundwater standards set by state agencies

20  under the purview of the California EPA, such as the Regional Water Quality Control Board

21  (0.042 ppm) and the Office of Environmental Health Hazard Assessment (0.15 ppm) to protect

22  human health.  (SUF ¶ 15.)  Under similar circumstances, the Court in *Lincoln Properties*

23  determined that the presence of dry cleaning chemicals detected in groundwater in excess of

24  federal cleanup standards sufficed to demonstrate that the environment had been sufficiently

25  degraded to satisfy the RCRA citizen suit standard:

26          RCRA does not define the term "environment." However, it
        presumably encompasses the air, soil, and water, including

27          groundwater.[]  In this case, the environment has already been
        degraded significantly by the contaminants' invasion of the water

28          table . . . . *The groundwater in Zones A and B now contains PCE,*

*TCE and DCE in concentrations far exceeding federal and state
standards.*

*Lincoln Props.*, 1993 U.S. Dist. LEXIS 1251, at *45 (emphasis added). Here, as in *Lincoln
Properties*, the enormous gap between the high toluene concentrations and the federal cleanup
standards provides the Court with equal justification for a finding of imminent and substantial
endangerment.

**B.    The Endangerment Stems from Handling, Storage, and Disposal of
Hazardous Waste at the Property.**

Toluene is a RCRA hazardous waste.  EPA has determined that toluene meets the
definition of "hazardous waste" by including it on lists of solid wastes that are deemed hazardous
under RCRA regulations.  First, Section 261.31 of the regulations implementing RCRA includes
toluene among the "spent non-halogenated solvents" deemed to be RCRA hazardous wastes.  40
C.F.R. § 261.31(a) ("The following solid wastes are listed hazardous wastes from non-specific
sources . . .").  Second, RCRA regulations include toluene on a list of "commercial products" that
are deemed to be "hazardous wastes" when discarded.  40 C.F.R. § 261.33(a) ("The following
materials or items are hazardous wastes if and when they are discarded or intended to be
discarded."); 40 C.F.R. § 261.33 (f).

It is beyond dispute that toluene detected in soils and groundwater at the Property is the
result of the handling, storage, and disposal of toluene used in the rotogravure printing business
and waste inks generated by that business.  There is no evidence of significant levels of toluene in
any area other than the vicinity of the rotogravure printing operation and its associated Product
and waste tanks.  There is also no evidence that any activity conducted at the Property other than
the rotogravure printing operation ever utilized significant amounts of toluene.  But for these
activities, toluene would not be present in the soil or groundwater.  And there can be no doubt
that Dopaco caused or contributed to these activities, which resulted in the handling, storage, and
disposal of toluene at the Property.  (SUF ¶¶ 4-10.)  Dopaco cannot rebut this evidence.

**C.**     **Dopaco generated RCRA hazardous waste and contributed to its storage, handling and disposal at the Property.**

Dopaco has admitted that it used toluene at the Property, and that its printing operation produced waste containing toluene. (SUF ¶¶ 4-6.)  Dopaco has also admitted that it stored toluene and toluene-containing waste inks in the waste tanks at the Property.  (SUF ¶ 7.)  These activities constitute generation and disposal of hazardous waste under RCRA.  Dopaco's improper handling, storage, and disposal of toluene at the Property resulted in leaks and spills of hazardous waste.

**1.**     **Dopaco created RCRA hazardous waste by discarding toluene into the waste tanks.**

RCRA solid waste is material that has been abandoned.  40 C.F.R. § 261.2(b)(1).  A material is considered abandoned, and thus discarded, by being "[a]ccumulated [or] stored . . . in lieu of or before . . . being disposed of . . . ." 40 C.F.R. § 261.2(b)(2).  Under this standard, waste ink stored in a UST for later off-site disposal – as Dopaco has admitted to here – is therefore considered solid waste by virtue of having been abandoned, and therefore, discarded for purposes of RCRA.  (SUF ¶ 7)  Thus, there is no dispute that the materials that Dopaco placed in the waste tanks constituted RCRA hazardous waste.

