1   H CHRISTIAN L'ORANGE (SBN #71730)
chris.lorange@dbr.com
2   MICHAEL P. PULLIAM (SBN #215435)
michael.pulliam@dbr.com
3   DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
4   San Francisco, CA  94105-2235
Telephone:   (415) 591-7500
5   Facsimile:   (415) 591-7510

6   Attorneys for Defendant
DOPACO, INC.

7

8                   UNITED STATES DISTRICT COURT

9                EASTERN DISTRICT OF CALIFORNIA

10

11   THE NEWARK GROUP, INC.,          Case No. 2:08-CV-02623-GEB-DAD

12            Plaintiff,              **DEFENDANT DOPACO, INC'S**
**RESPONSE TO MOTION FOR**
13       v.                      **SUMMARY JUDGMENT**

14   DOPACO, INC., and DOES 1-10,     **Date:**       **February 8, 2010**
**Time:**      **9:00 a.m.**
15           Defendants.       **Courtroom:10**

16

17

18

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
SF01/ 668517.3

CASE NO. 2:08-CV-02623-GEB-DAD

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ...................................................................................... 1

    A.    The Facility and its Occupants ................................................. 1

    B.    Underground Storage Tanks ("USTs") and Their Contents ......... 2

        1.    Product Tanks .................................................................. 2

        2.    Waste Tanks .................................................................... 3

    C.    Ink and solvent ...................................................................... 3

    D.    Agency Inspections and Tank Removal ..................................... 4

    E.    Newark's Acquisition of the Site ............................................. 9

    F.    On-Site Investigations .......................................................... 11

II. ARGUMENT ..................................................................................... 11

        1.    Newark Has The Burden of Demonstrating That Dopaco Contributed to the Contamination in Question. ................. 12

        2.    Newark Cannot Shift The Burden of Proof to Dopaco. .................. 13

        3.    Newark Has No Evidence Tying Dopaco To The Contamination and Therefore Cannot Carry Its Burden Of Proof. ................................................................. 16

            a.    Newark's 2005 Data Does Not Tie Dopaco To The Contamination. ............................................... 16

            b.    There Is No Evidence That Dopaco Caused Surface Spills. ........................................................... 17

            c.    There Is No Evidence That Any Tank Leaks Occurred During Dopaco's Occupancy. ....................... 18

            d.    There Is No Evidence of Leaks In The Basement Floors Or Below Grade Sumps ................................. 19

    B.    The 1986/87 Investigation and Cleanup by AEMC was Effective. ........................................................................... 20

        1.    Newark Has Introduced No Evidence, Besides the Lay Allegations of Its President and 30(b)(6) Witness and Its Counsel, That the Testing and Cleanup Were Inadequate. ................................................................ 20

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DOPACO'S RESPONSE TO PLAINTIFF'S
UNDISPUTED MATERIAL FACTS

- i -

CASE NO. 2:08-CV-02623-GEB-DAD

**TABLE OF CONTENTS**
(continued)

Page

2. The Protocol Followed by AEMC Was Strictly Scrutinized by the Regulatory Agencies Charged with Overseeing UST Removals. .......................................... 21

3. The Results of Multiple Rounds of Sampling Confirmed Toluene Was Not Detected, or Its Levels Were Below State Minimums for Drinking Water. ....................... 22

4. The Absence of Toluene in the Sampling Performed After October, 1986 Resulted in the Regulators Instructing AEMC to Backfill the Excavation Pits, as Opposed to Requiring Ground Water Testing. ................. 22

5. The Record is Devoid of Any Evidence That AEMC's Sampling, Analysis, and Cleanup Were Defective. ....................... 23

6. Newark Has Introduced No Expert Evidence to Support Its Lay Allegations That the Sampling Was Conducted too Shallow or The Cleanup Ineffective. .......................... 23

C. Newark's Motion Fails Because It Has Not Demonstrated That The Contamination Has Caused Imminent And Substantial Endangerment .................................................... 25

1. Newark Offers no Expert Opinion Regarding the Transport of the Contaminants. ....................................... 26

2. Newark Introduces no Expert Testimony as to the Fate of the Contaminants. ........................................... 26

3. Newark Introduces no Expert Testimony As To How The Contamination Puts A Population At Risk. .......................... 28

III. CONCLUSION ..................................................................... 29

DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DOPACO'S RESPONSE TO PLAINTIFF'S
UNDISPUTED MATERIAL FACTS

- ii -

CASE NO. 2:08-CV-02623-GEB-DAD

# TABLE OF AUTHORITIES

Page

**<u>Cases</u>**

*Acme Printing Ink Co. v. Menard, Inc.*,
  870 F. Supp. 1465 (E.D. Wis. 1994) ........................................................ 29

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................. 12

*Aurora Nat'l Bank v. Tri Star Mktg., Inc.*,
  990 F. Supp. 1020 (N.D. Ill. 1998).................................................... 13, 15

*Bayless Investment & Trading Co. v. Chevron USA, Inc.,* No. 93-704,
  1994 WL 1841850 (D. Ariz. May 25, 1994)............................................ 15

*Burlington Northern and Santa Fe Ry. Co. v. U.S.*,
  129 S.Ct. 1870 (2009) .............................................................................. 15

*City of M. Pleasant, Iowa v. Associated Elec. Co-op, Inc.*,
  838 f.2d 268 (8th Cir. 1988) ..................................................................... 12

*Eastman Kodak v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) .................................................................................. 12

*Foster v. U.S.*,
  922 F. Supp. 642 (D.D.C. 1996) ........................................................ 25, 28

*Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.*,
  138 F. Supp. 2d 482 (S.D.N.Y. 2001) ...................................................... 29

*Kara Holding Corp. v. Getty Petroleum Marketing, Inc.*, No. 99-0275,
  2004 WL 1811427 (S.D.N.Y. Aug. 12, 2004) .................................... 25, 29

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
  182 F.3d 157 (2nd Cir. 1990) ................................................................... 12

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000).................................................................. 12

*Price v. U.S. Navy*,
  818 F. Supp. 1323 (S.D. Cal. 1992),
  aff'd, 39 F.3d 1011 (9th Cir. 1994)........................................................... 25

*Simsbury-Avon Preservation Soc. LLC v. Metacon Gun Club*,
  575 F.3d 199 (2d Cir. 2009) ............................................................... 28, 29

*SPPI-Somersville, Inc. v. TRC Companies, Inc.*, Nos. 04-2648, 07-5824,
  2009 WL 2612227 (N.D. Cal. Aug. 21, 2009)......................................... 25

*United States v. Hardage*,
  116 F.R.D. 460 (W.D. Okla.1987) ........................................................... 13

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DOPACO'S RESPONSE TO PLAINTIFF'S
UNDISPUTED MATERIAL FACTS

- iii -

CASE NO. 2:08-CV-02623-GEB-DAD

**TABLE OF AUTHORITIES**
(continued)

Page

*Williams v. G.M. Roberts,*
    202 F.R.D. 294 (M.D. Ala. 2001) ........................................................... 25

*Zands v. Nelson,*
    797 F. Supp. 805 (S.D.Cal.1992) ............................................. 13, 14, 15

**Statutes, Rules & Regulations**

Federal Rules of Civil Procedure, Rule 56(c) ..................................... 12

United States Code, Title 42 , § 6972(a)(1)(B) ............................. 13, 25

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DOPACO'S RESPONSE TO PLAINTIFF'S
UNDISPUTED MATERIAL FACTS

- iv -

CASE NO. 2:08-CV-02623-GEB-DAD

1

# I.

2

## BACKGROUND

3

### A.   The Facility and its Occupants

4

The property at 800 West Church Street ("Facility") became an industrial site in 1917 and

5

was acquired by Fibreboard Corporation ("Fibreboard") in 1927.  Fibreboard commenced a

6

lithography printing process in the 1930s.  With the expansion of gravure printing in the 1950s,

7

Fibreboard added a gravure printing press in 1955 and installed six product and two waste tanks

8

that same year.[1]  The waste tanks were subsequently relocated in 1968 to an area 300 feet

9

southwest of the six product tanks.[2]  *See* L'Orange Dec., Exhibit 2.  Fibreboard added a second

10

rotogravure press in 1969, and built an addition onto the existing building where printing

11

operations were conducted in order to accommodate it.  Fibreboard continued gravure operations

12

until November 1977 when the facility was sold to an ESOP, Pacific Paperboard Products

13

("Pacific Paper"), that continued gravure printing until 1981.See L'Orange Dec., Exhibit 1.

14

Pacific Paper sold the facility in 1981 to Gold Bond Building Products, a division of National

15

Gypsum, ("Gold Bond") who continued gravure printing from July 1 through September, 1981.

16

Gold Bond sold its lithography printing equipment to San Joaquin Packaging Company

17

("San Joaquin"), which leased the ground floor of the printing building.  Dopaco, Inc. ("Dopaco"

18

or "Defendant") leased the basement of the printing building and purchased both rotogravure

19

presses, which it operated until June, 1988 when it moved the presses and its operations to a new

20

location in Stockton.  Id. at 1840, Plaintiff's SUF, ¶ 3.  San Joaquin remained at the site through

21

1991.

