IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE NEWARK GROUP, INC., | ) | |
| Plaintiff, | ) | 2:08-cv-02623-GEB-DAD |
| | ) | |
| v. | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION FOR PARTIAL SUMMARY |
| DOPACO, INC., | ) | JUDGMENT |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, The Newark Group, Inc. ("Newark"), moves for partial summary judgment on its Resource Conservation and Recovery Act ("RCRA") claim in this RCRA citizen suit. Newark seeks an order holding Defendant Dopaco, Inc. ("Dopaco") jointly and severally liable for the contamination of toluene on its property. Dopaco was a former tenant on Newark's property before Newark purchased the property.

**I. LEGAL STANDARD**

When considering a summary judgment motion, all reasonable inferences are drawn from the evidence in the non-movant's favor. Hart v. Parks, 450 F.3d 1059, 1065 n.4 (9th Cir. 2006). Further, the movant "must adduce admissible evidence on all matters as to which [it] bears the burden of proof." Zands v. Nelson ("Zands II"), 797 F.Supp. 805, 808 (S.D. Cal. 1992).

//

//

//

1                    **II.  REQUEST FOR JUDICIAL NOTICE**

2              Newark requests that judicial notice be taken of "certain

3    standards established by federal and state environmental agencies

4    concerning various regulatory action levels for toluene

5    contamination," and "of the fact that a chemical called Methyl

6    Isobutyl Ketone ('MIBK') is a common constituent of the types of inks

7    used in rotogravure printing, which is the alleged source of the

8    toluene contamination at issue in this case."  (Request for Judicial

9    Notice ("RJN") 1.)  Some of the documents are authored by the United

10   States Environmental Protection Agency ("EPA"), the California

11   Environmental Protection Agency ("California EPA"), the California

12   Regional Water Quality Control Board, Central Valley Region, and the

13   Interstate Technology & Regulatory Council.  (RJN Ex. A-F.)  Two of

14   documents state that MIBK is used in rotogravure printing: one is

15   authored by the EPA and the other by Eastman Chemical Company, a

16   corporation that manufactures MIBK. (RJN Ex. G-H.)

17             Federal Rule of Evidence 201(b)(2) allows the court

18   to take judicial notice of a fact not subject to reasonable dispute

19   because it is "capable of accurate and ready determination by resort

20   to sources whose accuracy cannot reasonably be questioned."  The

21   documents authored by federal and state agencies concern federal and

22   state toluene standards or MIBK's use in rotogravure printing, and

23   these documents come from "sources whose accuracy cannot reasonably be

24   questioned."  <u>New Mexico ex rel. Richardson v. BLM</u>, 565 F.3d 683, 702

25   n. 22 (10th Cir. 2009)(taking judicial notice of data on web sites of

26   federal agencies).  Therefore, Newark's request for judicial notice of

27   these federal and state agency documents is granted.  <u>Id.</u>

28             The website Newark provides from Eastman Chemical Company

showing that MIBK is used in "gravure printing inks" is not so easily verifiable. (RJN Ex. H.)  Therefore, this portion of Newark's judicial notice request is denied.

### III. Summary judgment facts considered in nonmovant's favor

Newark is the current owner of the property located at 800 West Church Street in Stockton, California (the "Property").  Newark purchased the Property from Gold Bond in June 1989. (Dopaco's Statement of Undisputed Facts ("SUF") ¶ 1).  When Gold Bond was the owner of the Property, Dopaco was Gold Bond's tenant in the basement of a building on the northwest corner of the Property from 1981 to 1988. (Id. ¶ 2).  "While a tenant . . . Dopaco operated a rotogravure printing operation in the basement area it leased." (Id. ¶ 3). "During its time on the Property, Dopaco used both solvent and water-based inks and toluene was not used in conjunction with water-based inks;" "toluene was only used by Dopaco as diluent for top lacquer, and top lacquer[s] were not used on all printing jobs."  (Id. ¶ 4).

