IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THE NEWARK GROUP, INC.,        )
                               )     2:08-cv-02623-GEB-DAD
          Plaintiff,           )
                               )
     v.                        )     ORDER DENYING DEFENDANT'S
                               )     MOTION FOR PARTIAL SUMMARY
DOPACO, INC.,                  )     JUDGMENT
                               )
          Defendant.           )
_____ )

          Defendant Dopaco, Inc. ("Dopaco") filed a motion for partial summary judgment on Plaintiff The Newark Group's ("Newark") Resource Conservation and Recovery Act ("RCRA") claim in this RCRA citizen suit. Dopaco argues it is entitled to summary judgment on this claim since Newark cannot show that the alleged toluene contamination at 800 West Church Street in Stockton, California (the "Property") presents an imminent and substantial endangerment to health or the environment, or that Dopaco contributed to the alleged toluene contamination. (Def.'s Mot. 1:5-10.)

          Newark opposes Dopaco's motion by showing that degrading toluene in the soil is the cause of a high concentration of methane existing in the area on the Property where Newark plans to fracture the basement floor. Newark contends that when the floor is fractured, this methane will present an imminent and substantial endangerment to health or the environment. Further, Newark argues it has shown Dopaco's use of

1

toluene contributed to the high methane concentration on the Property. (Pl.'s Opp'n 2:17-19.)

## I. LEGAL STANDARD

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

When the defendant is the moving party and is seeking summary judgment on one or more of a plaintiff's claims,

> [the defendant] has both the initial burden of production and the ultimate burden of persuasion on [the motion]. In order to carry its burden of production, the [defendant] must either produce evidence negating an essential element of the [plaintiff's claim] or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the [defendant] must persuade the court that there is no genuine issue of material fact.

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted). If the moving party satisfies its initial burden, "the non-moving party must set forth, by affidavit or as otherwise provided in [Federal] Rule [of Civil Procedure] 56, specific facts showing that there is a genuine issue for trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citation and internal quotation marks omitted). The "non-moving plaintiff cannot rest upon the mere allegations or denials

of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) (citation and internal quotation marks omitted).

Further, Local Rule 260(b) requires:

Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

Because a district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment, . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (citation and internal quotation marks omitted).

Evidence must be viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" that can be drawn from the evidence must be drawn "in favor of [the non-moving] party." Nunez v. Duncan, 591 F.3d 1217, 1222-23 (9th Cir. 2010).

///

///

## II. UNCONTROVERTED FACTS

Newark is the current owner of the Property. Six entities have owned or leased the Property since its conversion into an industrial site in 1917: Fibreboard Corporation ("Fibreboard"), Pacific Paperboard Products ("Pacific Paperboard"), Gold Bond Building Products ("Gold Bond"), San Joaquin Packaging Company ("San Joaquin"), Dopaco, and Newark. (Dopaco's Statement of Undisputed Facts ("SUF") ¶¶ 7-11.) Fibreboard, Pacific Paperboard, Gold Bond, and Dopaco each used toluene on the Property, and Newark used "toluene containing substances," on the Property. Id. ¶¶ 7-9, 11.

From 1981 to 1988, Dopaco was Gold Bond's tenant in the basement of a building on the northwest corner of the Property. (Order Denying Pl.'s Mot. for Partial Summ. J., Apr. 2, 2010 ("Order") 3:8-11.)[1] While a tenant, Dopaco stored "the toluene it used in a 4,000 gallon storage tank . . . and in 55-gallon drums. Dopaco pumped toluene from the [tank] through piping that ran from the [tank] to the interior of the building . . . ." Id. 3:21-4:2 (internal citations and quotation marks omitted).

On May 17 and September 23, 1985, representatives of the California Regional Water Board, Central Valley Region ("Regional Board") and the San Joaquin Environmental Health Department ("SJEHD") inspected the Property. (Order 5:13-15.) Following the inspections, the Regional Board issued Gold Bond a Notice of Violation ("NOV") requiring "Gold Bond to submit a technical report addressing items set out in the findings and recommendations of the November 23, 1985 memorandum accompanying the NOV." Id. 5:20-22.

