IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THE NEWARK GROUP, INC.,          )
                                 )     2:08-cv-02623-GEB-DAD
            Plaintiff,           )
                                 )
     v.                          )     ORDER
                                 )
DOPACO, INC. and DOES 1-10,      )
                                 )
            Defendants.          )
_____ )

## A.  Defendant's Motions in Limine

### i.   Defendant's Motion in Limine No. 1

Defendant seeks to preclude Plaintiff from introducing any evidence regarding methane in support of Plaintiff's RCRA claim, arguing Plaintiff "has failed to satisfy the citizen suit notice provisions of [RCRA] with respect to methane." (Def.'s Mot. 2:3-4.) Further, Defendant argues "[c]ompliance with [the] RCRA presuit notice requirement provision is a jurisdictional prerequisite to filing suit." Id. 4:2-3. Plaintiff opposes the motion, contending "[t]his is an improper use of a motion in limine." (Pl.'s Opp'n 2:1-2.)

RCRA "notice provisions are jurisdictional: Absent compliance with a required notice provision, [a court] lack[s] subject matter jurisdiction to hear the RCRA claims." Covington v. Jefferson Cnty., 358 F.3d 626, 636 (9th Cir. 2004); see also Cntr. for Biological Diversity v. Marina Point Dev. Co., 566 F.3d 794, 800 (9th Cir. 2009) ("[T]he

1  giving of a 60-day notice is not simply a desideratum; it is a

2  jurisdictional necessity."). Therefore, since "a party may raise

3  jurisdictional challenges at any time during the proceedings,"

4  Defendant's motion is proper. <u>Int'l Union of Operating Eng'rs v. Cnty.</u>

5  <u>of Plumas</u>, 559 F.3d 1041, 1043 (9th Cir. 2009) (internal quotation marks

6  omitted).

7       The Environmental Protection Agency promulgated the following

8  regulation concerning the RCRA presuit notice requirement:

9            Notice regarding an alleged violation of a permit,
             standard, regulation, condition, requirement, or
10           order which has become effective under [RCRA] shall
             include sufficient information to permit the
11           recipient to identify the specific permit,
             standard, regulation, condition, requirement, or
12           order which has allegedly been violated, the
             activity alleged to constitute a violation, the
13           person or persons responsible for the alleged
             violation, the date or dates of the violation, and
14           the full name, address, and telephone number of the
             person giving notice.
15

16  40 C.F.R. § 254.3(a) (2011). "It follows logically that the purpose of

17  notice to the alleged violator is to give it an opportunity to bring

18  itself into complete compliance with the Act and thus likewise render

19  unnecessary a citizen suit." <u>Cntr. for Biological Diversity</u>, 566 F.3d at

20  800. "[T]he notice must be sufficient in itself and, perforce, if the

21  desired change has been properly delineated and has been accomplished,

22  that, too, obviates the need or purpose of a citizen suit." <u>Id.</u> at 801.

23  In sum, there exists a "requirement that there be a true notice that

24  tells a target precisely what it allegedly did wrong, and when." <u>Id.</u>

25       Defendant argues in its reply brief that under the Ninth

26  Circuit standard, Plaintiff's notice of intent ("NOI") "did not include

27  sufficient information to allow Dopaco to remediate the alleged methane

28  contamination beneath the concrete foundation of the main building on

the Property." (Def.'s Reply 2:11-13.) Plaintiff's NOI to Defendant states as follows:

> This notice is based upon Dopaco's release of hazardous substances at its former printing facility in Stockton, California which "may present an imminent and substantial endangerment to health or the environment" within the meaning of RCRA section 7002(a)(1)(B).
>
> . . .
>
> Newark conducted an environmental investigation of the property that revealed soil and groundwater contamination with toluene, a hazardous substance. Dopaco used toluene as a solvent in its printing operations, and Newark's investigation demonstrated that the Site contamination was due to Dopaco's activities. Dopaco used solvents and water-based inks in its container printing operation. A November 26, 1985 Notice of Violation from the California Regional Water Quality Control Board confirms that Dopaco was responsible for spilling waste ink, solvents, and red ink at the Site. A copy of the notice is enclosed with this letter. Dopaco further owned and operated underground storage tanks used for such solvents but did not test or obtain an environmental assessment when those tanks were removed as is currently required under California law.
>
> . . .
>
> In its action, Newark will seek injunctive relief under RCRA for solid or hazardous waste contamination of soils and groundwater, which may pose, separately and collectively, an imminent and substantial endangerment to the environment. . . .
>
> Newark's ultimate goal is the cleanup of soil and groundwater at the Site. . . .