**2.**     **Dopaco's spills were "disposals" of hazardous waste.**

Undisputed evidence in the record establishes that regulators and others inspecting the Property during Dopaco's tenancy observed evidence of significant spills of waste inks at the Property.  Dopaco has admitted that it has no evidence to rebut these accounts.  (SUF ¶ 8; Sheehan Dep. 101:19-103:19.)  Inspectors from the Regional Board attributed spills to Dopaco's practice of emptying waste ink by hand from drums into the waste tanks.  (SUF ¶ 8.)[4]  Toluene-

---

[4] Dopaco has tried – unconvincingly – to distance itself from this evidence by claiming that the Regional Board did not expressly attribute these practices to Dopaco.  This is flatly inconsistent with the inspection report, which discusses these practices in the present tense under the heading "Dopaco."  (SUF ¶ 8, DOPACO at 257.) This can mean only one thing:  the Regional Board addressed this issue in its discussion of Dopaco's operations *because it concluded that Dopaco was engaged in a practice that was an ongoing source of spills*.  Indeed, Dopaco's Rule 30(b)(6) witness admitted that, at the time, Dopaco did not dispute the attribution of the spills to it.  (Sheehan Dep. at 104:11-23.)

1   containing waste ink that was spilled at the Property or leaked from the waste tanks constitutes a

2   disposal of RCRA hazardous waste.  42 U.S.C. § 6903(5).

3                   **3.      Dopaco's leaking toluene tank was also a "disposal."**

4          RCRA regulations define "commercial products" as hazardous waste where they have

5   been discarded.  40 C.F.R. § 261.33.  Courts have held that products that would otherwise be

6   useful constitute "solid waste" under RCRA where they are "discarded" via leaks from a UST or

7   pipe into soil or groundwater:

8              Despite any negative effects on the environmental system, gasoline
               is a useful product. Indeed, in the present situation, the intention in
9              placing the gasoline into the underground tank was that it would be
               subsequently taken out of the tank and sold.
10
               It is equally clear, however, that gasoline is no longer a useful
11             product after it leaks into, and contaminates, the soil. At this point,
               the gasoline cannot be reused or recycled. As a result, it must be
12             said that the gasoline has been abandoned via the leakage (even if
               unintentional) into the soil. Indeed, the Court is of the opinion that
13             by including the word "leaking" in its definition of the word
               "disposed," the statute incorporates this change in usefulness.
14

15  *Zands v. Nelson*, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991); *see also Dydio v. Hesston Corp.*, 887

16  F. Supp. 1037, 1048 (N.D. Ill. 1995) (following *Zands*); *Craig Lyle Ltd. P'ship v. Land O' Lakes,*

17  *Inc.*, 877 F. Supp. 476, 481-82 (D. Minn. 1995) (same); *Paper Recycling, Inc. v. Amoco Oil Co.*,

18  856 F. Supp. 671, 675 (N.D. Ga. 1993) (same).

19         Thus, while the toluene stored in Dopaco's product tank was intended for use by Dopaco

20  in the operation of the rotogravure process, leaks of this material from the tank into the soil and

21  groundwater constitutes a disposal of hazardous waste under RCRA.  Dopaco has admitted to

22  storing toluene at the Property in an area in the immediate vicinity of the highest toluene

23  concentrations at the Property.  (*See* SUF ¶ 5 (Avery Decl. Exs. 2, 3 (showing location of toluene

24  tank)); SUF ¶ 13 (NEW 314-315 (maps depicting locations of highest toluene contamination).)

25         Record documents further demonstrate that soils excavated during the removal of the

26  toluene tank showed signs that solvents were present in the soil.  (SUF ¶ 10.)  Dopaco has

27  admitted that the removed tanks were the most likely source of that odor.  (Sheehan Dep. 115:23-

28

116:9.)  Dopaco has further admitted that it has no evidence proving that its toluene tank, or the pipes from the toluene tank to Dopaco's basement printing space were "leak tight."  (SUF ¶ 20.)

### 4. Dopaco also "disposed" of toluene that leaked from the floor and floor sumps in the basement.

The record also contains evidence indicating that leaks or cracks in the floors and below-grade sumps in the basement where Dopaco operated contributed to the high concentrations of toluene in the northwest corner of the Property.  The highest concentrations of toluene were found approximately ten to twelve feet from the solvent "wash up" room, which contained dispensers connected by a pipeline to the toluene UST.  (Stafford Decl. Ex. 21 at DOPACO 2054;  Avery Decl. ¶ 7.)

Moreover, groundwater samples taken in the vicinity of the basement detected the presence of MIBK, a chemical known to be used in rotogravure inks.  (SUF ¶ 14; RJN Ex. G, H.)  Since none of the USTs or pipelines in the vicinity were used to store ink, the presence of MIBK shows that the waste inks that were allowed to accumulate in the sumps under Dopaco's presses found a pathway into the subsurface, and such leaks constitute a "disposal" under RCRA.  42 U.S.C. § 6903(3) ("The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.").