22

The Newark Group ("Newark" or "Plaintiff") purchased the facility from Gold Bond on or

23

about June 24, 1989, and operated it from 1989 through March, 2003.  While Newark maintains it

24

25

[1] *See* Declaration of H. Christian L'Orange, Exhibit 1.

26

[2] Some documents and consultant reports suggest the tanks were installed in 1968 (the
California Regional Water Quality Control Board Notice of Violation dated November 26, 1985),

27

but these are at odds with Newark's document 000834.

28

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
SF01/ 668517.3

CASE NO. 2:08-CV-02623-GEB-DAD

1    did not use significant amounts of toluene in its operations, Plaintiff was unable to produce any

2    environmental records for the facility.[3]

3    **B.    Underground Storage Tanks ("USTs") and Their Contents**

4        **1.    Product Tanks**

5            There were two sets of tanks at the facility during the time Dopaco was a tenant.  Six

6    product tanks, comprising a tank farm, were located in the northwest quadrant of the property,

7    and were used to store chemicals utilized in the printing process.  Those tanks, designated A

8    through F, contained the following products:

9            Tank A        isopropyl acetate

10           Tank B        isopropanol (isopropyl alcohol)

11           Tank C        toluol

12           Tank D        normal propyl acetate

13           Tank E        acetone

14           Tank F        blanket wash (consists of cyclohexane, n-heptane, methylchlorohexane,

15                         toluene, isopropanol, c6-c8 paraffins and cycloparaffins

16   *See* Avery Declaration attached to Newark's Motion for Partial Summary Judgment, Exhibit 3,¶5.

17           The lease between Gold Bond and Dopaco did not provide for a formal arrangement

18   regarding the use of any of the tanks.  *See* L'Orange Dec., Exhibit 2.  While Gold Bond remained

19   the owner of both the product and waste tanks, during Dopaco's tenancy, the companies reached

20   an informal agreement wherein Dopaco utilized tanks A, C, D & E and San Joaquin utilized tanks

21   B and F.[4]  *See* L'Orange Declaration, Exhibit 3.

22   _____

23   [3] Limited records obtained from regulatory agencies do reflect Newark's use of products
     wherein toluene is a constituent.  These records consist of hazardous waste manifests and SARA
     notifications and confirm Newark's use of printing solvents, as well as paints containing toluene.

24

25   [4] A factual dispute has arisen as to the number of tanks used by Dopaco.  Newark has
     procured a declaration from Roger Avery ("Avery"), a former Dopaco employee, who asserts in
     Paragraph 6 that Dopaco was the primary user of five of the product tanks and the two waste
26   tanks.  This is conflict with a Gold Bond June 10, 1985 memorandum (000266), which confirms
     Dopaco utilized four of the six product tanks and the two waste tanks.  According to this memo,
27   Tank B, containing isopropyl alcohol and Tank F, containing blanket wash, were utilized by San
     Joaquin.  Further, the declaration obtained by Newark from Avery creates a fact question as to the

28                                                                                    (Continued)

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 2 -          CASE NO. 2:08-CV-02623-GEB-DAD

### 2.   Waste Tanks

A set of waste tanks were located, at the time of their removal, 300 feet southwest of the product tanks.  *See* L'Orange Decl. Exhibit 4, EHD0001853.  These waste tanks received quantities of spent solvent and waste ink through an underground piping system, or as a result of drums of liquid being poured into them.  Dopaco generated approximately 100 gallons per month of waste (*See* L'Orange Dec., Exhibit 5) and permitted Gold Bond to dispose of obsolete inks and solvents, from time to time, in the same tank.  *See* L'Orange Dec., Exhibit 6.  Disposal of inks and solvents was carried out, by prior occupants, through the use of a solvent sprayer, described by the documents as an evaporative disposal area, and located approximately 75 feet southwest of the waste tanks.  *See* L'Orange Dec., Exhibit 7, EHD002184.[5]

### C.   Ink and solvent

Dopaco's 30(b)(6) witness, Robert Sheehan, testified that toluene was stored in Tank C, a 4000-gallon coated steel tank located in the product tank farm, and was only used in the top lacquer process.  *See* L'Orange Decl. Ex. 8.

According to Newark's theory of the case, the rotogravure presses at the Property "could not operate" without toluene.  *See* Avery Dec., ¶ 4.  While it is exaggeration to say the presses could not operate without toluene, Newark is correct that the prior occupants of the presses who operated them before the introduction of water-based inks certainly would have used significant amounts of toluene in their printing operations.  In short, the evidence shows that the tanks, and their chemical contents, were utilized by Fibreboard in its gravure printing processes from 1955

_____

(Continued)

presence or absence of toluene in San Joaquin Packaging blanket wash.  In 1986, Avery provided a list of the product and waste tanks and listed the contents of the blanket wash tank operated by San Joaquin Packaging.  In the declaration obtained by Newark and attached to this motion, Avery now says he did not confirm the accuracy of the tank contents with any employee of San Joaquin, and relied on the contents set out in a Material Safety Data Sheet for blanket wash. However, he does not retract his earlier written statement that toluene was one of the constituents of the blanket wash.

[5] It is difficult to assess the years of operation of the sprayer and its level of use by prior occupants.  As the declarations make clear, it was utilized by Fibreboard and Pacific Paper.  The sprayer was no longer in use when Dopaco commenced its lease in 1981.

1   through 1977 (*See* L'Orange Dec., Exhibit 9), by Pacific Paper during its tenure from 1977 to

2   1981 (*See* L'Orange Dec., Exhibit 7), and for a limited period of time, by Gold Bond in 1981.

3   *See* L'Orange Dec., Exhibit 10.

4   **D.     Agency Inspections and Tank Removal**

5          Inspections of the Gold Bond facility were conducted on May 17 and September 23, 1985

6   by representatives of the California Regional Water Quality Control Board ("Regional Board")

7   and the San Joaquin Environmental Health Department ("EHD").  A Notice of Violation

8   ("NOV") was issued to Gold Bond, as the owner of the property, on November 26, 1985.  *See*

9   L'Orange Dec., Exhibit 11.  The violations set forth in the notice consisted of (1) discharge of oil-

10  heating condensate to McDougal Slough and (2) sump discharge to the storm drain.  The notice

11  did contain a section concerning activities conducted by Dopaco at the Facility.[6]  The Regional

12  Board required Gold Bond to submit a technical report addressing items set out in the findings

13  and recommendations of the November 26, 1985 memorandum accompanying the NOV.  On

14  January 7, 1986, a meeting was conducted between the three regulatory agencies involved

15  (Regional Board, Department of Health Services ("DHS"), and EHD), Gold Bond, as the owner

16  of the site, and each of the lessees (Dopaco and San Joaquin), as well as a representative from

17  Larry Walker Associates (a remedial contractor initially retained by Gold Bond).  *See* L'Orange

18  Dec., Exhibit 12.  The memorandum confirms the Dopaco representative agreed that the two

19  waste tanks would be decommissioned and removed.

20         Gold Bond had solicited bids from the Stockton Service Station Equipment Company, Inc.

21  (*See* L'Orange Dec., Exhibit 13), but ultimately retained American Environmental Management

22  Corporation ("AEMC") on January 30, 1986.  *See* L'Orange Dec., Exhibit 14.  Between early

23  February 1986 and late August 1986, Gold Bond, AEMC and state representatives conferred on

24  _____

25         [6] The deficiencies noted by the Regional Board dealt with drum storage in an asphalt area,
    the addition of press condensate matter to a sump located on the loading dock, and spillages in the
26  location of the waste tanks.  The NOV also documented a response by the San Joaquin Local
    Health Department to a one time release red ink to a nearby slough.  The discharge was later
27  determined to be non-hazardous.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 4 -          CASE NO. 2:08-CV-02623-GEB-DAD

1    the development of an appropriate protocol relative to the tank removal and cleanup.

2            On May 6, 1986, AEMC submitted its proposed removal and closure plan for review by

3    the appropriate state agencies, which included DHS, EHD, and the Regional Board.  On May 25,

4    1986, the Regional Board requested a variety of modifications to the May 6th proposal.  *See*

5    L'Orange Dec., Exhibit 15.  With respect to the two waste tanks, the Regional Board asked

6    AEMC to assess potential soil and ground water pollution in this area.  Specifically the Regional

7    Board requested:

8            "a soil sampling plan should be submitted for definition of the
             horizontal ad vertical extent of soil pollution, if any, resulting from
9            tank leakage and the obvious spills surrounding the tanks.  This
             should include soil borings to ground water around the tank and
10           borings to ground water below the tank."

11   Id. at NEW 000084

12           With respect to the product tanks, the Regional Board observed:

13           "Due to the tanks close proximity to ground water, monitoring
             wells may be necessary if soil contamination is found.  Gold
14           Bond's revised plan should address this contingency."