Eight underground tanks are on the Property and are located "adjacent to the building on the northern boundary of the [P]roperty." (SUF ¶ 5, Avery Decl. ¶ 5.)  Two of these tanks are storage product tanks and the remaining six are waste tanks.  (Id.)  Dopaco stored the toluene it used in a 4,000 gallon storage tank ("Toluene Tank") and in 55-gallon drums.  (Id. ¶ 5.) Dopaco pumped toluene from the Toluene Tank "through piping that ran from the Toluene Tank to the interior of the building, where it was dispensed from wall-mounted nozzles." (Id. ¶ 6.)  At times "Dopaco's rotogravure printing operation generated waste ink that contained toluene, which was disposed of into two other

underground storage tanks ("waste tanks") on the Property."  (Id. ¶ 7).

The Gold Bond Property was inspected by representatives of the California Regional Water Board, Central Valley Region ("Regional Board") and the San Joaquin Environmental Health Department ("SJEHD") on May 17 and September 23, 1985.  (Id. ¶ 8)  Following the inspections, the Regional Board issued Gold Bond a Notice of Violation ("NOV") in 1985 concerning "a discharge of red dye into McDougald Slough allegedly from the Gold Bond facility." (Id.; NOV at EHD0000722.)  The NOV noted the following deficiencies when discussing Dopaco:

> 1.  **Fifty-five gallon drums of solvent are stored uncovered on an asphalt area adjacent to a paper storage warehouse.**  Runoff from this area is directed to McDougald Slough via the storm drain.
>
> 2.  **Workers in the plant stated press condensate water is routinely poured into loading dock sump. This sump discharges to the storm drain and McDougald Slough.**
>
> 3.  Waste ink and solvents are delivered to tanks #9 and 10 via underground lines or poured directly into the tank from drums. **Considerable spillage around the tanks was evident.  The practice of dumping waste drums into the tank by hand needs to be upgraded to prevent spills.**

(Id.; NOV at EHD0000723)(emphasis added.)

Subsequently, Gold Bond obtained a report authored by environmental engineer Donald K. Rothenbaum ("Rothenbaum"), who investigated the Property for Gold Bond in 1985 after Gold Bond received the NOV.  Rothenbaum noted the following in his report:

> **Ground spillage of solvent waste was very apparent and presents a potential threat to the local ground water quality.**  We strongly recommend that your tenant, Dopaco, be requested to discontinue use of these tanks and improve their current waste handling practices as soon as it is practical.

4

(Id.; Rothenbaum Decl. Ex. 1 at NEW 000996)(emphasis added).  Dopaco objects to Rothenbaum's report, arguing it lacks foundation, constitutes hearsay, and is speculative; however, Dopaco also acknowledges that the report "can establish . . . that Rothenbaum saw spillage."  (Dopaco Obj. ¶ 2.)  This objection but is sustained but the report establishes that Rothenbaum saw spillage.

As a result of the NOV, the Regional Board and SJEHD required Gold Bond to submit a technical report addressing the issues discussed in the NOV.  (Id. ¶ 8.)  The Regional Board, SJEHD, Gold Bond, Dopaco and another Gold Bond tenant on the Property decided that the tanks on the Property should be excavated. (Id. ¶ 10.)

Gold Bond retained American Environmental Management Corporation ("AEMC") to prepare an evacuation plan.  This excavation plan was implemented in September 1986, and involved the removal of the six product tanks, referenced below as tanks A, B, C, D, E, and F, and the two waste tanks referenced below as tanks G and H .  (Id.) AEMC noted in a written report dated October 21, 1996, ("AEMC Report"), that five of the product tanks appeared to have no leaks, and one of the product tanks and the two waste tanks "showed signs of leakage; ink could be seen around the tanks and the soil" and there was a "possible leak" from one of the tanks.  (SUF ¶ 10; AEMC Report at EHD 0001853-54.)  AEMC also discusses in the AEMC Report the sample results from the excavation as follows:

> [F]our of the eight removed tanks appeared to be in excellent condition with no visible signs of rusting or pitting. [Tanks B, C, D, and E] The remaining four tanks (Tanks A,F,G,H) appear to be rusty, but with no indications of leaks or holes.
>
> . . . .