---

[1] In the Court's April 2, 2010 Order Denying Plaintiff's Motion for Partial Summary Judgment, the Court recognized Statements of Undisputed Facts on Newark's RCRA claim. (Order, 3:5-8:6.)

1      Gold Bond retained American Environmental Management
2  Corporation ("AEMC") to prepare an excavation plan. (SUF ¶ 19.) This
3  excavation plan was implemented in September 1986, and involved a "soil
4  sampling plan . . . for definition of the horizontal and vertical extent
5  of soil pollution, if any, resulting from tank leakage and the obvious
6  spills surrounding the tanks," and the removal of the six product tanks.
7  Id. ¶¶ 20, 23-26. Soil samples were collected from ten feet below the
8  product tanks and from twelve feet below the waste tanks. Id. ¶ 27.
9  Although toluene was detected beneath the product tanks at levels ranging
10 between 3 and 36 parts per billion ("ppb"), these levels were below 100
11 ppb, the state minimum requiring remedial action. Id. ¶¶ 28-30. AEMC
12 concluded "the results indicate that although soil contamination exists,
13 it is limited in degree and is not a probable threat to groundwater." Id.
14 ¶ 30. AEMC recommended backfilling the excavations. Id.

15      On May 24, 1988, a Gold Bond plant manager performed a property
16 inspection and noted in a June 13, 1988 memo that "no hazardous waste was
17 found 'nor was there any visible evidence of hazardous materials which
18 would be the responsibility of [Dopaco] to remove.'" Id. ¶ 36. The lease
19 between Gold Bond and Dopaco subsequently ended.  (Order 6:22-24.)

20      In 1989, Newark purchased the Property from Gold Bond. Id. 3:6-
21 7. In 2005, "a prospective purchaser of the Property retained
22 environmental consultant Advanced GeoEnvironmental, Inc. ("AGE") to take
23 soil borings from the Property." Id. 7:3-5.

24           Samples taken in the vicinity of Dopaco's former
             underground storage tanks adjacent to the [b]asement
25           at a depth of fifteen to twenty feet below the
             ground surface showed up to 13,000 [parts per
26           million ("ppm")] of toluene in soil, and 6,800,000
             [('ppb') of toluene] in groundwater. . . .
27
             The toluene level in the soil far exceeds even
28           the highest state and federal regulatory cleanup
             standards and the toluene level in the groundwater

5

1        far exceed[s] environmental cleanup standards set by
       state and federal regulatory agencies.
2 Id. 7:5-8:1.

3        On April 17, 2007,

4        the City of Stockton (the "City") issued a Notice
       and Order of Intent to Abate by Demolition
5        ("Abatement Order") against the Property . . . . The
       Abatement Order instructed Newark to develop a plan
6        to rehabilitate the Property within forty-five days
       or develop a plan for demolishment. . . . The plan
7        developed by the City and Newark calls for a phased
       demolition, culminating with demolition of the
8        remaining structure or sale to interested party by
       June 1, 2012.
9 (Order Denying Dopaco's Mot. for Partial Summ. J., September 13, 2010,

10 7:9-8:4.)[2]

11                   **III. DISCUSSION**

12        "RCRA is a comprehensive statute designed to reduce or

13 eliminate the generation of hazardous waste and to minimize the present

14 and future threat to human health and the environment created by

15 hazardous waste. To achieve this goal, the statute empowers [the] EPA to

16 regulate hazardous wastes from cradle to grave, in accordance with

17 [RCRA's] rigorous safeguards and waste management procedures." Crandall

18 v. City & Cnty. of Denver, Colo., 594 F.3d 1231, 1233 (10th Cir.

19 2010)(internal citations and quotations omitted). As part of its

20 regulatory scheme, RCRA grants private citizens standing to enforce

21 certain RCRA statutory provisions. 42 U.S.C. § 6972 (2010). However,

22 RCRA's citizen-suit provision "permits a private party to bring suit only

23 upon a showing that the solid or hazardous waste at issue may present an

24 imminent and substantial endangerment to health or the environment."