(Pulliam Decl. Ex. 1; ECF No. 273.) The information included in the NOI is sufficient to permit Defendant to identify "the specific . . . regulation . . . which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice." 40

1 C.F.R. § 254.3(a).

2        The crux of Defendant's argument in its motion, however, is
3 that "the NOI . . . does not identify the contaminant—methane gas—upon
4 which the alleged RCRA violation is based." (Def.'s Mot. 7:3-4.)
5 Defendant bases this argument on the following principle stated in Brod
6 v. Omya, Inc., 653 F.3d 156 (2d Cir. 2011):

7              when an alleged violation of RCRA depends on the
               presence or release of a particular contaminant,
8              the NOI must identify the contaminant alleged to be
               the basis of the violation with sufficient
9              specificity to permit the recipient to identify the
               specific legal provision alleged to be violated and
10             the activity alleged to constitute the violation.

11 Id. at 169. However, in making this argument, Defendant misconstrues
12 Plaintiff's RCRA claim; specifically, Defendant makes the conclusory
13 assertion that methane is a contaminant under RCRA and argues that the
14 presence of methane is the sole basis for the alleged violation. Rather,
15 as stated by Plaintiff in its opposition brief, Brod "is a far different
16 situation than here, where methane itself is not a RCRA hazardous waste,
17 nor was methane actually used by Dopaco in its operations. Rather,
18 [Plaintiff alleges] the methane is a natural metabolite of the actual
19 RCRA hazardous waste at issue—the toluene." (Pl.'s Opp'n 8:23-25.)
20 Therefore, even assuming, arguendo, the Second Circuit's requirement
21 that each alleged contaminant be specifically enumerated in the NOI were
22 to apply here, Plaintiff's NOI is sufficient.

23        Further, Defendant argues "Newark's presuit notice failed to
24 identify the . . . proper area of contamination" since "Newark's NOI
25 only identified alleged toluene contamination in the area of two waste
26 tanks located approximately 300 feet from the northwest corner of the
27 main building." (Def.'s Reply 3:3-8.) However, this argument is
28 contradicted by the plain language of the NOI; for example, the NOI

clearly references "underground storage tanks" as a potential source of the alleged toluene contamination. (Pulliam Decl. Ex. 1.)

Therefore, for the stated reasons, Defendant's motion is DENIED.

### ii. Defendant's Motion in Limine No. 2

Defendant seeks to exclude "evidence regarding the toluene product tank and its piping" which Plaintiff contends supports its RCRA claim, arguing "any release of toluene from the toluene product tank or its piping falls outside the scope of [RCRA]." (Def.'s Mot. 2:3-6.) Plaintiff opposes the motion, arguing "Dopaco's argument addresses the merits of Newark's claim that these leaks constitute 'disposals' of 'solid waste' as those terms are defined by RCRA. In other words, Dopaco's argument does not go to admissibility of Newark's evidence, but rather to how RCRA applies to it as a matter of law." (Pl.'s Opp'n 4:1-4.) Since this motion involves law and motion issues which should have been noticed for hearing before the prescribed last hearing date for such matters, it is DENIED.

### iii. Defendant's Motion in Limine No. 3

Defendant seeks to preclude Plaintiff from introducing any evidence regarding the waste tanks since Plaintiff has "ruled out the waste tanks as a potential source of the contamination" and "admitted that evidence related to the waste tanks is 'Not a Material Fact.'" (Def.'s Mot. 3:6-8.) Defendant argues this evidence is irrelevant under Federal Rule of Evidence ("FRE") 401 and therefore inadmissible under FRE 402. Id. 3:3-10. Plaintiff counters, arguing that evidence regarding the waste tanks is still "directly relevant to Dopaco's general carelessness with respect to its chemical handing practices which in turn is relevant to, among other issues, Newark's negligence causes of

action." (Pl.'s Opp'n 2:11-13.)