### D. Dopaco Cannot Escape Liability by Theorizing About the Conduct of Others.

Dopaco may speculate about the conduct of companies that used toluene in rotogravure printing operations at the Property prior to Dopaco's tenancy.  However, none of this – even assuming that Dopaco has evidence to present – can relieve Dopaco of joint and several liability under RCRA.  *Me. People's Alliance*, 471 F.3d at 298; *Aurora Nat'l Bank*, 990 F. Supp. at 1034; *City of Bangor*, 437 F. Supp. 2d at 214 (D. Me. 2006); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 80-81 (1st Cir. 2008).

Dopaco cannot escape the consequences of joint and several liability without producing "concrete and specific" facts proving that the contamination at the Property is divisible.  *City of*

1    *Bangor*, 437 F. Supp. 2d at 218-19 ("avoiding joint and several liability is an uphill battle for any

2    defendant in an environmental case who shoulders the burden of proving that the harm is

3    divisible.")  This Dopaco cannot do.

4           Dopaco cannot produce evidence demonstrating that the toluene in deep soil and

5    groundwater—closest in proximity to the location of its former toluene tank, wash up room,

6    waste ink sump, and associated pipelines—was not present at the time that Dopaco left the

7    Property in 1988.  AEMC, the contractor that removed the USTs in 1986 never tested soils below

8    12 feet, and never tested groundwater at the Property.  (SUF ¶ 11.)  Dopaco also never took any

9    samples of soil or groundwater before, during, or after its tenancy. (SUF ¶ 20.)  When Dopaco

10   left the Property, it appears that Dopaco and its landlord Gold Bond relied completely on

11   AEMC's few shallow soil samples to conclude (mistakenly) that there was no significant

12   contamination remaining from Dopaco's operation at the Property.  (Sheehan Dep. 176:18-178:1

13   ("at the time we departed, there was documentation that says the spills were cleaned up and the

14   soil was tested.  I would say that we thought we were out.").)

15          **E.     Equitable Principles Require a Finding of Liability Against Dopaco.**

16          In RCRA cases where issues of serial ownership and operation of underground storage

17   tanks rendered causation difficult to prove, courts have applied equitable principles to assure that

18   those responsible for the contamination do not escape liability.  For example, in *Zands v. Nelson*,

19   the Southern District of California concluded that the defendants had been in the best position to

20   gather information that could be utilized to distinguish their individual contributions of hazardous

21   wastes from those of their predecessors and successors at a contaminated site:

22               [D]efendants had the best opportunity to gather evidence that would
                 have proven when the contamination occurred. Each defendant
23               could have tested the soil at the end of his or her ownership and
                 operation of the property. Such a test would potentially have proven
24               the absence of contamination when a given defendant separated
                 from the property, thereby enabling that defendant to prove he or
25               she did not cause the contamination. The plaintiffs, on the other
                 hand, did not have this option. At best, the plaintiffs could have
26               tested the property at the time they purchased it. Had the plaintiffs
                 conducted such a test and found contamination, they would have
27               had direct evidence to use at the first stage of the trial. The
                 plaintiffs, however, would still have no evidence as to when the
28               contamination occurred.

1     *Zands v. Nelson*, 797 F. Supp. 805, 817 (S.D. Cal. 1992) ("*Zands II*").  In part, upon a sufficient

2     showing that the contamination at the site had occurred prior to plaintiff's ownership, and the

3     defendants had each operated a business at the property that generated the hazardous waste at

4     issue, the court in *Zands II* shifted the burden to defendants to prove that they were not

5     responsible for the contamination.  *Id.*  Like the plaintiff in *Zands II*, Newark bought the Property

6     after the USTs had been removed and the rotogravure printing operation had ceased.  Like the

7     defendants in *Zands II*, the fact that Dopaco cannot produce evidence distinguishing between its

8     own contribution to the hazardous waste at issue from those of any other party is largely its own

9     fault.

10        Denying Newark relief under these circumstances would be inconsistent with the aims of

11     RCRA:

12           Indeed, Congress expressed its views on the significance of
13           compensation when it made RCRA a strict liability statute. This
            objective, and thus substantive justice, will be regularly subverted
14           and undermined if the burden of proof is not shifted to defendants
            in consecutive ownership cases such as this one.  Moreover,
15           because of the impossibility of these types of claims, refusing to
            shift the burden of proof would free owner/operator defendants of
16           liability even if a plaintiff proves all of the contamination was
            present prior to the transfer of the property to the plaintiff. Such a
17           result is illogical. Under such a rule, a plaintiff can prove that one
            or more defendants is fully responsible and yet the plaintiff is
18           denied any recovery simply because the property changed hands on
            several occasions. Consequently, equity requires a shifting of the
19           burden. Such a shifting of the burden of proof removes the
            possibility that plaintiffs will be without a remedy *even though the*
20           *Court knows that the contributor is before it.*

    *Zands II*, 797 F. Supp. at 816.