15   Id.

16           A revised plan was completed on July 22, 1986 (*See* L'Orange Dec., Exhibit 16) and

17   described locations for, and the construction of, ground water monitoring wells.  This plan was

18   submitted to the Regional Board and EHD on or about August 6, 1986 (*See* L'Orange Dec.,

19   Exhibit 17) and approved on or about September 22, 1986.  *See* L'Orange Dec., Exh. 18.  At no

20   time was Dopaco involved in the preparation of the plan, or the discussions between Gold Bond

21   its contractor or the regulatory agencies.  L'Orange Dec., Exhibit 19, Reents Dec. ¶9.  In fact,

22   AEMC's final plan was submitted on August 6, 1986 to only Gold Bond for review.  During this

23   same period, Gold Bond and Dopaco reached an agreement in which Dopaco would handle

24   emptying and cleaning of the tanks it used, while Gold Bond would have all tanks removed.  *See*

25   L'Orange Dec., Exhibit 20.  The tank removal and sampling commenced during the last week of

26   September 1986.

27           Staff from the Regional Board and EHD were present during the tank removal and

28   sampling process.  An Inspector from EHD observed the removal of  five of the product tanks on

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                - 5 -                CASE NO. 2:08-CV-02623-GEB-DAD

September 30, 1986 and noted:

> "5/U.G.S.T. removed during inspection on this date: no apparent leaks in tanks or plumbing."

*See* L'Orange Dec., Exhibit 4, EHD 0001854**.**

This same representative inspected the remaining product tank and the two waste tanks excavated on October 2, 1986 and commented:

> "3/U.G.S.T. removed during inspection on this date: Tank next to print shop didn't have any apparent leaks in plumbing or tank. 2/U.G.S.T. (waste tank) s/west of print shop showed signs of leakage; ink could be seen around tanks and soil."

This inspection report also noted the waste tanks were located 300 feet southwest of the tanks removed on September 30, and a possible leak was present in one of the tanks. Id. at EHD0001853.

Gold Bond's contractor, AEMC, provided a written report and sample results to Gold Bond and the regulatory agencies on October 21, 1986. *See* L'Orange Dec., Exhibit 4. The report noted at page 2:

> "after removal and visual inspection, four of the eight removed tanks appeared to be in excellent condition with no visible signs of rusting or pitting." These would include Tanks B and C (the toluene/toluol tank), D and E. The remaining four tanks (A, F, G, H) appeared to be rusty, but with no indications of leaks or holes."

The report further noted on the same page:

> "The excavation containing the six product tanks had no visible signs of stains, but a slight odor was detected. Soils containing the strongest odors were segregated from other excavated soils.
>
> …
>
> The second excavation (Tanks G and H [the waste tanks] had visible ink stains. Staining was limited, however, to a depth of less than six inches along the sides and bottom of the excavation. The thickest areas were located at the top of the vertically standing tanks. In addition, soils excavated from the waste ink excavation were also stained with ink. The staining was not extensive and was only due to the material scraped off from directly adjacent to the tank. Odors were detected in the excavation, but not the excavated soils."

Id. at EHD0001807.

A total of 12 soil samples were collected between the eight tanks; two samples were

1    connected beneath each of the larger tanks (Tanks A, B, C and E), and one sample was collected

2    beneath each of the smaller tanks (Tanks D, F, G, and H).  These samples were collected in the

3    native soil, approximately two feet below the bottom of the excavation utilizing a backhoe.  The

4    sample depth ranged between 10 feet and 12 feet.  Id. at EHD0001809, 0001827, 0001828.

5    Toluene was detected beneath the product tanks at levels ranging between 3 and 36 parts per

6    billion ("ppb").  Toluene was detected beneath the waste tanks at levels ranging between 7 and 92

7    ppb.  All of these levels were below 100 ppb, the state minimum requiring corrective action.  Id.

8    at 0001810.  AEMC concluded:

9    
10   > "Based on the above, the results indicate that although soil
     > contamination exists, it is limited in degree and is not a probable
     > threat to groundwater."

11   Id. at EHD0001812.  Based on the testing results, the company recommended backfilling the

12   excavation pits.  Id.

13          AEMC took six additional soil samples from the product tank and waste tank excavation

14   pits on November 7, 1986, and the results were reported to the Regional Board on November 26,

15   1986.  See L'Orange Dec., Exhibit 21.  These sampling results were in addition to those reported

16   in the October 21, 1986 report and were collected at the request of EHD to resolve a dispute

17   regarding testing results of the samples collected during removal of the tanks in September and

18   October, 1986.  See L'Orange Dec., Exhibit 22.  Four soil samples were collected from the pit

19   beneath Tank C, the tank containing the toluol/toluene, and one sample was collected beneath

20   each of the former waste tanks.  Samples collected beneath Tank C were obtained at depths 1-3

21   feet below the bottom of the tank excavation, while the samples beneath the former waste tanks

22   were collected at a depth of approximately 8 feet.  Neither toluene nor any other aromatic

23   hydrocarbon was detected in any of the samples.  Id. at EHD0001797.  The Regional Board

24   concluded with respect to the product tank excavation:

25   
26   > "Pursuant to a request by the San Joaquin Local Health District for
     > further work in the product tank area, additional examination and
     > sampling by American Environmental (AE) [AEMC] was
27   > performed.  Results of this work transmitted to the Board and the
     > County on 26 November 1986 confirmed the pollution in the
     > product tank area was limited in horizontal and vertical extent.  The
28   > county has instructed Gold Bond to backfill the product tank area

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 7 -          CASE NO. 2:08-CV-02623-GEB-DAD

….

> November 1986 samples were taken below the elevation of the tank
> bottom. … Analysis of the samples showed nondetectable
> concentrations of TPH [total petroleum hydrocarbons] and 8020
> constitutes [toluene and other aromatic hydrocarbons].  Based on
> the data and field observations, it appears the contamination is very
> shallow and limited to the surficial tank bottom area.

Id., EHD 0001797.

On December 12, 1986 additional samples were taken at depths between 6-36 inches below the original tank bottom of the waste tanks.  Id. at 1797.  This was the third round of soil sampling at the waste tanks.  Again, these samples were obtained to resolve a discrepancy between result originally reported by AEMC and those obtained by the Regional Board based on samples taken during the removal of the tanks.  In its Memorandum to the file, the Regional Board noted:

> "Based on the ten soil samples, depth to groundwater, and soil type,
> the amount of pollutants in the soil do not appear to threaten ground
> water quality.  The County {EHD} concurs that the excavation
> should be filled."

Id., EHD 0001798.

The Regional Board advised Gold Bond of its decision on January 6, 1987, stating:

> "Enclosed are the reports from the 12 December 1986 sampling of
> the "waste tank" area.  Based on these results we concur with your
> consultant's [AEMC] recommendation that the excavation should
> be backfilled.  San Joaquin County officials have been consulted
> and they are in agreement with this action.
>
> The County will oversee completion of this work and must be
> present to certify closure of the excavation."

See L'Orange Dec., Exhibit 23, at EHD 0001798.

A fourth round of testing was performed on excavated material from the waste tanks on February 16, 1987.  No aromatic volatile compounds (including toluene) were detected and accordingly the excavated material was disposed of on site.  See L'Orange Dec., Exhibit 24, EHD 0001475.  Based on these results, the Department of Health Services (DHS) concluded on March 8, 1988 that tank closure (the process of removing the tanks and analyzing the nature and

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                - 8 -            CASE NO. 2:08-CV-02623-GEB-DAD

1  extent of any contamination) was complete, and requested a copy of the Certificate of Closure.[7]

2  *See* L'Orange Dec., Exhibit 29.  On May 24, 1988 Gold Bond plant manager Michael J. Rogge

3  performed a property inspection prior to Dopaco's departure to its new location.  His June 13,

4  1988 memo noted no hazardous waste was found "nor was there any visible evidence of

5  hazardous materials which would be the responsibility of Dopaco California Inc, or its guarantor,

6  Dopaco, Inc., to remove."  *See* L'Orange Dec., Exhibits 26 and 9.

7  **E.    Newark's Acquisition of the Site**

8         Newark purchased the Facility from Gold Bond on or about June 24, 1989.  On

9  September 30, 1997, Newark was advised by EHD that its files did not contain a formal closure

10 letter regarding the 1986 removal of the USTs and suggested Newark contact the Regional Board,

11 and request such a letter be issued.  *See* L'Orange Dec., Exhibit 27.  On October 17, 1997,

12 Newark formally requested the Regional Board to review its file and issue the closure letter.  *See*

13 L'Orange Dec., Exhibit 28**.**  On February 3, 1998, the Regional Board responded with a letter and

14 attached memorandum dated January 30, 1998, that required Newark to develop additional

15 information in order to evaluate the presence of soil and groundwater contamination.

16 Specifically, the Regional Board required additional testing to detect the presence of *other*

17 chemicals contained in the product tanks.[8]  *See* L'Orange Dec., Exhibit 29.  Confronted with the

18       [7] Newark's statements that the testing performed during the tank removal was inadequate
19 are misleading and inaccurate.  The official documents make clear that tank removal and testing
   was rigidly supervised by DHS, the Regional Board, and EHD.  Two of the agencies (Regional
20 Board and EHD) were present at the tank removal, and EHD required two analyses of the soil
   samples taken from the product tank pit and three analysis of samples taken from the waste tank
21 pit and area before approving closure.  Ultimately, all three agencies were in agreement that, as
   expressed in the Regional Board's letter, "… the amount of pollutants in the soil do not appear to
22 threaten ground water quality."  Even more egregious is the fact that Newark's assertions of
   inadequate testing are made solely by its lawyers and are inadmissible, since they are delivered in
23 the complete absence of any expert testimony which, in any way, suggests the testing performed
   was inadequate, or the conclusions reached incorrect..