> ***The excavation containing the six product tanks had
> no visible signs of stains, but a slight odor was
> detected.  Soils containing the strongest odor were
> segregated from the other excavated soils.***
>
> . . . .
>
> ***The second excavation (Tanks G and H) had visible
> ink stains.*** Staining was limited, however, to a
> depth of less than six inches along the sides and
> bottom of the excavation.  The thickest areas were
> located at the top of the vertically standing tanks.
> ***In addition, soils excavated from the waste ink
> excavation were also stained with ink. The staining
> was not extensive and was only due to the material
> scraped off from directly adjacent to the tank.
> Odors were detected in the excavation but not the
> excavated soils.***

(Id. at EHD0001807-08)(emphasis added).  Soil samples were collected

between the eight tanks from ten to twelve feet below the tanks. (SUF

¶ 11).  Although toluene was detected beneath the product tanks at

levels ranging between 3 and 36 parts per billion ("ppb"), and between

the waste tanks at leavlts ranging between 7 and 92 ppb, these levels

were below 100 ppb, the state minimum requiring remedial action. (Id.

¶ 10; AEMC Report at EHD0001810-11).  "Based on the above," AEMC

concluded "the results indicate that although soil contamination

exists, it is limited in degree and is not a probable threat to

groundwater." (Id. at EHD0001812.)  AEMC recommended backfilling the

excavations. (Id.)

Dopaco vacated the property in 1988, taking with it to a new

location the rotogravure presses for its printing services. (Id. ¶

18).[1]

---

[1]  Newark states in its undisputed facts that Dopaco left behind on
the Property thirty "[(30)] barrels full of waste ink and solvents that
had accumulated in 'vaults' in the floor beneath one of the rotogravure
presses." (SUF ¶ 9.)  Newark asserts the environmental disclosures and
due diligence documents provided by Gold Bond in conjunction with
Newark's purchase of the property supports this statement.  (Stafford
(continued...)

### ii.  **Newark's Purchase of the Property**

Newark purchased the Property from Gold Bond in 1989. (<u>Id.</u> ¶ 1.)  In 2005, a prospective purchaser of the property retained environmental consultant Advanced GeoEnvironmental, Inc. ("AGE") to take soil borings on the Property.  (<u>Id.</u> ¶ 12).  Samples taken "in the vicinity of Dopaco's former underground storage tanks adjacent to the [b]asement" at a depth of fifteen to twenty feet below the ground surface "showed up to 13,000 [parts per million ("ppm")] of toluene in soil, and 6,800,000 [('ppb') of toluene] in groundwater." (<u>Id.</u>) Further, MACTEC, Engineering and Consulting, Inc. ("MACTEC"), another environmental consultant, took "additional soil and groundwater samples adjacent to the [b]asement [which] "revealed toluene in groundwater at 7,600 and 36,000 ppb." (<u>Id.</u> ¶ 13.)  Dopaco objects to the MACTEC report, arguing it has not been authenticated and is hearsay. (Dopaco's Obj. ¶ 5).  Dopaco, however, produced the MACTEC report itself as Exhibit 18 to the Pulliam Declaration, which is attached to Dopaco's opposition brief.  Dopaco therefore waives its objection.  <u>See</u> <u>Ohler v. U.S.</u>, 529 U.S. 753, 755 (2000) (stating generally a party introducing evidence waives objection to that evidence).

The toluene level in the soil far exceeds even the highest state and federal regulatory cleanup standards and the toluene level in the groundwater "far exceed[s] environmental cleanup standards set

---

[1](...continued)
Decl., Ex. 36-37).  Dopaco objects to these documents, arguing they are unauthenticated and are hearsay. (Dopaco Obj. ¶¶ 7-8).  Newark rejoins, arguing that deposition testimony Dopaco submits with its opposition authenticates these documents.  (Newark's Response to Dopaco's Obj. G-H).  This deposition testimony, however, does not clearly reference these documents.  Therefore, Dopaco's objection is sustained.

by state and federal regulatory agencies." (Id. ¶¶ 15-16).  These
concentrations "are in excess of levels toxic to fish and
invertebrates, and to microorganisms that might otherwise break down
the contamination, causing it to attenuate over time." (Id. ¶ 17).
Further, "[t]he groundwater samples taken in the vicinity of the
[b]asement also detected the chemical . . . MIBK." (Id. ¶ 14).