25 Meghrig v. KFC Western, Inc., 516 U.S. 479, 484-86 (1996) (internal

26 citation and quotations omitted). Since Newark is proceeding under

27

28      [2]    In the Court's September 13, 2010 Order Denying Dopaco's Motion for Partial
Summary Judgment, the Court established "Uncontroverted Facts" on Newark's RCRA claim
(Order Denying Dopaco's Mot. For Partial Summ. J., 7:4-10:2.)

§ 6972(a)(1)(B) in prosecution of its RCRA claim, it must show Dopaco is a "past or present . . . owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the . . . handling, storage, treatment, transportation, or disposal" of the solid or hazardous waste. 42 U.S.C. § 6972(a)(1)(B).

EPA regulations promulgated under RCRA list toluene as a hazardous waste. 40 C.F.R. § 261.33(f) (2010). Further, the Court previously determined that uncontroverted evidence established Dopaco was a past operator of toluene on the property. (Order 9:2-3.) Therefore, the remaining issues to be determined are whether the toluene on the Property may present an imminent and substantial endangerment to health or the environment, and whether Dopaco contributed to the toluene contamination on the Property.

### A. Imminent and substantial endangerment to health or the environment

Dopaco argues it is entitled to summary judgment on Newark's RCRA claim since Newark cannot prove the RCRA requirement that "the alleged [toluene] contamination presents an imminent and substantial endangerment to health or the environment." (Def.'s Mot. 1:9-10.) Newark responds, arguing, *inter alia*, it can show "the City's demolition permit is likely to force digging in the area contaminated with methane and toluene." (Pl.'s Opp'n 32:4-5.)

Dopaco's argument concerns the terms "imminent," "substantial," and "endangerment" prescribed in 42 U.S.C § 6972(a)(1)(B). "A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present." Price v. U.S. Navy, 39 F.3d 1011, 1019 (9th Cir. 1994). "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result

in harm to the public [or the environment]." Id. (internal citations and quotations omitted). "Imminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose.'" Id. (citing United States v. Price, 688 F.2d 204, 213 (3d Cir. 1982)). Further,

> '[s]ubstantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree). . . . [However, there must be] some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken.

Lincoln Props., Ltd. v. Higgins, 1993 WL 217429, at *13 (E.D. Cal. Jan. 21, 1993) (internal citation omitted). "Courts have also consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm." Price, 39 F.3d at 1019 (internal citations omitted).

Dopaco argues the alleged endangerment is not imminent as required by RCRA, since "Newark never intended to fracture the portion of the foundation (floor slab) where the toluene and/or methane contamination is allegedly present . . . and never [planned] to remediate the toluene/methane contamination before the demolition." (Def.'s Mot. 15:23-27.) Further, Dopaco argues "the vertical demolition of the facility [is] complete and the only remaining items includ[e] filling the hole, hydroseeding, erecting a permanent fence, removing and capping gas and power[] lines, removing some items (e.g. a large safe) and obtaining the documentation necessary to close the file." Id. 14:15-19.

In response, Newark provides the August 10, 2010 Deconstruction and Facility Razing Plan (the "Plan") completed by Marcor, Newark's demolition contractor, to show the Plan "specifically envisioned that the

work would include 'fracturing the basement floor.'" (Pl.'s Opp'n 12:3-5; Stafford Decl., Ex. 10 (Demolition Services Agreement) NEW 9915.) Newark also responds to Dopaco's argument that the demolition is complete, arguing "the final demolition activities slated for the contaminated area have been suspended due to the hazard's presented." (Pl.'s Opp'n 5:18-19.) Further, Newark argues, "the [City's] demolition permit cannot be closed until Newark installs drainage laterals in the contaminated area." Id. 12:18-20. Newark supports its argument by citing the deposition testimony of Joseph Michaud, Newark's Vice President, who testified: "the deferral of this work is contingent on us determining what we need to do with the toluene . . . . If we can't dig in those areas . . . then I don't know how we are going to be able to close the permit." (Stafford Decl., Ex. 5 (Michaud Dep.) 252:19-23.) Michaud also gave deposition testimony that the City "want[s] [Newark] to connect to other laterals that would take us in the area of the contamination." Id. 240:17-241:15. Newark's evidence is sufficient to create a genuine issue of material fact concerning the issue whether the alleged endangerment the Marcor employees could encounter is imminent.