Defendant responds to this argument in its reply brief, contending that any evidence regarding the waste tanks "is irrelevant and inadmissible hearsay, and should be excluded as character evidence." (Def.'s Reply 2:7-8.) Further, Defendant enumerates the specific documents it seeks to exclude. However, this argument is disregarded since it was made for the first time in Defendant's reply brief. See U.S. v. Anderson, 472 F.3d 662, 668 (9th Cir. 2006)("Issues raised for the first time in an appellant's reply brief are generally deemed waived."); Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007)("The district court need not consider arguments raised for the first time in a reply brief.").

Since it is unclear what evidence is involved in this motion, and the record lacks sufficient factual context for an in limine ruling on this issue, this motion is DENIED.

### iv. Defendant's Motion in Limine No. 4

Defendant seeks to preclude Plaintiff from using Brian Gleason, Ben Valverde, and David Ascher as trial witnesses, arguing Plaintiff did not disclose these witnesses in accordance with Rule 26. In response, Plaintiff "voluntarily withdraws its general counsel David Ascher from the witness list, but [argues] the other two witnesses (Ben Valverde and Brian Gleason) can come as no surprise to Dopaco given the repeated revelation of those witnesses throughout the discovery process, including expert discovery." (Pl.'s Opp'n 1:27-2:2.)

Rule 26(e)(1) prescribes:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

1         (A) in a timely manner if the party learns that in
        some material respect the disclosure or response is
2         incomplete or incorrect, and if the additional or
        corrective information has not otherwise been made
3         known to the other parties during the discovery
        process or in writing.

4

5 Rule 37(c)(1) prescribes: "If a party fails to . . . identify a witness

6 as required by Rules 26(a) or (e), the party is not allowed to use that

7 . . . witness to supply evidence . . . at a trial, unless the failure

8 was substantially justified or is harmless." "The burden is on the party

9 facing sanctions to prove harmlessness [or substantial justification]."

10 Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th

11 Cir. 2001).

12       Concerning witness Gleason, Defendant argues Plaintiff did not

13 include him in its initial disclosures, did not supplement its witness

14 list to include him, and did not identify him in its discovery

15 responses. (Def.'s Mot. 4:10-12.) Plaintiff rejoins, arguing Gleason has

16 been made known since "Gleason's name and activities appear on 203

17 separate documents [produced in this case], nearly 10% of the total."

18 (Pl.'s Opp'n 3:6-7.) Plaintiff also contends Gleason's involvement in

19 the case "cannot be a surprise to [Defendant since] Gleason is the

20 broker who was retained by [Plaintiff] to find buyers for the

21 Property—an undertaking that failed due to the toluene contamination."

22 Id. 3:3-5.

23       However, "merely because [Gleason's] name . . . appeared,

24 among [numerous] other names, somewhere in the thousands of pages of

25 documents produced by [Plaintiff], does not mean that [Defendant] should

26 have anticipated that [Plaintiff] would call [Gleason] as [a] trial

27 witness[] and deposed [him] accordingly." Ty, Inc. v. Publ'ns Int'l,

28 Ltd., No. 99 C 5565, 2004 WL 421984, at *4 (N.D. Ill. Feb. 17, 2004).

1    Regarding witness Valverde, Defendant argues he was not made
2 known to Defendant since Plaintiff "did not produce the Valverde
3 Declaration until August 30, 2011." (Def.'s Mot. 4:2 n.1.) Plaintiff
4 counters, arguing the "declaration was specifically described in the
5 January 15, 2010 expert report of Keith O'Brien," and it "was produced
6 as part of Mr. O'Brien's expert reliance materials." (Pl.'s Opp'n 2:21-
7 27.) Further, Plaintiff contends, "Valverde was the Superintendent of
8 San Joaquin Packaging Company, which Dopaco incorrectly accuses of also
9 storing toluene in an underground storage tank at the site. . . .
10 Valverde's name, address, and phone number are listed on the first page
11 of the primary document Dopaco relies on in arguing that San Joaquin
12 Packaging Company used toluene." Id. 2:14-18. However, this is
13 insufficient to place Defendant on notice that Plaintiff intended to
14 call Valverde as a trial witness. See Fonseca v. City of Fresno, No. 10-
15 cv-00147, 2012 WL 44041, at *4-5 (E.D. Cal. Jan. 9, 2012) (rejecting the
16 use of a declaration at trial since the declarant was not identified in
17 any Rule 26 disclosures).