21        Throughout the fact discovery process, including responses served on the last day of

22     discovery – after both parties had conducted depositions of 30(b)(6) witnesses and propounded

23     written discovery and the production of documents – Dopaco repeatedly responded to Newark's

24     discovery requests by asserting that it had insufficient information to admit or deny facts about

25

26

27

28

1   the condition of its USTs.[5]  Under the Federal Rules, such responses to requests for admission are

2   proper only after the responding party has conducted a reasonable inquiry:

3   
> The answering party may assert lack of knowledge or information
> as a reason for failing to admit or deny *only if the party states that it*
4   *has made reasonable inquiry and that the information it knows or*
> *can readily obtain is insufficient to enable it to admit or deny.*
5

6   Fed. R. Civil Proc. 36(a)(4) (emphasis added); *see also ASEA, Inc. v. S. Pac. Transp. Co.*, 669

7   F.2d 1242, 1245 (9th Cir. 1981).  A sufficient inquiry under Rule 36 requires the responding party

8   to conduct an investigation that may extend beyond current employees and records:

9   
> Such reasonable inquiry includes an investigation and inquiry of
> employees, agents, and others, "who conceivably, but in realistic
10   terms, may have information which may lead to or furnish the
> necessary and appropriate response."  The inquiry may require
11   venturing beyond the parties to the litigation and include, under
> certain limited circumstances, non-parties, but surely not strangers.
12   The operative words then are "reasonable" and "due diligence."

13   *Henry v. Champlain Enters., Inc.*, 212 F.R.D. 73, 78 (N.D.N.Y. 2003) (internal citations omitted).

14   Failure to comply may be deemed an admission.  *ASEA*, 669 F.2d at 1245.  Dopaco claims it has

15   completed the required inquiry.  (*See, e.g.*, Stafford Decl. Ex. 30 (Response to RFA Nos. 3, 6, 10,

16   12).)  Thus, through its responses, Dopaco has effectively already admitted that it has no evidence

17   with which to demonstrate a genuine issue of triable fact on the question of whether it contributed

18   to the present contamination.

19      Under these circumstances, other courts have exercised their broad discretion under

20   RCRA to order an equitable remedy.  This Court should do the same.

21

22   [5] Dopaco first stated it had insufficient information based on "the passage of time" to
admit or deny that it had never leak-tested its USTs.  (Stafford Decl. Ex. 30 (Response to RFA
23   Nos. 12-13).)  Its 30(b)(6) witness later contradicted this assertion by admitting that Dopaco had
conducted no such test, and would not have known if the USTs had small perforations.  (Sheehan
24   Dep. at 87:19-89:15; 201:17-203:15.)  Despite that admission at deposition, on the last day of fact
discovery Dopaco served discovery responses denying the request for admission that Dopaco has
25   no evidence that the USTs were "leak-tight."  (Stafford Decl. Ex. 31 (Response to RFA No. 53).)
Asked in a separate interrogatory to provide the factual basis for such denial, Dopaco stated only
26   that it was unaware of documents or witnesses proving that the tanks *did* leak.  (Stafford Decl.
Ex. 32 (Response to Rog. 22).)  Taken together, these responses effectively admit that Dopaco
27   has no evidence to form a genuine dispute concerning the condition of its USTs.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.     CONCLUSION**

For all of the reasons stated above, indisputable evidence demonstrates that Dopaco contributed to the generation, storage, handling, and disposal of RCRA hazardous wastes at the Property, and that this hazardous waste may pose an imminent and substantial endangerment to the environment.  Newark is therefore entitled to partial summary judgment establishing Dopaco's liability under the RCRA cause of action.

Dated: December 23, 2009                    PETER HSIAO
                                            ROBIN S. STAFFORD
                                            MARK POE
                                            MORRISON & FOERSTER LLP


                                            By:  /s/ Robin S. Stafford
                                                 Robin S. Stafford

                                            Attorneys for Plaintiff
                                            THE NEWARK GROUP, INC.

1

2

**CERTIFICATE OF SERVICE**

3      I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 23, 2009.

4

5                                                      _/s/_ Robin Stafford_____

6                                                        Robin Stafford

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28