24       [8] Testing performed during the tank removal and sampling process was designed to detect
25 the presence of some chemicals used in the gravure process (generically referred to as BTEX
   (benzene, toluene, ethyl benzene and xylene)), but not all the contents of product tanks (isopropyl
26 alcohol, acetone, acetates and the components of the blanket wash).  While not completely clear
   on its face, it appears the Regional Board was requesting further information as to chemicals
27 contained in the product tanks other than toluene, although the testing protocols specified would
   have detected toluene.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 9 -          CASE NO. 2:08-CV-02623-GEB-DAD

1    Regional Board's requirements, a Newark executive, Mark Vincent, requested input from

2    Newark's former Environmental and Technical Services Director at the Stockton plant, David

3    Baker.  In response, Baker forwarded a two-page memorandum dated February 3, 1998, wherein

4    he suggested three options which included "(1) run the requested tests, send the reports and wait

5    (might cost $10,000); (2) ignore and wait (may gain another 10 years); (3) discuss technical

6    merits and ramifications with agencies."  *See* L'Orange Dec., Exhibit 2630

7        Baker went on to argue against further testing, suggesting a dialogue with agency

8    representatives.[9]  Newark never responded to the Regional Board's February 3, 1998 request.

9    The issue was raised again by San Joaquin County on April 11, 2000 in response to a request by

10   Newark regarding issues concerning its 210,000 gallon fuel oil tank.  The County representative

11   noted:

12           "(Please be advised that the evaluation of "no further action
             required" applies only to the 210000 #6 fuel oil underground
13           storage tank (UST) and sump and the two USTs that were in the
             courtyard.  The USTs that contained solvents in the northwest
14           portion of the site are under the oversight of the CVRWQCB
             [Regional Board].  Further investigation of these USTs was
15           requested by the CVRWQCB in February, 1998 and still has not
             occurred."
16

     *See* L'Orange Dec., Exhibit 31.
17
         Again, Newark ignored the county's admonition regarding its obligation to conduct
18
     further investigation.
19
         The facility was officially closed in 2003.  On September 16, 2004, MACTEC
20
     Engineering and Consulting, Inc. ("MACTEC") performed a Phase I Environmental Site
21

22   _____

23       [9] Newark's characterization of Baker as a former Gold Bond employee is misleading and
     untrue.  Baker had been employed by Gold Bond but became an employee of Newark as a result
24   of the 1989 sale.  For a period of time he was the Environmental and Technical Services Manager
     of the Newark Stockton facility.  Further, Newark's statement that they acted on Baker's
25   recommendation is belied by the testimony of Newark's president, Robert Mullen, who testified
     the decision was made at an executive level.  *See* L'Orange Dec., Exhibit 32, p. 96:12-20.
26   Additionally, it begs credulity that a corporation the size of Newark would predicate a decision to
     respond to a direct request for further study by the leading California enforcement agency on the
27   recommendation of one who, as characterized by Newark's lawyers, was a former employee of
     the previous owner of the site.
28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                    - 10 -              CASE NO. 2:08-CV-02623-GEB-DAD

1    Assessment ("ESA") for the facility at the request of Newark.  The report specifically pointed out

2    the removal of eight USTs in 1996, and highlighted the 1998 request from the Regional Board for

3    further investigation.  MACTEC recommended that the Regional Board's files be reviewed to

4    determine whether the requested work had been performed, concluding if the case remained open,

5    further investigation may have to be performed.[10]

6    **F.**     **On-Site Investigations**

7         An on-site investigation was performed by Advanced Geo Environmental, Inc. ("AGE"),

8    a consultant retained by a tentative purchaser of the property.  Soil and groundwater samples were

9    taken in September 2005 and found concentrations of toluene in both the groundwater and soil.[11]

10   *See* L'Orange Dec., Exhibit 33.  On November 16, 2006, David Ascher, General Counsel of The

11   Newark Group, forwarded a demand letter to Dopaco.  *See* L'Orange Dec., Exhibit 34.  The

12   parties entered into a stipulated standstill agreement; however this ligation ensured after they

13   were unable to resolve their differences.

14                                  **II.**

15                             **ARGUMENT**

16        Newark's motion fails because (a) it has produced no evidence as to the origin of the

17   contamination discovered by AGE in 2005; (b) it has failed to demonstrate that Dopaco's 1986

18   cleanup of the site was anything but effective; and (c) even if Newark had carried its burden

19   under (a) and (b), it has failed to demonstrate that the site contamination poses an imminent and

20   substantial threat to health or the environment, because Newark has not proved any population is

21   _____

22        [10] For unknown reasons, Newark has not authenticated either the Phase I completed by
     MACTEC, or the groundwater and soil sampling performed by the company in 2006, yet refers to
23   the latter in its moving papers.  Dopaco sought to depose the MACTEC engineer who authored
     the Phase I and supervised MACTEC's investigations in 2006 and 2008, but Newark refused to
24   produce him, claiming MACTEC was a litigation consultant.  MACTEC's investigative findings
     are interesting in that that they demonstrate a huge disparity in readings and locations of
25   contamination.

26        [11] AGE reported toluene in groundwater at a concentration of 6,800,000 ppb, suggesting
     the presence of pure product on the water table.  One soil sample tested allegedly contained
27   13,000 mg/kg, or 13,000,000 ppb toluene.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 11 -          CASE NO. 2:08-CV-02623-GEB-DAD

1    at risk or that any pathway for exposure exists.

2        **1.    Newark Has The Burden of Demonstrating That Dopaco Contributed to the
           Contamination in Question.**

3

4        Summary judgment is only appropriate where there is no genuine issue of material fact.

5    Fed. R. Civ. Pro. 56(c).  Because summary judgment is a "drastic device" that terminates a

6    party's right to present its case to a jury, the moving party bears a "heavy burden" of

7    demonstrating the absence of any triable issue of material fact.  *Nationwide Life Ins. Co. v.*

8    *Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2nd Cir. 1990).  In order to carry its burden the

9    moving party must either (1) negate or disprove an essential element of the opposing party's

10   claim or defense; or (2) show that the opposing party does not have enough evidence of an

11   essential element of its claim or defense to carry its ultimate burden of persuasion at trial.  *Nissan*

12   *Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).  "It is not

13   enough to move for summary judgment … with a conclusory assertion that he opposing party has

14   no evidence to prove his case."  *Celotex Corp. Catrett*, 477 U.S. 317, 326 (1986) (J. White,

15   concur. opn.).  The moving party must identify specifically the issues for this it claims the

16   opposing party has no supporting evidence and demonstrate the absence of such evidence.  *City of*

17   *M. Pleasant, Iowa v. Associated Elec. Co-op, Inc.*, 838 f.2d 268, 273 (8th Cir. 1988).

18       When the moving party has carried its burden under Rule 56(c), its opponent must present

19   evidence on which a jury could reasonably find for the opposing party.  *Anderson*, 477 U.S,. at

20   252.  However, if the moving party fails to carry its initial burden of production, the opposing

21   party has no obligation to produce anything.  *Nissan*, 210 F.3d at 1102-1103.  Further, any

22   inferences drawn from the evidence must be viewed in the light most favorable to the non-moving

23   party.  *Eastman Kodak v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).  "The

24   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

25   favor."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986).

26       A finding of liability under RCRA requires that a defendant "contribut[e] to … the

27   handling, storage, treatment, transportation, or disposal of the solid or hazardous waste which is

28   alleged to present an imminent and substantial endangerment to health or the environment."

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 12 -          CASE NO. 2:08-CV-02623-GEB-DAD

1  42 U.S.C. § 6972(a)(1)(B).  The "contributed to" language of subsection (a)(1)(B) has been held

2  to "'expressly specif[y] that there is no liability without a causal relationship between a defendant

3  and an imminent and substantial endangerment.'" *Zands v. Nelson,* 797 F. Supp. 805, 809

4  (S.D.Cal.1992) (*Zands II*) (quoting *United States v. Hardage,* 116 F.R.D. 460, 466 (W.D.

5  Okla.1987)).  Specifically, in order for RCRA liability to attach, it is necessary to prove that a

6  defendant was the owner and/or operator *when the contamination occurred. Zands II,* 797 F.Supp.

7  at 810-11.  As the court in *Zands II* stated:

8           [P]laintiffs cannot prevail if they prove only that the defendants
         were the owners and operators of this gas station at some point in
9         the past. Additionally, to hold these defendants responsible for the
         contamination, it is necessary to prove that the defendants were the
10        owners and operators of the gas station *when* the gasoline leaked
         into the soil. The primary issue thus becomes: "When did the
11        contamination occur?"

12  *Id.*; see also *Aurora Nat'l Bank v. Tri Star Mktg., Inc.,* 990 F. Supp. 1020, 1029 (N.D. Ill. 1998)

13  ("[P]laintiffs would have to show that the contamination at issue is the "direct result" of

14  defendants Chronister and Tri Star's activities and that specific amounts of leakage occurred

15  during the periods when each of the defendants was operating the gasoline station.").