## IV.  ANALYSIS

### A. RCRA Liability

        "RCRA is a comprehensive statute designed to reduce or
eliminate the generation of hazardous waste and to minimize the
present and future threat to human health and the environment created
by hazardous waste.  To achieve this goal, the statute empowers [the]
EPA to regulate hazardous wastes from cradle to grave, in accordance
with [RCRA's] rigorous safeguards and waste management procedures."
Crandall v. City and County of Denver, Colo.,--- F.3d ----, 2010 WL
430918 (10th Cir. 2010)(internal citations and quotations omitted).
RCRA also grants private citizens standing, such as Newark, to enforce
some of the statute's provisions. See 42 U.S.C. § 6972.  The Supreme
Court held in Meghrig v. KFC Western, Inc., that RCRA's citizen-suit
provision "permits a private party to bring suit only upon a showing
that the solid or hazardous waste at issue may present an imminent and
substantial endangerment to health or the environment." 516 U.S. 479,
484-86 (1996)(internal citation and quotations omitted).  Further,
Newark must also show that Dopaco "contributed" to the "handling,
storage, treatment, . . . or disposal" of the toluene which caused the
contamination on Newark's Property.  Lincoln Properties, Ltd. v.
Higgens, No. S-91-760DFL/GGH, 1993 WL 217429 at *12 (E.D. Cal. January
21, 1993).

1    EPA regulations promulgated under RCRA list toluene as a
2  hazardous waste. 40 C.F.R. § 261.33(f).   It is also undisputed that
3  Dopaco was a "past . . . operator" of toluene on the property.  See
4  Singer v. Bulk Petroleum Corp., 9 F.Supp.2d 916 (N.D. Ill.
5  1998)(stating "Subsection (a)(1)(B) authorizes suits against all past
6  or present owners or operators").

7        **I. Imminent and substantial endangerment to health or the**
8           **environment**

9        Newark argues that the toluene contamination on its
10  property poses an "imminent and substantial endangerment" under RCRA.
11  Newark indicates in its argument that since the toluene contamination
12  on the Property is in excess of the standards set by the governmental
13  regulatory agencies, this contamination evidence is sufficient to show
14  the existence of a "hazardous waste which may present an imminent and
15  substantial endangerment to health or the environment."  42 U.S.C §
16  6972(a)(1)(B).  Dopaco counters that Newark's evidentiary showing is
17  insufficient because it does not contain evidence that health or the
18  environment is at risk, or that a "pathway" exists for exposure of the
19  contamination to humans or the environment.

20        Dopaco's argument concerns terms used in 42 U.S.C §
21  6972(a)(1)(B).  "A finding of 'imminency' [under 42 U.S.C §
22  6972(a)(1)(B)] does not require a showing that actual harm will occur
23  immediately so long as the risk of threatened harm is present: "An
24  'imminent hazard' may be declared at any point in a chain of events
25  which may ultimately result in harm to the public [or the
26  environment]."  Price v. United States Navy, 39 F.3d 1011, 1019 (9th
27  Cir. 1994) (internal citation omitted).  "Imminence refers 'to the
28  nature of the threat rather than identification of the time when the

1 endangerment initially arose.'" Id. (citing United States v. Price,

2 688 F.2d 204, 213 (3d Cir. 1982)(quoting H.R.Committee Print No.

3 96-IFC 31, 96th Cong., 1st Sess. at 32 (1979))).  Further,

4              'Substantial' does not require quantification of the
               endangerment (e.g., proof that a certain number of
5              persons will be exposed, that 'excess deaths' will
               occur, or that a water supply will be contaminated
6              to a specific degree). . . . [However, there must
               be] some reasonable cause for concern that someone
7              or something may be exposed to a risk of harm by a
               release or a threatened release of a hazardous
8              substance if remedial action is not taken.