Dopaco also argues no endangerment exists since "Newark has produced thousands of pages of documents and not one of them supports Newark's allegation that any methane gas present at the Property poses a threat to any Marcor employee." (Def.'s Mot. 13:22-25.) Dopaco argues "Geosyntec tested the ambient air above the foundation throughout the basement, with a device specifically designed to detect methane, and did not, at any time, detect methane gas." (Def.'s Reply 5:10-13.)

Newark counters, arguing "all ten soil gas samples Dopaco took reveal[] methane at levels far higher than methane's 'Lower Explosive Limit' of 5%." (Pl.'s Opp'n 13:4-8.) In support of this argument, Newark

submits the expert reports of Peter Krasnoff and Dr. Patrick Lucia. Krasnoff, Newark's expert, "found methane concentrations of 17%" in one of his soil samples. Id. 5:5. Further, Krasnoff declares "[w]hen the slab is broken up during demolition, however, the sub-slab methane will mix with the surrounding atmosphere, which could create an exceedingly dangerous explosive condition (the Lower Explosive Limit for methane is 5%), and a threat of asphyxiation, because methane displaces oxygen." (Pulliam Decl., Ex. 56 (Decl. of Krasnoff) 5:4-7.) Dr. Lucia's rebuttal report, commissioned by Dopaco, showed "maximum concentrations of 83%, 64%, 43%, 73%, and 74% methane" in soil gas samples. Id. 5:7. Dopaco does not controvert Dr. Lucia's findings. (Dopaco's Obj. & Resps. to Newark's SUF ¶ 1.) Newark argues, "[t]hese concentrations are all "far higher than methane's explosive threshold of 5%." (Pl.'s Opp'n 5:5-6.) Further, Newark cites Michaud's deposition testimony in arguing that the reason for delay in fracturing the basement is "it might blow up. High levels of methane." (Id. Ex. 5.)

Newark has presented sufficient evidence from which a reasonable inference can be drawn establishing the uncontroverted facts that the high methane concentrations present "a threatened or potential harm" to Marcor employees on the Property and that there is "some reasonable cause for concern that [Marcor employees] may be exposed to a risk of harm by a . . . threatened release of [methane] if remedial action is not taken." Price v. U.S. Navy, 39 F.3d 1011, 1019 (9th Cir. 1994); Lincoln Props., Ltd. v. Higgins, 1993 WL 217429, at *13 (E.D. Cal. Jan. 21, 1993). Therefore, Newark has produced sufficient evidence to create a genuine issue of material fact on the issue whether fracturing the basement floor presents a risk of substantial endangerment to any Marcor employee.

### B. Contribution to the contamination

Dopaco also argues it is entitled to summary judgment since "Newark has not produced a single document or witness" to support the allegation that "Dopaco released or spilled toluene that caused the alleged methane gas contamination . . . at the Property." (Def.'s Mot. 2:6-9.) In response, Newark argues "there is a surfeit of evidence showing that Dopaco contributed to the toluene contamination." (Pl.'s Opp'n 22:11.)

"To state a claim predicated on RCRA liability for 'contributing to' the disposal of hazardous waste, a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." Hinds Invs., L.P. v. Angioli, --- F.3d ----, 2011 WL 3250461, at *4 (9th Cir. Aug. 1, 2011).

RCRA is a strict liability statute, imposing joint and several liability on those who have contributed "only where the cause of the contamination [is found] to be indivisible." Goe Eng'g Co., Inc. v. Physicians Formula Cosmetics, Inc., No. CV 94-3576-WDK, 1997 WL 889278, at *23, n.12 (C.D. Cal. June 4, 1997) (referencing United States v. Conservation Chem. Co., 619 F. Supp. 162, 199 (D.C. Mo. 1985)). There are two circumstances in which RCRA does not impose joint and several liability on the contributors. "If . . . the defendant can demonstrate that the harm is divisible and if there is a reasonable basis for the apportionment, the defendant is [only] responsible for its own contribution to the harm." Cox v. City of Dallas, 256 F.3d 281, 301 n.37 (5th Cir. 2001) (referencing Restatement (Third) of Torts § 26 (2000); Dan B. Dobbs, Law of Torts 423 (2001); William Prosser, Law of Torts 348-52 (1984)). Further, "plaintiffs who seek relief pursuant to [RCRA's

11

citizen-suit provision] cannot establish joint and several liability for contamination that they themselves have contributed to." <u>Bayless Inv. & Trading Co. v. Chevron USA, Inc.</u>, No. 93C704, 1994 WL 1841850, at *10 (D. Ariz. May 25, 1994).