18    Further, Plaintiff has not met its burden of showing its
19 failure to identify Gleason and Valverde as witnesses was substantially
20 justified or harmless. Therefore, Defendant's motion is GRANTED.

21    **v.   Defendant's Motion in Limine No. 5**

22    Defendant argues "this Court should preclude [Plaintiff] from
23 introducing any . . . damages evidence [other than the costs of
24 remediating the alleged toluene contamination] including, but not
25 limited to, any diminution of value damages" since Plaintiff "never
26 supplemented its initial disclosures to allege any other category of
27 damages beyond remediation costs." (Def.'s Mot 2:4-6, 2:27-28.)
28 Plaintiff rejoins that it properly disclosed damages evidence under Rule

26(e), arguing "[t]he information regarding the diminution in the value of the Property has been made known to Dopaco in multiple ways." (Pl.'s Opp'n 2:13-14.) Plaintiff argues its "complaint specifically alleged diminution-in-value damages of greater than $1 million, [Plaintiff] produced the documents that support that calculation, and [Plaintiff] put forward a witness to testify on that topic." Id. 3:17-19.

Defendant also refers to excluding damages evidence of "carrying costs related to the Property" in both its motion and its reply brief. (Mot. 5:27; Reply 2:7-8.) However, since it is unclear what evidence is involved regarding carrying costs, this portion of the motion is DENIED.

Here, as Defendant acknowledges in its reply brief, the documents regarding the diminution of value were made known to Defendant in Plaintiff's response to Defendant's requests for production. (Def.'s Reply 3:1-13.) Further, Plaintiff's complaint includes the following statement: "[Plaintiff] has suffered and is expected to suffer damages, including diminution in the value of the Property, in an amount to be proved at trial, but which exceeds $1,000,000." (Compl. ¶¶ 40, 44; see also Poe Decl. Ex. 5 (Mullen Dep. 140:18-141:8 (demonstrating that Defendant's counsel posed questions and received responses from Mr. Mullen relating to the Property's value)); Decl. Supp. Pl.'s Mot. Partial Summ. J. Exs. 19-20, 22-28 (showing that on December 23, 2009, Plaintiff filed several exhibits associated with their motion disclosing communications with several prospective buyers' regarding interest in purchasing the Property and valuation of the Property).

Defendant also argues Plaintiff's "failure to disclose an expert on [diminution of value damages] . . . preclude[s] [it] from introducing such damages." (Def.'s Mot. 6:24-25.) Plaintiff rejoins,

arguing "Newark's former CEO Robert Mullen . . . will testify [on the topics of Plaintiff's damages and the value of the Property] at trial." (Pl.'s Opp'n 4:19-21.) "An owner may testify as to the reasonable value of the land. The weight of such testimony, is, of course, affected by the owner's knowledge of circumstances which affect value." White v. Atl. Richfield Co., 945 F.2d 1130, 1133 (9th Cir. 1991) (internal citations and quotation marks omitted); see also Lund v. Albrecht, 936 F.2d 459, 466 (9th Cir. 1991) ("[A]n officer [of the corporation] may be able to give personal opinion testimony on land value.").

For the stated reasons, this motion is DENIED.

**vi.  Defendant's Motion in Limine No. 6**

Defendant argues that since Plaintiff has offered no expert opinion on four of its theories of liability, Plaintiff should be precluded from arguing these theories at trial. Specifically, Defendant argues as follows:

> [Krasnoff's] report is absolutely silent on all four theories. Further, Newark also has not disclosed any supplemental reports disclosing these opinions or the basis and reasons for them. As such, and because all four theories are entirely unsupported by any documentary evidence, they should therefore be excluded.

(Def.'s Mot. 4:7-10.) Plaintiff opposes the motion, arguing "specific factual support for all four of these facts was provided in Newark's opposition [to Defendant's 2011 motion for summary judgment, and t]he factual support for each of these facts is not uniformly based upon expert testimony." (Pl.'s Opp'n 2:6-10 (internal citations omitted).)