16

17       **2.       Newark Cannot Shift The Burden of Proof to Dopaco.**

18       Newark is wrong to suggest that this Court shift the burden of proof to Dopaco under a

19  theory of alternative liability.  Newark sued only one of six potentially liable parties, and it has

20  not succeeded in identifying a discrete time period within which the contamination could have

21  taken place.  It is well settled that under such circumstances, Newark cannot foist its burden upon

22  Dopaco.

23       In its haste to file its ill-conceived motion, Newark has mischaracterized the legal standard

24  for RCRA alternative liability set forth in *Zands II*:

25           Where plaintiff identifies a period of time during which
         contamination occurred,
26
         where owners of the property or operators of a gas station are
27        strictly liable for the contamination of the property that occurred
         during their period of ownership or operation,

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                    - 13 -              CASE NO. 2:08-CV-02623-GEB-DAD

1

2

> where plaintiff joins as defendants all persons who owned the property or operated the gas station for at least a portion of the time during which the contamination occurred,

3

4

> but where plaintiff cannot prove which owner or operator "caused" the contamination because more than one person owned the property and operated the gas station during the period of known contamination,

5

6

7

> the Court will shift the burden to each of the owner/operator defendants to show the contamination did not occur during the period of the defendant's ownership or operation.

8

Zands at 817-18.[12]

9        Newark fails this test for several reasons.  First and most importantly, Newark has not

10   joined as defendants all persons who owned or operated the site for at least a portion of the period

11   during which contamination potentially occurred.  As described more thoroughly in Section

12   II(A)(3), *infra*, Newark has failed to identify a period of time during which the toluene

13   contamination occurred.  This is problematic because as many as six companies (including

14   Newark) used toluene at the site between 1955 and 2003, but only one of those six companies is a

15   defendant in this case.  It is undisputed that Fibrerboard, Pacific Paper, Gold Bond and Dopaco

16   used toluene in their rotogravure printing operations consecutively at the site from 1955 to 1988.

17   Pl's Brf. at 3.  Moreover, San Joaquin operated two of the six underground tanks during Dopaco's

18   tenancy, one of which contained toluene.  Further, in its Statement of Undisputed Facts, Newark

19   characterizes its use of toluene as not substantial, tacitly admitting that it used some unknown

20   amount of toluene on for property.  Plt SUD, ¶9.  Thus, Newark is implicated as a potentially

21   liable party and the potential contamination time period runs to 2003.  Because Dopaco is the

22   only party to be sued, this lawsuit covers only 7 of the 48 possible years of contamination—or

23

24           [12] Contrary to Newark's representation, *Zands II* does not merely stand for the proposition that the burden of proof should shift to defendant(s) when defendants have had "the best opportunity to gather evidence that would have proven when the contamination occurred."  Pl's Brf. at 23, quoting *Zands II* at 817.  In any event, Dopaco has discharged its burden even under Newark's misreading of *Zands II*: Dopaco *did* test the soil prior to relinquishing control of the site, and found no evidence of contamination that could threaten ground water quality.  *See* L'Orange Dec., Exhibit 1 at ¶4.  Newark just did not like the test results.

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                    - 14 -                    CASE NO. 2:08-CV-02623-GEB-DAD

1   14.5%.

2          Alternative liability only works when the court is certain that it has all potentially liable

3   parties before it. *Zands II* at 16 ("[E]quity requires a shifting of the burden. Such a shifting of

4   the burden of proof removes the possibility that plaintiffs will be without a remedy *even though*

5   *the Court knows that the contributor is before it.*") (emphasis in original). By failing to join

6   Fibreboard, Pacific Paper, Gold Bond and San Joaquin , Newark has waived any right to avail

7   itself of an alternative liability theory.[13]  Dopaco is only one of many potential parties, and indeed

8   there are strong indications (as described in Section II(B), *infra*) that Dopaco is *not* liable.[14]

9          Second, burden shifting is inappropriate in this case because some of the toluene

10  contamination contained MIBK (*See* L'Orange Dec., Exhibit 35, O'Brien Expert Report p. 10), a

11  substance which was not combined with any of the toluene used by Dopaco. *See* L'Orange Dec.,

12  Exhibit 36. Because at least two different toluene-containing chemicals were released, Dopaco

13  cannot have been the sole responsible party. As a result, the harm in this case is divisible. *See*

14  *Burlington Northern and Santa Fe Ry. Co. v. U.S.,* 129 S.Ct. 1870, 1882-3 (2009) (finding

15  different contaminants to be a basis for divisibility in a CERCLA case). "Where we can be sure

16  that at least one other party contributed to the contamination, joint and several liability is

17  inappropriate."[15]  Thus, the burden falls on Newark to recover against the other, as yet unnamed

18  defendants. *Aurora Nat. Bank*, 990 F. Supp. at 1034-5.

19         Newark quite plainly cannot shift the burden of proof in this case unless it, at minimum,

20

21         [13] In the Purchase Agreement, Newark agreed not to sue Gold Bond regarding any
       environmental contamination after three years elapsed from signing of the Agreement. *See*
22     L'Orange Dec., Exhibit 37. Newark bargained at arms length for this term, and its voluntary
       decision to release Gold Bond of all liability should not prejudice Dopaco in this litigation.

23
       [14] Ironically, by arguing for alternative liability, Newark has in effect conceded that it
24     cannot prove which owner caused the contamination.

25         [15] Joint and several liability is also inappropriate where the plaintiff in the lawsuit is not an
       innocent party. *See Bayless Investment & Trading Co. v. Chevron USA, Inc.,* No. 93-704, 1994
26     WL 1841850 (D. Ariz. May 25, 1994). Since there is at least an issue of fact as to whether
       Newark shares responsibility for the contamination at the facility, apportionment is the better
27     approach – assuming Newark even succeeds in proving that another party is liable.

28

1   sues the other potentially liable entities, and presents evidence as to a specific time period during

2   which the contamination could have occurred.  Newark is doubly doomed because the list of

3   unjoined potential parties includes itself.

4         **3.**      **Newark Has No Evidence Tying Dopaco To The Contamination and**
                    **Therefore Cannot Carry Its Burden Of Proof.**

5           Given that Newark carries the burden of proving that Dopaco caused the contamination

6   found in 2005, its lack of evidence to this effect seals the fate of this motion and Newark's case as

7   a whole.  As an initial matter, the 2005 data upon which Newark bases its case does not indicate

8   that Dopaco caused the contamination.  *See* L'Orange Dec., Exhibit 38, ¶7.  Moreover, there is no

9   support for Newark's three primary contentions (a) that Dopaco employees caused ground spills

10  of toluene, (b) that any leaks in tanks, pipes or printing occurred during the time Dopaco occupied

11  the facility, or (c) that toluene was ever released through cracks in the floor of the facility's

12  printing pit.

13                **a.**      **Newark's 2005 Data Does Not Tie Dopaco To The Contamination.**

14          As an initial matter, the data collected by AGE in 2005 is useless in determining when the

15  contamination took place.  Newark assumes that the contamination allegedly detected in 2005

16  was released sometime prior to 1986, and went undetected despite multiple rounds of testing and

17  analysis performed by AEMC and reviewed by three state agencies charged with overseeing tank

18  removal.  Newark's assumption is based on data collected by its contractor, AGE, and three soil

19  samples and four grab samples of ground water, all taken at the same time.  No monitoring wells

20  were employed, and there is a complete absence of multiple samples taking over a defined period

21  of time.  Even if these data was assumed to be correct, AGE's results represent an increase of

22  more than 35 million percent over the sampling results of AEMC in 1986.  Finally, Mr. Robert

23  Mullen, the President of The Newark Group and Newark's 30(b)(6) witness confirmed Newark

24  has made no attempt to age date any of the chemicals to determine if the contamination was the

25  result of releases which occurred before or after 1986.  *See* L'Orange Dec., Exhibit 32, p. 154,

26  L5-23.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT
- 16 -
CASE NO. 2:08-CV-02623-GEB-DAD

### b.      There Is No Evidence That Dopaco Caused Surface Spills.

Newark's discovery responses confirm that it had no witnesses to any spills of chemicals during the time Dopaco occupied the facility.  As set forth in the Declaration of Michael Rogge, the former plant manager for both Gold Bond and Newark, he never observed any spills by any Dopaco employee.  *See* L'Orange Dec., Exhibit 9, ¶10.  Further, the only document relied upon by Newark's 30(b)(6) witness as evidence that spills had occurred during Dopaco's tenure was the NOV. [16]  *See* L'Orange Dec., Exhibit 32, at 31:21-32-22.  He also confirmed the sole document he thought supported Newark's assertion that Dopaco employees spill material at the waste tank was the NOV.  Id.  Mullen testified he conducted no investigation as to who did the alleged dumping of material into the waste tanks (Id. at 35:13-36:17), was unaware of any witnesses who saw Dopaco employees dumping material into the waste tanks (Id. at 37:23-38:20), and was not aware of any witnesses to spills or leaks by Dopaco (Id. at 81:15-82:4).[17]  While Mullen testified an alleged removal of 30 barrels of material from a pit beneath a six-color printing press was evidence of spillages by Dopaco, he did not know what material was removed, or whether it was solvent or water-based ink.  Id p 41, 44:4-15, 45:1-15.  Finally, Newark relies on a business proposal by Donald K. Rothenbaum, a field engineer from Kleinfelder & Associates, who performed a one-time visit at the facility in December 1985.  *See* L'Orange Dec., Exhibit 39.  Rothenbaum mention discolored soil by the waste tanks, but his statement suffers from the same deficiencies as the NOV.  Rothenbaum was never identified by Newark as a witness to any spills, and his report contains no statement that he witnessed any during his inspection.  His declaration merely authenticates the report.