9 Lincoln, 1993 WL 217429 at *13 (internal citation omitted). "Courts

10 have also consistently held that 'endangerment' means a threatened or

11 potential harm and does not require proof of actual harm. However, at

12 the very least, endangerment or a threat must be shown." Price, 39

13 F.3d at 1019 (internal citation omitted).

14              Newark submits test results from "two separate environmental

15 consultants [who] have confirmed that the groundwater and soil

16 immediately adjacent to Dopaco's operation[,] [specifically near the

17 product tanks and the building basement where Dopaco "piped in and

18 dispensed the toluene", show] contaminat[ion] with toluene at levels

19 thousands of times higher than action standards established by the

20 [EPA] and the California [EPA]." (Mot 2:8-14).  The first samples of

21 soil and groundwater were taken in 2005, and the test results show

22 13,000 ppm of toluene in the soil and 6,800,000 ppb of toluene in the

23 groundwater fifteen to twenty feet below the surface on the property

24 near Dopaco's tanks and adjacent to the basement.  (SUF ¶ 12).  The

25 second samples were taken "adjacent to the [b]asement" in 2006 and the

26 test results "reveal[] toluene in groundwater at 7,600 and 36,000

27 [ppb,]" as well as the presence of MIBK in the groundwater samples."

28 (Id. ¶¶ 13-14.)  These results show that the levels of toluene in the

1  soil and groundwater far exceed environmental cleanup standards set by

2  state and federal regulatory agencies. (Id. ¶¶ 15-16.)

3          Newark also relies on statements from the Regional Board

4  about toluene: "Regional Board considers all groundwater in the

5  Central Valley Region to be **potential** sources of municipal or domestic

6  water supply." (RJN Ex. A)(emphasis added).  In addition, Newark

7  provides evidence on the effect toluene can have on humans:

8          Humans exposed to intermediate to high levels of
           toluene for short periods of time experience adverse
9          central nervous system effects ranging from
           headaches to intoxication, convulsions, narcosis,
10         and death.

11         . . . .

12         Exposure to 600 ppm for 8 hours resulted in the same
           and more serious symptoms including euphoria,
13         dilated pupils, convulsions, and nausea (U.S. EPA
           1994)

14
           . . . .
15
           Exposure to 10,000-30,000 ppm has been reported to
16         cause narcosis and death (U.S. Air. Force 1898)

17         . . . .

18         Exposures to high levels of toluene can result in
           adverse effects in the developing human fetus
19
           . . . .
20
           Variable growth, microcephaly, CNS dysfunction,
21         attentional deficits, minor craniofacial and limb
           abnormalities, and developmental delay were seen in
22         three children exposed to toluene in utero as a
           result of maternal solvent abuse before and during
23         pregnancy (U.S. EPA 1994).

24  (RJN Ex. E).  Further, it is undisputed that "[t]oluene concentrations

25  on the [p]roperty are in excess of levels toxic to fish and

26  invertebrates, and to microorganisms that might otherwise break down

27  the contamination, causing it to attenuate over time." (SUF ¶ 17).

28          Dopaco counters Newark's evidence with expert testimony from

1  geoenvironmental and civil engineer Patrick Lucia ("Lucia").  Lucia

2  declares that "Newark has not demonstrated a finding of imminent and

3  substantial endangerment because [Newark] [has] not evaluated whether

4  there is a population at risk and [it] [has] not evaluated potential

5  exposure pathways." (Lucia Decl. ¶ 8).  Lucia declares that a work

6  plan showing the "extent of impacted soil and groundwater" and

7  contamination characterization, a receptor survey to identify "water

8  supply wells, buildings, surface water bodies, and any other receptors

9  that could be impacted or potentially threatened by the identified

10  contamination," and a "site conceptual model" concerning exposure

11  pathways and potential receptors should be done in accordance with the

12  "Tri-regional Board Staff Recommendations for Preliminary

13  Investigation and Evaluation of Underground Tank Sites ([Regional

14  Water Quality Control Board] 1990)." (Id.)  Dopaco also cites expert

15  testimony from Newark's expert, Keith M. O'Brien ("O'Brien"), in which

16  O'Brien opines that the toluene contamination on the Property "has

17  remained in the subsurface in the northwest corner of the facility

18  despite shallow groundwater flow directions generally to the

19  southeast."  (Opp'n 28:5-6; L'Orange Decl. 35, O'Brien Report at 18.)