### i. Dopaco's Contribution

Dopaco first argues "[a]lthough Newark's entire case . . . is predicated upon proving Dopaco released or spilled toluene that caused the alleged methane gas contamination . . . at the Property, Newark has not produced a single document or witness to support this allegation." (Def.'s Mot. 2:7-10.) Specifically, Dopaco argues

> Newark has introduced no probative evidence to support its claims that: (a) Dopaco employees caused ground spills of toluene; (b) any leaks in tanks, pipes or printing occurred during the time Dopaco occupied the facility; or (c) Dopaco employees spilled toluene which leaked through cracks or fissures in the facility floor, or leaked from the two sumps, or the printing pit located in the printing area.

<u>Id.</u> 21:6-10.

In response, Newark submits evidence showing that spills occurred on the Property during Dopaco's use and that toluene remained on the Property even after the excavation. Newark provides the Regional Board's NOV, a document made prior to the excavation, in which the Regional Board remarked that "[c]onsiderable spillage around the tanks [operated by Dopaco] was evident." (Stafford Decl., Ex. 23 (Notice of Violation) NEW 282.) Newark also relies on the AEMC 1986 Tank Excavation and Sampling Report ("AEMC Report"), written after the excavation was complete, which indicated "[t]he excavation containing the six product tanks had no visible signs of stains, but a slight odor was detected." (Pulliam Decl., Ex. 41 (AEMC Report) EHD 1807.)

Newark also produces Keith O'Brien's expert report, which concludes "[t]he use, handling, storage, and disposal of chemicals

associated with the former rotogravure printing operations conducted by Dopaco [on the Property] contributed to the contamination found in the subsurface." (Stafford Decl., Ex. 8 (Expert Report of Keith O'Brien) 11.) O'Brien identifies

> likely release points for toluene [during Dopaco's use of the Property as including] underground storage tanks and associated piping, solvent wash up room and associated floor sumps, the concrete pit beneath the 6-color rotogravure press, and the piping associated with disposal of waste inks and solvents in the concrete pit beneath the 6-color rotogravure press.

Id. at 12. O'Brien declares that he relied upon statements in more than a dozen documents, including those in the AEMC Report and the Regional Board's NOV. Id. at 11-19. O'Brien also declared "toluene has remained in the subsurface in the northwest corner of the facility despite shallow groundwater flow." Id. at 18. O'Brien declares he based this conclusion on six additional documents. Id. at 18-19.

Dopaco responds to this evidence in its reply brief, asserting "neither Newark nor its experts inspected or tested the sumps, vault or concrete, and contrary to O'Brien's speculation, the sumps in the solvent washroom are not concrete, they are concrete lined with metal." (Def.'s Reply 12:10-12.) However, Dopaco's reply further demonstrates the existence of disputed factual issues involved with this portion of Newark's RCRA claim. Therefore, Newark has created a genuine issue of material fact as to Dopaco's contribution to the alleged toluene contamination.

Alternatively, Dopaco argues it can show it did not contribute to the contamination, since "the affirmative evidence shows the 1986 cleanup supervised by the three state agencies . . . was effective in eliminating any contamination that existed at that time." (Def.'s Mot. 25:11-15.) Dopaco further argues "the levels detected in the soil by AEMC

13

at the product tank excavation ranged from 2 to 36 ppb, while AGE's soil sample result was 13,000,000ppb, a 35 million percent increase. Newark offers no expert analysis as to how such an enormous increase could occur." Id. 28:15-17.

In response, Newark provides documents and expert opinion to show

> the only sampling done in 1986 near the existing contamination was taken at a depth of 10 feet. But the existing contamination is found in its highest concentrations between 15-20 feet, and in the groundwater, which was not sampled in 1986. The contamination was not found in 1986 for the simple fact that no one tested there.