Since this motion involves law and motion issues filed after the prescribed last hearing date for such matters, it is DENIED.

**vii. Defendant's Motion in Limine No. 7**

Defendant seeks exclusion of all evidence regarding Marcor,

arguing as follows: "Because Newark prevented Dopaco from subpoenaing documents from Marcor and deposing Marcor employees, this Court should preclude Newark from introducing evidence regarding Marcor at trial to support its claims." (Def.'s Mot. 2:3-5.) Plaintiff opposes the motion, arguing "it was this Court and Magistrate Judge Drozd, not Newark, that prevented Dopaco from the unfettered discovery it demanded. Dopaco may think that the Court erred in making that ruling, but Dopaco cites no authority suggesting that Newark should not be permitted to use evidence that was produced simply because Dopaco was reined-in from pursuing evidence that was not produced." (Pl.'s Opp'n 2:25-3:4 (emphasis omitted).) Since the Magistrate Judge previously considered a discovery motion involving the issues Defendant raises, and Defendant failed to seek review of the Magistrate Judge's ruling as authorized under the applicable local rule, Defendant has not shown this motion is appropriate for judicial decision at this stage of the proceeding. (ECF No. 154.) Therefore, this portion of the motion is DENIED.

Further, Defendant argues Plaintiff "should be estopped from using at trial what it was unwilling to disclose during discovery." (Def.'s Mot. 5:3-4.) Plaintiff responds, stating in its opposition brief that it "does not intend to rely on previously undisclosed Marcor documents or witnesses." (Pl.'s Opp'n 1:27-2:2.) Therefore, since Defendant has not shown that this portion of the motion involves a controversy warranting a decision, it is also DENIED.

**viii. Defendant's Motion in Limine No. 8**

In its motion, Defendant seeks the following relief:

> [Plaintiff's] fate and transport expert, [O'Brien], should be precluded from offering any testimony that: (1) spills likely happened in the operations conducted by Dopaco; and (2) the cement sumps in the basement used by Dopaco allowed toluene to

> escape to the subsurface below the basement because
> of cracks or joints in the concrete on the grounds
> these opinions are inadmissible under Federal Rule
> of Evidence 702 and Daubert.

(Def.'s Mot. 2:3-7.) In its argument, however, Defendant is unclear concerning to which evidence it is referring. Further, in its reply brief, Defendant contradicts certain language in its motion, where Defendant argues the motion "has nothing to do with underground leaks or . . . that the sumps and pits in the basement were impervious to leaks." (Def.'s Reply 2:4-6.) Since the opening brief for the motion does not explain what evidence is involved in this motion, the motion is DENIED.

   **ix.  Defendant's Motion in Limine No. 9**

   Defendant seeks to preclude Plaintiff from offering evidence identifying Defendant as the cause of the toluene contamination, arguing: "Because Newark failed to engage in a proper differential diagnosis under Daubert, Newark should be precluded from offering any expert opinion that Dopaco caused the contamination at issue." (Def.'s Mot. 6:3-5.) Specifically, Defendant argues "[t]he failure to evaluate other toluene users as potential sources of the contamination renders the differential diagnosis unreliable and inadmissible under Daubert." Id. 2:10-11. Plaintiff counters, arguing "O'Brien did not undertake a 'differential diagnosis' at all, and there was no reason for him to do so, because a differential diagnosis is only appropriate where the investigator is attempting to identify the sole cause of a particular condition." (Pl.'s Opp'n 2:1-3.)

   "Differential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under Daubert." Clausen v. M/V New Carissa, 339 F.3d 1049, 1057 (9th Cir. 2003). A differential

diagnosis "is a process by which an expert compiles a comprehensive list of potential causes and then engages in a process of elimination to reach the most likely cause." In re Hanford Nuclear Reservation Litig., 534 F.3d 986, 1014 (9th Cir. 2008); see also Clausen, 339 F.3d at 1057 ("Differential diagnosis is the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." (internal quotation marks omitted)).