---

[16] Newark places great reliance on the NOV as evidence that the spills observed were the result of activities conducted by Dopaco employees.  The NOV merely records the investigation's observation that stains were seen in soil around waste tanks.  The NOV is silent as to who spilled the observed material, when the spillage occurred, and what was spilled.  The waste tanks had been in the same locations since 1968, accordingly the discolorations in the soil could have been caused by activities conducted by Fibreboard, Pacific Paper, or Gold Bond.

[17] Newark attached to its Motion for Partial Summary Judgment, the Declaration of Roger Avery, a former manager of the Dopaco facility.  While the Avery declaration describes, in great detail, the printing activities conducted inside the print building, it is absolutely silent with respect to the issue of spills.

The only thing that the evidence cited by Newark can establish is that there was spillage by the waste tanks.  Newark offers no evidence to support its speculation that Dopaco was responsible for the spills or that the spills contained toluene.  In fact, none of the evidence cited by Newark contains any reference to toluene.  Indeed, the laboratory results analyzing the stained soil collected from around the waste tanks were not deemed hazardous and detected no toluene.  In sum, the evidence does not support Newark's allegation that the spillage contained any toluene.

Newark's allegation that Dopaco is responsible for the spillage is similarly deficient.  Rothenbaum's declaration and Newark's discovery responses, where Newark admits it has no witnesses to any spill by any Dopaco employee, make it clear that neither Rothenbaum nor anyone at the Regional Board personally witnessed the spills.  Thus, there is no foundation for the allegation that Dopaco was responsible for the spillage.  The evidence shows Gold Bond, Fibreboard and Pacific Paperboard also used the waste tanks during the time they operated the rotogravure presses and that Gold Bond used the waste tanks during Dopaco's tenancy.

### c.   There Is No Evidence That Any Tank Leaks Occurred During Dopaco's Occupancy.

Newark also alleges the contamination was caused by leaks from the product and waste tanks and the plumbing to those tanks.  Two tank removal reports, filed by an inspector from the San Joaquin EHD, recorded his contemporaneous observations of the conditions of the tanks at the time of their removal.  Five tanks were removed on September 30, 1986, and no apparent leaks were observed, either in the tanks or the plumbing.  Included in this group of UST's was Tank C, which contained the toluene used by Dopaco.  The three tanks, removed on October 2, 1986, consisted of the remaining UST in the product tank field, and the two waste tanks.  The same investigator, after inspecting the tanks noted no leaks in the product tank or its plumbing, and a possible leak near the top of one of the waste tanks.

Gold Bond's contractor also inspected the tanks during the removal process.  AEMC's October 21, 1986 report noted that four, including the toluene tank were in excellent condition, with no signs of rusting or pitting.  The remaining four, including the blank wash tank operated

1  by San Joaquin, were described by AEMC as rusty, but with no indications of leaks or holes.  A

2  slight odor was detected in the product tank pit, while "odors" were reported with respect to the

3  waste tank pit.  AEMC never identified the source of these odors, nor did its reports ever suggest

4  the odor was solvent-based.

5  Newark has produced no evidence regarding any attempts by anyone to identify the origin

6  of the odor reported by AEMC.  Whether it was solvent based, or even a chemical odor, is left

7  open to speculation.  If it were assumed to be solvent based, it is more likely to have been from a

8  release from one of the tanks described as rusty, such as the tank containing San Joaquin's

9  blanket wash, a constitute of which was toluene.  Further, Gold Bond and later Newark were

10  concerned about the movement of a plume from a superfund site formerly operated by

11  McCormick and Baxter.  Newark was located southeast and down gradient from the site.  Not

12  only does the groundwater flow to the south east in this area, Gold Bond customarily extracted

13  approximately 2.5 million gallons of water per day from four production wells located on the

14  Gold Bond facility (*See* L'Orange Dec., Exhibit 40), and was concerned about the encroachment

15  of the McCormick plume.  *See* L'Orange Dec., Exhibit 41.  CH2M Hill (the contractor

16  remediating the McCormick and Baxter site) proposed a series of monitoring wells on the Gold

17  Bond facility.  Monitoring Well #5 was to be positioned in close proximity to the product tank

18  field.  *See* L'Orange Dec., Exhibit 42.  Consequently, there are issues of fact surrounding the

19  identification and origin of the odors in the excavation pits.

20  
            **d.      There Is No Evidence of Leaks In The Basement Floors Or Below
                     Grade Sumps.**

21  
22  Commencing at page 22 of Newark's motion, Newark states "the record also contains

22  evidence indicating that leaks or cracks in the floors and below grade sumps in the basement

23  where Dopaco operated contributed to the high concentrations of toluene in the northwest corner

24  of the property."  Newark references the Avery declaration filed in support the Motion for Partial

25  Summary Judgment.  While the Avery declaration described, in great detail, the activities

26  conducted in the print building, it makes no mention of spills or leaks in that area.  Further,

27  Newark's allegation is devoid of any reference to a statement, either by a percipient witness or an

28  

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                - 19 -                CASE NO. 2:08-CV-02623-GEB-DAD

1   expert, supporting the claim that leaks or spillages occurred, or that cracks were present in the

2   floor or the sumps.  No expert investigation has been conducted concerning the structural

3   integrity of the vaults, sumps and floor in the printing building, and there has been no testing of

4   the concrete comprising these structures, no analysis of the building's foundation and no soil or

5   groundwater testing beneath that foundation reflecting the presence of any contaminants.

6   Additionally, there is no reference to the sumps or tank pits being a source of contamination in

7   the entire deposition of Newark's 30(b)(6) witness.[18]

8          Counsel's allegations regarding the spills, leaks and floor cracks remain, from beginning

9   to end, sheer speculation framed as unsupported statements of facts offered by a lawyer, and not

10   an expert.  Newark cannot prove that Dopaco was responsible for any of the contamination,

11   detected by AGE in 2006, and its motion fails on this basis alone.

12   **B.      The 1986/87 Investigation and Cleanup by AEMC was Effective.**

13          Not only can Newark not demonstrate that Dopaco caused the 2005 contamination, but the

14   affirmative evidence indicates that the 1986 cleanup directed by Dopaco was effective in

15   eliminating any contamination that existed at that time.

16          **1.      Newark Has Introduced No Evidence, Besides the Lay Allegations of Its
                      President and 30(b)(6) Witness and Its Counsel, That the Testing and
17                    Cleanup Were Inadequate.**

18          Newark asserts the contamination discovered in 2005 was the result of alleged leaks and

19   spills attributable solely to Dopaco's activities between 1981 and 1988, and was simply missed by

20   AEMC and three regulatory agencies, when the sampling and testing occurred in 1986 and 1987.

21   The evidence Newark relies upon are the lay opinions of its 30(b)(6) witness and unsupported

22   statements by its counsel.  Mullen claimed, in his 30(b)(6) deposition, there  was a distinct

23

24          [18] The origin of the sumps and tank pits as a source was raised, for the first time, in the
        expert declaration of Keith O'Brien (*See* L'Orange Dec., Exhibit 35), Newark's hydrogeologist,
25      who visited the site two days before his declaration was to be served.  O'Brien lifted the grates to
        the sumps, observed they were full of water, but made no observations as to cracks in the sumps
26      or joints.  Further, he conducted no testing regarding the structural integrity of either the pits or
        the sumps, the building's foundation, and AGE has never sampled soil or groundwater beneath
27      the building.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT               - 20 -            CASE NO. 2:08-CV-02623-GEB-DAD

1  possibility the cleanup did not capture all of the contamination.  In support of this statement he

2  relied on the reference to odor in the AEMC report, and the fact groundwater is 10-15 feet below

3  the excavations.  *See* L'Orange Dec., Exhibit 32, p 82:5-25, p 83:1-23.  However, Mullen then

4  confirmed he was not qualified to opine on the quality of the cleanup.  Id. at p 85:6-17.  Newark

5  claims the testing performed by AEMC was inadequate because it was too shallow, and failed to

6  detect pure product just two feet deeper.  Other than the lay opinion expressed by counsel, this

7  allegation is not supported by any scientific evidence or expert opinion[19].  Further, none of these

8  allegations are supported by the evidence surrounding the testing and analysis performed by

9  AEMC.

10       **2.       The Protocol Followed by AEMC Was Strictly Scrutinized by the Regulatory
             Agencies Charged with Overseeing UST Removals.**

11       Three agencies, DHS, EHD and the Regional Board reviewed AMEC's proposed closure

12  plan submitted on May 6, 1986.  For the AEMC tank removal and sampling, the process is one of

13  review and approval by the regulatory agencies.  Proposals are often modified, based on

14  comments by these authorities.  *See* L'Orange Dec., Exhibit 19, ¶6.