20      Dopaco argues the evidence shows that Newark has not

21  satisfied RCRA's citizen suit provision, which requires Newark to

22  demonstrate that the disposal of hazardous waste "'may present an

23  imminent and substantial endangerment to health or the environment.'

24  42 U.S.C. § 6972(a)(1)(B)." (Opp'n 25:5-19)(citing Price 39 F.3d at

25  1011 and Foster v. United States, 922 F.Supp. 642 (D. D.C. 1996)).

26      Newark objects to Lucia's opinion, arguing it concerns an

27  incorrect legal standard since contamination of groundwater by itself

28

is sufficient to constitute an "imminent and substantial endangerment" to health or the environment. (Newark's Obj. D.)

Newark's objection to Lucia's opinion is overruled.   The objection indicates that Newark fails to appreciate "that there is a limit to how far . . . the word *may* [in 42 U.S.C. § 6972(a)(1)(B)] can carry a plaintiff. Meghrig tells us that an endangerment cannot be merely possible, but must threaten[ ] to occur immediately." Crandall v. City and County of Denver, Colo.,--- F.3d ----, 2010 WL 430918 at *6 (10th Cir. February 8, 2010) (internal citations and quotations omitted). "One essential point that [Newark] appear[s] to overlook is that although the harm may be well in the future, the *endangerment* must be imminent." Id. (referencing Meghrig, 516 U.S. at 486 ("[T]here must be a threat which is present now, although the impact of the threat may not be felt until later.")(emphasis in original).

Newark fails to establish that the contamination "may present an imminent and substantial endangerment to health or the environment . . . " 42 U.S.C. § 6972(a)(1)(B).  Newark was required to show more than just that toluene contamination exists on the Property. The risk of endangerment from the toluene contamination "must be imminent for there to be a claim under RCRA." Crandall, 2010 WL 430918 at *7 (citing § 6972(a)(1)(B)).  Newark "does not contend that the contaminated groundwater is used for drinking, . . . [or] how or whether [the] groundwater had been drawn from the site by individuals unrelated to this litigation. Kara Holding Corp. v. Getty Petroleum Marketing, Inc., No. 99 Civ. 0275(RWS), 2004 WL 1811427 at *11 (S.D.N.Y. 2004).  "It is not enough under RCRA that in the future someone may do something with solid waste that, absent protective

measures, can injure human health" or the environment. <u>Crandall</u>, 2010 WL 430918 at *7 (citing <u>Meghrig</u>, 516 U.S. at 485-86).

        "In sum, evidence that certain samples taken from the [Newark Property] exceeded [government] standards simply provides an inadequate basis for a jury to conclude that federal law, specifically, [RCRA's citizen suit provision, § 7002(a)(1)(B),] [42 U.S.C.] § 6972(a)(1)(B), has been violated.  Absent additional evidence, the mere fact that [Newark] has produced such samples does not support a reasonable inference that [the contamination on its Property] presents an imminent and substantial endangerment" to health or the environment.  <u>Cordiano v. Metacon Gun Club, Inc.</u>,575 F.3d 199, 214 (2nd Cir. 2009).  Therefore, Newark has "failed to make a sufficient showing on an essential element of [its liability claim]," "with respect to which [it] has the burden of proof" at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

### V.  CONCLUSION

        Since Newark has failed to satisfy "the imminent and substantial endangerment" element of its RCRA claim, Newark's motion for partial summary judgment is **DENIED.**

Dated:  April 1, 2010

                        _____
                        GARLAND E. BURRELL, JR.
                        United States District Judge

14