(Pl.'s Opp'n 19:19-22.) In support of this argument, Newark produces the AEMC Report, which shows that the soil samples taken in 1986 were taken at depths of ten and twelve feet. (Pulliam Decl., Ex. 41 EHD 1813, 1850-52.) Newark also provides the AGE Report, completed in 2005, which identifies high concentrations of toluene in the groundwater and at a depth of fifteen feet. (Pulliam Decl., Ex. 50 NEW 231-32.) These facts, Newark argues, show "there is no evidence—or other reason to suspect—that the same 13,000,000 ppb found by AGE in 2005 wasn't also present in 1986, if only someone had sampled at that depth." (Pl.'s Opp'n 21:23-25.)

Newark also addresses Dopaco's lack of expert opinion evidence, arguing "the depth of the samples taken in 1986, the depth of the groundwater, and the depth of the 2005 AGE borings are facts in the record, not matters of opinion." Id. 19:26-28, n.15. Newark also submits O'Brien's Rebuttal Report, which engages Dr. Lucia's opinion regarding the toluene concentration in the groundwater and at 15 feet in the soil. (Stafford Decl., Ex. 36 (O'Brien Rebuttal) 5.) Specifically, O'Brien declares "it is clear [Dr. Lucia] did not consider all the available information in his assessment of releases," in particular the "slight odor" noted in the AEMC Report and "the total time the [tank] was open

14

1  to the atmosphere for aeration of exposed soils." Id. 5-6. Further,

2  Newark emphasizes Dr. Lucia's admission that the samples taken by AEMC

3  and AGE were separated by five feet. (Stafford Decl., Ex. 21 (Lucia Dep.)

4  235:25-236:20.)

5        Viewing the evidence in the light most favorable to Newark, as

6  required under the summary judgment standard, the depth discrepancy

7  between the soil samples taken in the 1986 AEMC Report and the 2005 AGE

8  Report is such that "a reasonable jury could return a verdict for

9  [Newark]." Thrifty, 322 F.3d at 1046. Therefore, although not accompanied

10 by a direct expert opinion on the increase, Newark's submitted evidence

11 creates a genuine issue of material fact, and Dopaco has not met its

12 burden in demonstrating otherwise.

13       **ii. Joint and Several Liability**

14       Dopaco will not be found jointly and severally liable if

15 "[Dopaco] can demonstrate that the [alleged] harm is divisible and if

16 there is a reasonable basis for the apportionment," or if Newark is found

17 to have contributed to the contamination. Cox v. City of Dallas, 256 F.3d

18 281, 301 n.37 (5th Cir. 2001); Bayless Inv. & Trading Co. v. Chevron USA,

19 Inc., No. 93C704, 1994 WL 1841850, at *10 (D. Ariz. May 25, 1994).

20       Dopaco argues it is entitled to summary judgment on the

21 divisibility of the harm issue since "Newark's experts conducted no

22 analysis of the toluene use by [other] companies." (Def.'s Mot. 23:26-

23 27.) Further, Dopaco argues

24       the mere fact that Dopaco used toluene at the Property does
   not mean it is responsible for the toluene contamination.
25       The evidence clearly shows Gold Bond, Fibreboard and Pacific
   Paperboard also used toluene during the time they operated
26       the rotogravure presses, and that Gold Bond used the waste
   tanks during Dopaco's tenancy. The evidence also shows that
27       San Joaquin Packaging Co.'s blanket wash . . . contained
   toluene, and that Newark used toluene at the Property.
28 Id. 23:20-25 (internal citations omitted).

Newark does not controvert Dopaco's assertion that "Newark has developed no information on Dopaco's responsibility for the contamination versus the responsibility of the other parties." (SUF ¶ 62.) Rather, Newark argues "[t]he fact that Dopaco 'contributed' to the contamination creates its joint and several liability with any other parties that Dopaco may allege also polluted the Property with toluene." (Pl.'s Opp'n 24:22-25:1.)