However, as argued by Plaintiff, "[a] 'differential diagnosis' is simply one means of demonstrating causation, not a fundamental requirement of every expert opinion." (Pl.'s Opp'n 2:17-19.) Here, "[Plaintiff's experts] did not purport to employ differential diagnosis, and Clausen does not preclude the use of all other methods to determine the cause . . . ." Millenkamp v. Davisco Foods Int'l, Inc., 562 F.3d 971, 979 (9th Cir. 2009). Therefore, Defendant's motion is DENIED.

**x.   Defendant's Motion in Limine No. 10**

Defendant seeks to "preclude Newark from offering any evidence or arguments that methane gas is present in the ambient air or that any such gas poses a threat to Marcor workers" since Plaintiff "has not produced any admissible evidence proving the presence of methane gas in the ambient air, nor has it produced any admissible evidence that the supposed presence of methane gas poses an actual threat to any Marcor workers." (Def.'s Mot. 2:7-14.)

Since this motion involves law and motion issues filed after the prescribed last hearing date for such matters, it is DENIED.

**B.   Plaintiff's Motion in Limine**

Plaintiff seeks "an order barring Dopaco's expert witness, Dr. Patrick Lucia, from offering expert testimony on two topics: (1) the

source of the high methane concentrations that both sides have found under the foundation of the main building on the Property, and (2) the risks that the toluene and the methane contamination present to human health and safety." (Pl.'s Mot. 1:5-9.) Defendant opposes the motion.

### i.   The Source of the Methane Contamination

Plaintiff argues, *inter alia*, that Lucia should be precluded from offering testimony on the source of the high methane concentrations since his "new theory that the methane comes from some unspecified degrading organic material in the soil is not found in his expert report." Id. 6:9-10. Defendant counters, arguing "Lucia's report properly disclosed his opinions regarding potential causes of methane gas." (Def.'s Opp'n 8:5-6.) In support of this argument, Defendant provides the following statement from Lucia's report: "there is another and much more likely source of methane gas under the building slab. The major constituent of natural gas is methane, which is most commonly derived from the degradation of organic material." (Pulliam Decl. Ex. C.)

In its reply brief, Plaintiff argues "read in context, [this statement] does not disclose a theory that the methane comes from degrading organic material in the shallow soil immediately under the building, but rather that it comes from the Stockton Gas Field." (Pl.'s Reply 3:8-10.) Further, Plaintiff argues "[t]he only opinion that Dr. Lucia . . . disclosed . . . is his theory that 'the natural gas field beneath the City of Stockton is a much more probable source of the methane detected under the building.' Accordingly, Dr. Lucia is free to offer *that* testimony at trial." Id. 6:1-3 (quoting Pulliam Decl. Ex. C).

Defendant also contends since "Dopaco has no obligation to prove the cause of the methane gas beneath the concrete foundation, it

follows that Dopaco has no obligation to *prove* that degrading organics, natural gas, or any other *source* of methane gas other than toluene, caused the methane gas at issue." (Def.'s Opp'n 9:22-25.) Further, Defendant argues it is "entitled to show that organics, natural gas, and causes of methane gas other than toluene *may* cause methane gas, because such proof satisfies Rule 401's undemanding test for 'relevant evidence.'" Id. 9:25-28. However, these arguments conflate the issue Plaintiff raises regarding expert witness disclosures with what constitutes relevant evidence.

Rule 26(a)(2) requires that an expert witness provide a written report, which must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Rule 26 "imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Fed. R. Civ. P. 26 advisory committee's note. "[T]he report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness . . . ." Id. "Rule 37(c) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." Jarritos, Inc. v. Reyes, 345 F. App'x 215, 216 (9th Cir. 2009).

Lucia's expert report states as follows regarding the "most probable source of methane below the building slab":

> The methane gas below the building slab is not derived from the degradation of toluene as speculated by Mr. Krasnoff. With the exception of a single soil sample with a low concentration of toluene, there is no toluene in soil or groundwater

under the building. However, there is another and much more likely source of methane gas under the building slab. The major constituent of natural gas is methane, which is most commonly derived from the degradation of organic material. In the last century natural gas was produced from wells at numerous locations throughout the State of California. In the State of California " . . . by far the greatest production [of natural gas] comes from wells at the City of Stockton" (Whiteshot, 1905). The location of the Stockton Gas Field is shown on the attached Figure 2 (State of California, Department of Conservation, Division of Oil, Gas, and Geothermal Resources, 9 March 2007). As shown in the figure, the Site is located within the Stockton Gas Field. This figure also shows the locations of numerous gas wells that have been plugged and abandoned within the City of Stockton. Given the historical development of methane as natural gas in the Stockton Gas Field, and the location of the site within that field, the most probable source of the methane detected under the building is natural gas.