15       A review of an internal memorandum dated May 25, 1986, from the Regional Board

16  confirms that soil borings to ground water were requested only in the investigation of the waste

17  tanks.  *See* L'Orange Dec., Exhibit 15, NEW0000083.  The Board was less demanding with

18  respect to the product tanks commenting "…monitoring well may be necessary if soil

19  contamination is found."  Id.  In response to these comments, AEMC's final plan, submitted on

20  July 22, 1986, not only discussed the location of monitoring wells, but the details of their

21  construction and the sampling protocol.  This plan was submitted to both the Regional Board and

22  EHD on August 6, 1986, and approved on September 22, 1986.

23

24       [19] In support of his allegation, Newark' cites to a single sentence in the AEMC October
     21, 1986 report which states, "[c]onsidering the depth and location of the samples, the only

25  possibly environmental and/or health threat of contamination on site is to groundwater."
     Contained on the next page of the report was the actual conclusion reached by AEMC.  "Based on

26  the above [soil sample results taken beneath each of the tanks], the results indicate that although
     soil contamination exists, it is limited in degree and is not a probable threat to groundwater."  *See*

27  L'Orange Dec., Exhibit 4, EHD0001812.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                    - 21 -              CASE NO. 2:08-CV-02623-GEB-DAD

The evidence could not be clearer. The tank removal and sampling plan, initially drafted by AEMC, was subject to substantial review by the regulators, and underwent major revisions, including the addition of a ground water sampling protocol which encompassed both sets of tanks. Without question, the issue of soil borings to groundwater, and the possibility of subsequent sampling was firmly on the minds of the regulators and AEMC.

**3.     The Results of Multiple Rounds of Sampling Confirmed Toluene Was Not Detected, or Its Levels Were Below State Minimums for Drinking Water.**

The state agencies participated in, supervised, or reviewed four rounds of soil samples taken from the tank excavation pits, or the stained soils. Sampling of the tank excavation pits were taken at multiple depths. Two rounds of sampling were conducted on samples from the product tank pit, while three were performed on samples taken from the waste tank pit. The stained soil was sampled on one occasion. While the initial samples obtained on October 21, 1986 reflected toluene levels below state drinking water minimums, no toluene was detected in any of the samples taken at any location after that date. The latter rounds of sampling from the two excavation pits were required at the direction of EHD, because of a discrepancy in results, it is highly likely these subsequent samples were closely scrutinized by the regulators.[20]

**4.     The Absence of Toluene in the Sampling Performed After October, 1986 Resulted in the Regulators Instructing AEMC to Backfill the Excavation Pits, as Opposed to Requiring Ground Water Testing.**

The Regional Board and the EHD were the two state agencies principally involved in reviewing the sampling data. The additional samples taken from the excavation pits in November and December, 1986 were done so at the request of the EHD. Both agencies agreed the pollution in the product tank area was limited both horizontally and vertically, appeared to be shallow and limited to the surface of the tank bottom area. With respect to the waste tanks, both agencies concluded the amount of pollutants in the soil did not appear to threaten groundwater quality. Neither agency required any borings or any sampling to determine ground water quality.

---

[20] In fact, representatives from the Regional Board directed the sampling of the waste tank pits on December 12, 1986, and had the samples analyzed by two different laboratories. *See* L'Orange Dec., Exhibit 22.

1    Accordingly, AEMC was instructed by the agencies to backfill both excavation pits

2    **5.    The Record is Devoid of Any Evidence That AEMC's Sampling, Analysis, and Cleanup Were Defective.**

3

4    Newark attempts to convert fact into fiction by suggesting the testing and cleanup by

5    AEMC was defective.  It can point to no documents where the contractor (AEMC) or any

6    regulator (DHS, EHD or the Regional Board) ever suggested, let alone concluded the testing and

7    cleanup was inadequate, or the results reached were incorrect.  Rather, it attempts to support its

8    brash claim by citing to only limited portions of documents, or ignoring the conclusions of others,

9    intimating that Gold Bond, and AEMC, skirted the requirements of the regulators.

10   Contrary to Newark's unsupported assertions, the evidence is overwhelming that the site

11   was thoroughly investigated, and the contamination accurately characterized.  AEMC

12   acknowledged in its report that the threat of the onsite contamination was to ground water, but

13   after investigating the site ultimately concluded, in the same report: "Based on the above, the

14   results indicate that although soil contamination exists, it is limited in degree and is not a probable

15   threat to groundwater."

16   This conclusion was supported by the Regional Board and the EHD, after the latter had

17   requested additional rounds of sampling in both tank excavation pits.  These results were

18   analyzed by both agencies and lead to their final conclusion that the excavation pits be filled.

19   Neither agency required any further investigative efforts to characterize ground water quality.

20   Perhaps most compelling is the fact Newark has consistently maintained the stained soils

21   described in both the NOV and the Kleinfelder report confirmed the presence of toluene, despite

22   the absence of any analytical findings by the state inspector or the Kleinfelder engineer,

23   confirming the presence of toluene.  Indeed, when these soils were analyzed, no toluene was

24   detected, and the material was considered to be non-hazardous.

25   **6.    Newark Has Introduced No Expert Evidence to Support Its Lay Allegations That the Sampling Was Conducted too Shallow or The Cleanup Ineffective.**

26   The claim that the testing was conducted too shallow, and the cleanup inadequate rests

27   solely on statements made exclusively by Newark.  No expert opinion or analysis has been

28   introduced to support these claims.  A review of  the expert and rebuttal reports (submitted

1   December 2, 2009 and January 15, 2010 respectively) (*See* L'Orange Dec., Exhibit 43) of George

2   O'Brien, Newark's hydro-geologic expert, confirms that he has offered no opinion regarding the

3   testing and cleanup in either document, despite the fact this issue has been paramount from the

4   outset of the case.  In making these allegations, counsel is delving into sampling protocols, the

5   interpretation of contaminants in soil samples, and the movement of those contaminants in soil

6   and groundwater, clearly subjects of expert opinion.

7          In his declaration offered in support of this response, Dr. Lucia has reviewed the data

8   pertaining to the testing and cleanup and concluded the testing and analysis conducted by AEMC

9   clearly defined the vertical and horizontal extent of the contaminants, and the results obtained in

10  the sampling justified the decision of the regulatory agencies in ordering the excavation pits

11  filled.  *See* L'Orange Dec., Exhibit 38, ¶4.  Newark offers nothing but counsel's speculation in

12  opposition.

13         The arguments made by Newark's counsel that the testing and clean-up was defective and

14  missed toluene floating on the water table lack basic hydro-geologic creditability.  The levels

15  detected in the soil by AEMC at the product tank excavation ranged from 2 to 36 ppb, while

16  AGE's soil sample result was 13,000,000 ppb, a 35 million percent increase.  Newark offers no

17  expert analysis as to how such an enormous increase could occur.  AEMC sampled within two

18  feet of the level where AGE detected massive concentrations of toluene in soil.  If Newark's

19  theory were correct,  Dr. Lucia would have expected the samples taken in 1986 from the product

20  tank excavation pit and its excavated soils to reflect significantly higher concentrations of toluene

21  than was detected.  Id. at ¶7.

22         The evidentiary record confirms the regulatory agencies agreed with the results reported

23  by AEMC, and concluded the contamination did not present a threat to groundwater.  Were it

24  otherwise, the agencies would have never agreed to either of the excavation pits being backfilled.

25  Consequently, Newark cannot meet its burden of establishing that the contamination detected in

26  2005 was released by DOPACO at anytime during its occupancy of the facility.

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                    - 24 -          CASE NO. 2:08-CV-02623-GEB-DAD

1

**C.      Newark's Motion Fails Because It Has Not Demonstrated That The Contamination Has Caused Imminent And Substantial Endangerment**

2

3      Even if Newark was somehow able to negate the voluminous evidence in Dopaco's favor

4  and carry its burden of proving that Dopaco caused the contamination in question, it still has not

5  introduced any expert testimony which would explain the fate and transport of the contaminants

6  that Dopaco allegedly released.  Consequently, there major issues of fact as to whether such

7  contamination presents "an imminent and substantial endangerment to health or the

environment." 42 U.S.C. § 6972(a)(1)(B).

8

9      RCRA's citizen suit provision requires the plaintiff to demonstrate that the disposal of

10  hazardous waste "may present an imminent and substantial endangerment to health or the

11  environment."  42 U.S.C. § 6972(a)(1)(B).  It is well settled that in order for an imminent and

substantial endangerment to exist:

12

13          (1) there must be a population at risk, (2) the contaminants must be
            listed as hazardous waste under RCRA, (3) the level of
14          contaminants must be above levels that are considered acceptable
            by the State, and (4) there must be a pathway of exposure.

15  *Price v. U.S. Navy*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992), aff'd, 39 F.3d 1011 (9th Cir. 1994);

16  *SPPI-Somersville, Inc. v. TRC Companies, Inc.*, Nos. 04-2648, 07-5824, 2009 WL 2612227, *16

17  (N.D. Cal. Aug. 21, 2009); *Foster v. U.S.*, 922 F. Supp. 642, 661 (D.D.C. 1996); *Kara Holding*

18  *Corp. v. Getty Petroleum Marketing, Inc.*, No. 99-0275, 2004 WL 1811427, *10 (S.D.N.Y. Aug.

19  12, 2004).