Dopaco's bare assertions of toluene use by Gold Bond, Fibreboard, Pacific Paperboard, San Joaquin, and Newark are insufficient to satisfy its burden of demonstrating the divisibility of the harm. Further, Dopaco's reliance on Newark's failure to analyze other parties' responsibility does not satisfy Dopaco's burden on this issue. Therefore, Dopaco has "failed to make a sufficient showing" on the divisibility of the harm, "with respect to which [it] has the burden of proof at trial." Celotex Corp. V. Catrett, 477 U.S. 317, 323 (1986).

Dopaco also argues it is not joint and severally liable by addressing Newark's contribution to the toluene contamination. Specifically, Dopaco argues "Newark used substantial quantities of toluene." (Def.'s Mot. 3:13.) Further, Dopaco argues Michaud "testified he made no effort to determine whether Newark used any toluene at the Property . . .[,] and while he speculated the toluene may have been used to clean up parts he conceded he had no specific knowledge as to where the toluene at the Property came from or how it was used." Id. 3:14-18.

Newark concedes toluene was present on the Property "as a constituent of other products that were disposed of, most frequently 'waste paint.'" (Pl.'s Opp'n 7:26-8:1.) However, Newark disputes its alleged use of toluene on the Property and submits the deposition testimony of Michaud and Robert Mullen in support of its argument.

Michaud, Newark's Vice President with responsibility for the Property, testified: "[i]f there was toluene that we use in our process, I would know about it." (Stafford Decl., Ex. 5 (Michaud Dep.) 249:15-16.) Michaud also testified that "[t]oluene as such was not used at the Property after Dopaco left." Id. 248:14-16. Newark also relies on Mullen's testimony that he undertook a number of investigations and concluded "that [Newark's] paper mill activities did not use or purchase solvents [and] that [Newark] never purchased nor used quantities of toluene." (Stafford Decl., Ex. 7 (Mullen Dep.) 107:24-109:4.)

A plaintiff seeking relief under RCRA's citizen-suit provision "cannot establish joint and several liability for contamination they themselves have contributed to." Bayless Inv. & Trading Co. v. Chevron USA, Inc., No. 93C704, 1994 WL 1841850, at *10 (D. Ariz. May 25, 1994); see also Zands v. Nelson, 797 F. Supp. 805, 811 (S.D. Cal. 1992) ("In the same manner that . . . defendants are strictly liable for contamination caused by leakage related to [defendant's] activities, plaintiffs are strictly liable for leakage that occurred after plaintiffs acquired the property."). Therefore, if a plaintiff "is responsible for at least some percentage of the contamination, any scheme implicating joint and several liability for the clean up that does not include them is inherently unequal." Bayless, 1994 WL 1841850, at *11.

The plaintiff has the initial burden of proving "that at least some of the contamination occurred prior to the transfer of property to plaintiffs." Zands, 797 F. Supp. at 811. "If the plaintiff cannot make this most basic showing, then the plaintiffs cannot prove that plaintiffs were not the sole cause of the contamination." Id. However, a plaintiff is not required to show "that specific amounts of contamination occurred while each defendant owned or operated the property." Id. The burden

shifts to each of the defendants "to show the contamination did not occur during the period of the defendant's ownership or operation" where the plaintiff joins as defendants all persons who owned the property for at least a portion of the time during which the contamination occurred, but where the plaintiff cannot "prove which owner or operator 'caused' the contamination." Id.

Since Newark created a material issue of genuine fact regarding Dopaco's contribution to the alleged contamination, Newark has satisfied its initial burden. Further, even assuming, *arguendo*, the burden does not shift to Dopaco since Newark did not join as defendants all persons who owned the property during the time in which the contamination occurred, Newark has produced documents demonstrating genuine issues of material fact on the issue: whether Newark used toluene or toluene-containing substances on the Property and whether such use contributed to the contamination.

### IV. CONCLUSION

For the stated reasons, Newark has created a genuine issue of material fact as to both the "imminent and substantial endangerment" and the "contribution" issues of its RCRA claim. Further, Dopaco has not satisfied its burden of demonstrating the divisibility of harm. Therefore, Dopaco's motion for partial summary judgment is denied.

Dated:  September 26, 2011

GARLAND E. BURRELL, JR.
United States District Judge

18