The high concentrations of methane in the samples at the site are consistent with the methane as natural gas degraded from naturally occurring organic material. Whiteshot, 1905 reports that the composition of natural gas from five (5) gas wells in the city of Stockton have a concentration of methane ranging from about 66% to about 78%. These high levels of methane are consistent with the results shown on Table 1 for samples at 800 West Church Street, Stockton, California.

Given the total absence of toluene in groundwater the natural gas field beneath the City of Stockton is a much more probable source of the methane detected under the building.

. . .

The methane gas found in soil gas under the building slab is not the result of degradation of toluene. The building slab is located over the Stockton Gas Field, as shown in Figure 2. The methane concentrations measured in the soil gas samples are consistent with the concentrations of methane gas seen in natural gas from gas wells located within the City of Stockton. The possibility that methane gas is derived from the degradation of toluene is virtually nonexistent given the absence of toluene in groundwater beneath the building.

1  (Poe Decl. Ex. 4.) In his deposition, however, Lucia averred an

2  additional opinion regarding the source of the methane as follows:

3      Q.  So is it your opinion that—that natural gas
           that is created at that depth from these
4          thermogenic processes is constantly migrating
           up and coming out of the surface of the soil?

5

6      A.  Well, I think there's probably several things
           going on. And that there was a map test in my
7          report. There's a number of—wells within the
           Stockton area which—going through the—to those
8          depths that were sealed at some unknown time
           at—by some unknown folks to some unknown
9          degree, and that's—that's—that's one possible
           source.

10             But the more—more probable source is that
           the situation that created this gas field is
11         the location of the City of Stockton and its
           location in the valley and the fact that
12         there's—this is a depositional environment
           over which sediments have—containing a lot of
13         organic matter have been placed over millions
           of years. So it's a depositional environment
14         that created these fields and it created the
           stratigraphy above it.

15

16     Q.  So wait. Is it your opinion or not that the
           methane that is under the slab at 800 West
17         Church Street is methane that migrated up from
           a depth of 2,000 feet?

18     A.  No, I don't believe it's a methane that
           migrated up from 2,000 feet. I think it's
19         methane that's derived from soil that's
           created in—in—the methane you see at 2,000
20         feet was created because it was an area
           subject to a lot of deposition, and that
21         deposition has continued for a million years
           or so. But that same processes are going on
22         today and creating soils which can degrade to
           methane.

23

24  (Poe Decl. Ex. 9, 433:8-434:12.) Although Lucia relies upon the same

25  underlying scientific principles in forming each opinion—that degrading

26  organic material produces natural gas containing concentrations of

27  methane—he did not disclose in any expert report his opinion that

28  (1) organic material is present in the soil directly beneath the

1   foundation on the Property, and (2) this organic material is the cause
2   of the high levels of methane beneath the foundation on the Property.
3   "In short, Defendant[] seek[s] to add . . . [a] theor[y] that should
4   have been either included in the original report or in a timely
5   submitted supplemental report." Cueto v. Overseas Shipholding Group,
6   Inc., No. 10cv1243, 2012 WL 28357, at *2 (S.D. Cal. Jan 4, 2012).

7        Rule "37(c)(1) forbids the use at trial . . . of any
8   information not properly disclosed under Rule 26(a) unless the failure
9   to disclose is substantially justified or harmless." Bess v. Cate, 422
10  F. App'x 569, 572 (9th Cir. 2011). Defendant has the burden of showing
11  that its omission was substantially justified or harmless under Rule 37,
12  and failed to satisfy that burden. See U.S. ex rel. O'Connell v. Chapman
13  Univ., 245 F.R.D. 652, 655 (C.D. Cal. Sept. 19, 2007) ("Yet, here,
14  relators inexplicably fail to address whether their violation of
15  Rule(a)(2)(B) is harmless; rather, they continue to argue the two-page
16  letter complies with Rule 26. . . . [T]he Court finds relators' failure
17  to comply with Rule 26(a) is not harmless and defendant has been
18  prejudiced."). Therefore, Lucia is precluded from giving this opinion at
19  trial since it exceeds the scope of his opinions disclosed in his expert
20  report regarding the source of methane beneath the foundation.