20      Newark's motion for summary judgment fails to meet this standard because it has failed to

21  demonstrate a pathway by which anyone could be exposed to the toluene.  Indeed, all of the

22  assertions regarding the alleged movement of contaminants at the facility are made solely and

23  exclusively by Newark's lawyers, none of whom is a disclosed expert, and in the complete

24  absence of any supporting expert opinion. Federal law is clear that this is impermissible.  *See*

25  *Williams v. G.M. Roberts*, 202 F.R.D. 294, 295 (M.D. Ala. 2001) ("Lay witnesses are unfamiliar

26  with things like toxicology, groundwater contamination, and related public health issues.").

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT                - 25 -                CASE NO. 2:08-CV-02623-GEB-DAD

1.    **Newark Offers no Expert Opinion Regarding the Transport of the Contaminants.**

Summarizing Newark's attorneys lay allegations, this Court is asked to assume (1) spillages and leaks have occurred at or near the product tank field; (2) spillages occurred in the print building as well as leaks in two sumps and the vaults located beneath the printing presses; (3) the chemicals from leaking product tanks, notably toluene, moved from beneath the tanks to a level of 14 to 16 feet below ground, and gathered on the water table; (4) chemicals (a combination of toluene and MIBK (the latter not used by Dopaco) leaked from sumps and vaults, and then migrated against the direction of groundwater flow to reach the product tank field; and (5) spills and leaks occurred at the waste tanks, and these chemicals moved approximately 300 feet across the groundwater gradient to reach the product tank area.

None of these lay assertions is supported by the underlying evidence, let alone expert opinion.  Newark has no witnesses to any spills by Dopaco employees, and no evidence of any leaks in the product tanks or their plumbing.  While the Avery declaration described activities in the printing building any offers no evidence that any spills occurred or any leaks were detected during Dopaco's occupancy.  The NOV and Kleinfelder report do document discolored soil (which was later determined to be non-hazardous), but neither document identifies what the discoloration was, when it occurred or who deposited the material on the ground.  Further, Newark's written discovery responses identify no witnesses to any spills or leaks during Dopaco's occupancy.  *See* L'Orange Dec., Exhibit 44**.**

Newark introduces no expert testimony addressing leaks or spills, or explaining the 300 foot migration from the waste tanks to product tank field, or the movement of chemicals allegedly from sumps and vaults directly against the flow of groundwater to reach the tank field.  Finally, no expert testimony has been introduced that the clean up conducted in 1986 was inadequate, and somehow missed the enormous concentration of a pure product purportedly located just 2 to 4 feet deeper than the sampling performed by AEMC.

2.    **Newark Introduces no Expert Testimony as to the Fate of the Contaminants.**

AEMC detected Toluene in soil samples taken from the product tank field at levels

1  between 2 and 36 parts per billion.  Subsequent testing and analysis confirmed the absence of

2  toluene in both excavation pits, and the extracted soil.  Both pits were backfilled after a review of

3  three sets of testing results by the three regulatory agencies charged with oversight in UST

4  removal cases.

5       Nineteen years later, AGE allegedly detects massive contaminations of toluene in

6  groundwater and soil.  On the basis of 3 groundwater grab samples and 4 soil samples, Newark's

7  attorneys offer their lay opinion that the contamination detected in 2005 was the result of

8  undocumented and unwitnessed releases by Dopaco between 1981 and 1986.  However, Newark

9  offers no explanation how low-levels detected in 1986 (2 to 36 ppb in soil at 12 feet) could

10  increase to 13,000,000 ppb in soil at 14 feet, an increase of 35 million percent.

11       Further, Newark offers no evidence explaining these quantum increases in the levels of

12  toluene in the soil samples obtained in 2005.  Newark, in the complete absence of facts or expert

13  opinion, opines the 1986 sampling was performed too shallow, and simply missed this enormous

14  quantity of pure toluene located just 2 feet deeper.  However, the facts surrounding the sampling,

15  particularly the results and their analysis by three regulatory agencies, refute counsel's

16  speculation.

17       If the extraordinary levels of toluene reported by AGE were present in 1986, the soil

18  samples taken from the excavation pits by AEMC would have had reflected significantly higher

19  concentrations of toluene, a condition that clearly did not exist.[21]

---

20       [21] Newark and its counsel clearly understand that assessing the efficacy of the 1986 testing
21  and cleanup, or analyzing the hydraulic relationship between releases allegedly occurring in the
   1980s and the levels reported by AGE in 2005.  At his deposition, Newark's 30(b)(6) witness
22  admitted he was critical of AEMC's efforts.  However, he was quick to point out he was not
   qualified to opine on the quality of the 1986 cleanup.  See L'Orange Dec., Exhibit 32, p 85:6-17.
23  Additionally, when he was asked whether Newark had performed any rotometric analysis to
   determine the quantity of toluene that needed to be released in order to generate the levels
24  reported by AGE, Newark's counsel responded:

25       "I'm going to object to the extent the question calls for analysis that will be done by an
      expert witness."
26
   Id. at 83:3-23.
27
        Finally, Mr. Mullen was questioned about statements made by Newark's former

28                                                                        (Continued)

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT          - 27 -          CASE NO. 2:08-CV-02623-GEB-DAD

**3.     Newark Introduces no Expert Testimony As To How The Contamination Puts A Population At Risk.**

Newark has mustered no evidence that the toluene found on the site - whether in the soil or groundwater - is in danger of entering the municipal water supply or otherwise presenting a risk to any population.  Indeed, Newark's own expert suggests that whatever toluene exists in the groundwater is not moving anywhere.  Rather, it "has remained in the subsurface in the northwest comer of the facility despite shallow groundwater flow directions generally to the southeast."  *See* L'Orange Dec. Exhibit 35.  The best that Newark claim that "[t]he Regional Board considers all groundwater in the Central Valley Region to be potential sources of municipal or domestic water supply."  Pl's Brf. at 12.  But this is not sufficient, as *Foster v. U.S* illustrates.  In that case, the court found that there was no imminent and substantial endangerment where "there [was] no evidence [that] the contamination is migrating and percolating through the soil," where the water below the site was not used for drinking water, and where endangerment could only conceivably occur if the site was developed.  922 F. Supp. at 661-2.  As in *Foster*, is not enough that the water underneath the site *could* be used for drinking water at some unknown point in the future.

This case is analogous to a recent Second Circuit decision, *Simsbury-Avon Preservation Soc. LLC v. Metacon Gun Club,* 575 F.3d 199 (2d Cir. 2009).  In that case, the court granted summary judgment to the defendants on plaintiff's RCRA claim where discarded lead at a gun club site did not present an "imminent and substantial endangerment." The plaintiff's expert had found that various samples exceeded state thresholds for residential sites and concluded the lead represented potential exposure risk to humans and wildlife.  *Id.* at 213.  However, the court found that the report failed to (a) state the degree of potential exposure to lead contamination on the site, (b) provide any evidence that anyone was subject to long-term exposure to lead contamination at

--------

(Continued)

Environmental and Technical Services Manager, Daniel Baker, in his February 1998 memo assessing the effectiveness of the 1986 cleanup.  Mr. Mullen agreed that while Mr. Baker was a technical person, "he's not an environmental engineer or a groundwater consultant or a person knowledgeable about cleanup of these things.: Id. at p 110:13-25; 101:1-23.  When questioned about Mr. Baker's comments regarding the absence of solvent in the soil, Mr. Mullen observed "He's not a geologist.  He's a printer."  Id. at p 105:8-14.

1   the site, or (c) describe any realistic pathways of exposure.  *Id.*  Newark's expert report has

2   likewise stated only that toluene levels exceed state standards; it has failed to describe any

3   pathways to exposure.

4        Given the fact-intensive nature of the inquiry, "[c]ourts have been understandably

5   reluctant to find the existence of an imminent and substantial endangerment as a matter of law."

6   *Acme Printing Ink Co. v. Menard, Inc.*, 870 F. Supp. 1465, 1478 (E.D. Wis. 1994).  This is

7   particularly the case where, as here, the evidence proffered by the plaintiff is exceedingly weak.

8                              **III.   CONCLUSION**

9        Even under the best of circumstances, granting summary judgment to a RCRA plaintiff is

10  exceedingly rare.  *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.*, 138 F. Supp. 2d 482,

11  488 -489 (S.D.N.Y. 2001) ("[S]ummary judgment on a RCRA claim is infrequently granted.").

12  Moreover, where, as here, there are conflicting expert reports presented, courts are wary of

13  granting summary judgment.  *See, e.g., Kara Holding Corp., 67 F.Supp.2d at 312* (denying

14  summary judgment is "appropriate in the face of the conflict in expert testimony").

15       But this case is an even worse candidate for summary judgment because the plaintiff,

16  Newark, has presented a paper thin case based primarily on lawyers' opinions, and in the absence

17  of any supporting expert opinion.  Held up to the light, this Court should see right through

18  Newark's unsupported conclusions and innuendo.

19

20  Dated: January 25, 2010                 DRINKER BIDDLE & REATH LLP

21

22                                          By: /s/ H. Christian L. Orange

23                                              H. Christian L'Orange
                                                Michael P. Pulliam

24                                          Attorneys for Defendant
                                            DOPACO, INC.

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT DOPACO'S RESPONSE TO
MOTION FOR SUMMARY JUDGMENT            - 29 -            CASE NO. 2:08-CV-02623-GEB-DAD