21        ii.   **Lucia's Qualifications**

22        Plaintiff also argues "Lucia has no qualifications to testify
23  as to the risks presented by environmental contamination, nor to the
24  risks presented by methane accumulation under buildings, and thus should
25  not be permitted to offer any expert opinion on those topics." (Pl.'s
26  Mot. 10:17-19.) Specifically, Plaintiff contends "Lucia's curriculum
27  vitae reveals no experience, training, or education in [either] the area
28  of evaluating the risks to human health from environmental

contamination, . . . [or] in evaluating the safety risks posed by
methane accumulation, either during demolition of a building or as to
future construction activities." Id. 11:5-8.

Defendant opposes the motion, arguing "Lucia's knowledge,
skills, experience, training, and education demonstrate that he is
qualified to offer opinions regarding the health risks posed by the
alleged contamination." (Def.'s Opp'n 12:1-2.) Specifically, Defendant
argues as follows:

> During his more than 25-year career as an
> environmental engineer, Dr. Lucia has worked on
> hundreds of environmental projects. In virtually
> every project, the objective was to evaluate and,
> if necessary, mitigate any risks to human health
> and the environment. On these projects, Dr. Lucia
> has supervised and coordinated teams of
> professionals including groundwater hydrologists,
> environmental engineers, fate and transport
> modelers, chemists, toxicologists, remediation
> engineers and scientists, each of whom contributes
> their expertise to the evaluation of risk and the
> appropriate remedial mitigation to meet health and
> environmental risk objectives. Risk assessment is a
> process that requires the input of numerous
> technical experts, and which must be supervised by
> an individual with the type of technical expertise
> and qualifications possessed by Dr. Lucia.

Id. 12:3-12. In support of this argument, Defendant produces Lucia's
curriculum vitae, which identifies the following experience: "Remedial
investigation and feasibility study at a former electronics facility
with contaminated soil and ground water. Studies included evaluation of
human health risk and alternative water supplies for ground water
users." (Pulliam Decl. Ex. E.) Further, Lucia's curriculum vitae states
the following "representative experience":

> Dr. Lucia is a civil engineer specializing in the
> areas of geotechnical engineering and waste
> management. During more than 25 years of
> professional practice, he has been responsible for
> directing a broad range of projects that have

19

required expertise in foundation, soil, and
earthquake engineering at various facilities
ranging from industrial commercial sites to power
plants. He also has directed investigation and
remediation of soil, surface water and groundwater
contamination at sites regulated under the
Comprehensive Environmental Response, Liability,
and Compensation Act (CERCLA) and the Resource
Conservation and Recovery Act (RCRA). During these
assignments, he has had extensive interaction with
federal, state and local regulatory agencies. In
addition, he provides litigation support on
geotechnical and environmental, and has provided
depositions and testimony at trial.

Id. In its reply brief, Plaintiff argues Defendant "did not submit any
declaration from Dr. Lucia or other additional evidence to counter
[Plaintiff's] argument that he lacks any expertise in the relevant area
of knowledge." (Pl.'s Reply 7:1-3.)

        "In determining whether expert testimony should be admitted,
the court must first determine whether a proposed witness's qualifying
training or experience, and resultant specialized knowledge, are
sufficiently related to the issues and evidence before the trier of fact
that the witness's proposed testimony will be of assistance to the trier
of fact." Prest v. Jermstad, No. 07cv1771, 2009 WL 3634114, at *4 (S.D.
Cal. Oct. 30, 2009) (internal quotation marks omitted). However, since
the record lacks sufficient factual context for an in limine ruling on
this issue, this portion of Plaintiff's motion is DENIED.

Dated:  March 14, 2012

                                    _____
                                    GARLAND E. BURRELL, JR.
                                    United States District Judge

20